# EXHIBIT A

CSC



# Notice of Service of Process

**Primary Contact:** Shani Pipkin
Pulte Group
27401 Los Altos
Ste 400
Mission Viejo, CA 92691-8550

**Electronic copy provided to:** Jane Celovsky

| | |
|---|---|
| **Entity:** | Pulte Homes Tennessee Limited Partnership<br>Entity ID Number 2633838 |
| **Entity Served:** | Pulte Homes Tennessee Limited Partnership |
| **Title of Action:** | Eileen Longstreet vs. Pulte Homes Tennessee Limited Partnership |
| **Matter Name/ID:** | Eileen Longstreet vs. Pulte Homes Tennessee, Inc. (16231299) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Maury County Chancery Court, TN |
| **Case/Reference No:** | 25-238 |
| **Jurisdiction Served:** | Tennessee |
| **Date Served on CSC:** | 05/02/2025 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Belcher Sykes Harrington, PLLC<br>615-810-8777 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674 (888) 690-2882 | sop@cscglobal.com

CHANCERY COURT SUMMONS | MAURY COUNTY | COLUMBIA, TENNESSEE

STATE OF TENNESSEE
22nd JUDICIAL DISTRICT

FILE NO. 25-238

EILEEN LONGSTREET

Plaintiff

VS.

PULTE HOMES TENNESSEE LIMITED PARTNERSHIP

(to be served by cerified mail)

Corporation Service Company

2908 Poston Avenue

Nashville, TN 37203

Defendant

FILED
CHANCERY COURT
APR 30 2025
A.M.___ P.M.___
LARRY ROE, JR. C&M

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in Chancery Court, Maury County, Tennessee, and your defense must be made within thirty (30) days from the date this summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgement by default can be rendered against you for the relief demanded in the complaint.

Issued: 4-30, 20 25

LARRY M. ROE, JR.
Chancery Court Clerk
Maury County, Tennessee

By: Carol Edwards
Deputy Clerk

ATTORNEY FOR PLAINTIFF John O. Belcher, Esq., Belcher Sykes Harrington, PLLC
320 Seven Springs Way, Ste 110, Brentwood, TN 37027
or Address

PLAINTIFF'S ADDRESS ____________________

TO THE SHERIFF:

Please execute this summons and make your return hereon as provided by law. LARRY M. ROE, JR.
Chancery Court Clerk

Received this summons for service this ________ day of ____________________, 20___.

____________________
SHERIFF

CHANCERY 03

ADA
FOR ASSISTANCE CALL
931-375-1100

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the_____________________ day of___________________________________, I

[ ] served this summons and complaint/petition on__________________________________________________

_____________________________________________________________________________in the following manner:

______________________________________________________________________________________________

[ ] failed to serve this summons within 30 days after its issuance because:_________________________________

______________________________________________________________________________________________

______________________________
Sheriff/Process Server

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the___________________ day of___________________________ I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in Case No.________ to the defendant, _________________________________. On the______________ day of_____________________________ I received the return receipt for said registered or certified mail, which had been signed by_______________________________ on the _______________day of_____________________________. Said return receipt is attached to this original summons and both documents are being sent herewith to the Chancery Court Clerk for filing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS ___________

DAY OF________________________, 20____.

______________________________________________________

___________NOTARY PUBLIC or ___________DEPUTY CLERK

MY COMMISSION EXPIRES:________________________________

______________________________
PLAINTIFF, PLAINTIFF'S ATTORNEY OR OTHER PERSON AUTHORIZED BY STATUTE TO SERVE PROCESS.

NOTICE

TO THE DEFENDANT (S):
Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgement. If a judgement should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgement becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

STATE OF TENNESSEE
COUNTY OF MAURY

(To be completed only if copy certification required).

I, Larry M. Roe, Jr., Clerk of the Chancery Court in the State and County aforesaid, do hereby certify this to be a true and correct copy of the original summons issued in this case.

LARRY M. ROE, JR., CLERK

By:__________________________________D.C.

CHANCERY COURT SUMMONS | MAURY COUNTY | COLUMBIA, TENNESSEE

STATE OF TENNESSEE
22nd JUDICIAL DISTRICT

FILE NO. 25-238

EILEEN LONGSTREET

Plaintiff

VS.

PULTE HOMES TENNESSEE LIMITED PARTNERSHIP
(to be served by cerified mail)
Corporation Service Company
2908 Poston Avenue
Nashville, TN 37203

Defendant

FILED
CHANCERY COURT
APR 3 0 2025
A.M.___ P.M.___
LARRY ROE, JR. C&M

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in Chancery Court, Maury County, Tennessee, and your defense must be made within thirty (30) days from the date this summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgement by default can be rendered against you for the relief demanded in the complaint.

Issued: 4-30, 2025

LARRY M. ROE, JR.
Chancery Court Clerk
Maury County, Tennessee

By: Cindy Edwards
Deputy Clerk

ATTORNEY FOR PLAINTIFF John O. Belcher, Esq., Belcher Sykes Harrington, PLLC
320 Seven Springs Way, Ste 110, Brentwood, TN 37027
Address

or

PLAINTIFF'S ADDRESS ________________

TO THE SHERIFF:

Please execute this summons and make your return hereon as provided by law. LARRY M. ROE, JR.
Chancery Court Clerk

Received this summons for service this ______ day of __________, 20___.

________________
SHERIFF

ADA
FOR ASSISTANCE CALL
931-375-1100

CHANCERY 03

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the____________________ day of________________________________, I

☐ served this summons and complaint/petition on_________________________________________________

_______________________________________________________________________in the following manner:

______________________________________________________________________________________

☐ failed to serve this summons within 30 days after its issuance because:_____________________________

______________________________________________________________________________________

______________________________
Sheriff/Process Server

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the___________________ day of_____________________________ I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in Case No.________ to the defendant, _____________________________________. On the______________ day of______________________________ I received the return receipt for said registered or certified mail, which had been signed by________________________________ on the ________________day of____________________________.
Said return receipt is attached to this original summons and both documents are being sent herewith to the Chancery Court Clerk for filing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS ___________

DAY OF_________________________, 20____.

_____________________________________________________

___________NOTARY PUBLIC or ___________DEPUTY CLERK

MY COMMISSION EXPIRES:________________________________

______________________________
PLAINTIFF, PLAINTIFF'S ATTORNEY OR OTHER PERSON AUTHORIZED BY STATUTE TO SERVE PROCESS.

### NOTICE

TO THE DEFENDANT (S):
Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgement. If a judgement should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgement becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

STATE OF TENNESSEE
COUNTY OF MAURY

(To be completed only if copy certification required).

I, Larry M. Roe, Jr., Clerk of the Chancery Court in the State and County aforesaid, do hereby certify this to be a true and correct copy of the original summons issued in this case.

LARRY M. ROE, JR., CLERK

By:_________________________________D.C.

IN THE CHANCERY COURT FOR MAURY COUNTY, TENNESSEE

| | | |
|---|---|---|
| **EILEEN LONGSTREET,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No. 25-238 |
| | ) | |
| **PULTE HOMES TENNESSEE LIMITED PARTNERSHIP,** | ) | FILED CHANCERY COURT |
| | ) | APR 30 2025 |
| | ) | |
| **Defendant.** | ) | A.M.___ P.M.___ LARRY ROE, JR. C&M |

**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES**

The Plaintiff, Eileen Longstreet, by and through counsel, hereby states her claims against the Defendant, Pulte Homes Tennessee Limited Partnership ("Pulte"), as follows:

## INTRODUCTORY STATEMENT

This case is about a builder's obligation to turn over control of a homeowner's association to the homeowners. In 2015 Pulte announced that it was going to develop an active adult community in Maury County named Southern Springs. In 2018 Ms. Longstreet purchased a home in Southern Springs. Seven years later, Pulte still has not turned over control of the homeowner's association to the homeowners, depriving them of their ability to govern their own community, monitor how their dues are spent, and make decisions for themselves.

## PARTIES

1. Eileen Longstreet resides in the Southern Springs community in Spring Hill, Maury County, Tennessee. Ms. Longstreet has resided in Southern Springs since she purchased her home from Pulte on or around September 19, 2018. A copy of Ms. Longstreet's Special Warranty Deed is attached hereto as **EXHIBIT A.**

2. Pulte Homes Tennessee Limited Partnership (referred to herein as "Pulte") is a Nevada limited partnership and is licensed to do business in the state of Tennessee, with a principal business address at 1635 Village Center Circle, Suite 250, Las Vegas, Nevada 89134, and a registered agent for service of process of Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee, 37203.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of this action pursuant to Tenn. Code Ann. §16-1-101 and §20-4-101, *et seq.*

4. Venue is proper in this judicial district and county pursuant to Tenn. Code Ann. § 16-11-115.

## FACTS

5. The Southern Springs community ("Southern Springs") is a common-interest community for adults over 55 years of age located in Maury County, Tennessee.

6. Southern Springs is governed by the Southern Springs Homeowners Association, Inc. (the "HOA"). The HOA is a Tennessee nonprofit corporation, with a principal business address of 1033 Demonbreun Street, Suite 300, Nashville, TN 37203,

and a registered agent for service of process of First Service Residential Tennessee, LLC, 1033 Demonbreun Street, Suite 300, Nashville, TN 37203.

7. Pulte owned the Southern Springs property and began developing the Southern Springs subdivision in approximately 2016.

8. Pulte has controlled the HOA since the HOA's inception.

**The Declaration**

9. The properties located at Southern Springs are made subject to certain declarations of covenants, conditions, and restrictions for Southern Springs, as evidenced by the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Southern Springs of Record in Book R2409, Page 686, and recorded with the Maury County Register of Deeds on December 27, 2016 (the "Declaration"). A copy of the Declaration is attached hereto as **EXHIBIT B**.[1]

10. The cover page of the Declaration describes Southern Springs as "an age restricted community intended to provide housing for older persons."

11. The recitals in the Declaration provide for the creation of the HOA (which it refers to as the Southern Springs Community Association, a Tennessee non-profit corporation) "to own, operate and maintain the Common Area, and to administer and enforce the provisions of the Governing Documents."

12. Pulte is the Declarant that issued, and signed, the Declaration.

---

1 The Declaration is itself an amendment, amending the Declaration of Covenants, Conditions, and Restrictions that was recorded at Book R2398, Page 55. Subsequently, the Declaration has been amended numerous times, as evidenced by further recordings with the Maury County Register of Deeds.

13. The Declaration contemplates that the HOA shall have a Board of Directors, which shall be "the body responsible for administration of the Association..." (Declaration, Section 1.8).

14. Section 1.17 of the Declaration defines the "Declarant Control Period" as:

> The period commencing upon the recording of this Declaration and ending upon the first to occur of:
>
> (a) The end of the Development Period or
>
> (b) The date designated in written notice recorded in public records as being the end of the Declarant Control Period.

15. The Declaration defines the Development Period as, "the period of time commencing upon the recording of this Declaration and at such time as Declarant no longer holds or controls title to any portion of the real estate which is described in Exhibit B [to the Declaration]." (Declaration, Section 1.9).

16. Exhibit B to the Declaration provides as follows:

> (Additional Property Which May Be Subjected to Declaration)
>
> Any real property located within three (3) miles of any part of the Property.

17. Section 3.1 of the Declaration states as follows:

> The Association shall be **the entity responsible for management**, maintenance, operation and control of the Area of Common Responsibility; **the primary entity responsible for compliance with and enforcement of the Governing Documents**; and, to the extent provided for in Article IX, shall be responsible for exercising architectural control and for administering, monitoring compliance with, and enforcing all architectural standards, including any Design Guidelines. The Association shall perform its functions in accordance with the Governing Documents and the laws of the State of Tennessee.
>
> (Emphasis added.)

18. Article III, Sections 3.2 and 3.2 of the Declaration provides that owners of residences in Southern Springs are members of the HOA, with one Voting Member per household.

19. Section 3.3(a) of the Declaration states as follows:

> **DURING THE DECLARANT CONTROL PERIOD, ALL OF THE VOTING RIGHTS OF THE OWNERS AT ANY MEETING OF THE MEMBERS OF THE ASSOCIATION OR OTHERWISE EXERCISED OR CAST AS BY LAW ALLOWED SHALL BE VESTED EXCLUSIVELY IN THE DECLARANT, AND OWNERS OTHER THAN THE DECLARANT SHALL HAVE NO VOTING RIGHTS.**

(Emphasis added.)

20. Accordingly, the Members have **no** voting rights during the "Declarant Control Period;" rather, voting rights are not vested in the Members until **after** the Declarant turns the HOA over to the Members.

21. Article VIII, Section 8.1 entitles the HOA to levy assessments against each residence for Association expenses as the Board of Directors may specifically authorize from time to time.

22. According to Article VIII:

> The assessments levied by the Association pursuant to the authority granted in this Article VIII, **shall be used exclusively to promote the recreation, health, safety, and welfare of the Owners and other residents of the Properties** to the fullest extent authority or responsibility is granted to the Association hereunder and to discharge all rights, privileges, and duties assigned or allowed to the Association hereunder...

(Emphasis added.)

23. During the Declarant Control Period or the Development Period the Declarant has several exclusive rights, including but not limited to, the following:

a. Convey any portion of the Properties to the Association as "common areas" without notice to Members (Section 1.12);

b. Determine the community-wide standards of conduct, maintenance, or other activity generally prevailing throughout the Properties and can modify them at any time (Section 1.14);

c. Sole discretion to modify, amend, or revise the master plan (Section 1.29);

d. Sole discretion to revise, modify, reconfigure, or withdraw any recorded plat at any time (Section 1.41);

e. Holds all voting power of the Members (Section 3.3);

f. Sole right, power, and authority to convey any portion of the Properties to local, state, or federal governments (Section 4.7);

g. Add or withdraw real property from the Declaration (Article VII);

h. Exercise architectural control (Article IX);

i. The unilateral right and power to appoint and remove any director or officer of the Association (Article 13.1)

j. Maintain sales offices, management offices, signs advertising on the Property (Section 13.3);

k. Use easements through the Common Area for the purpose of making improvements (Section 13.4);

l. Use Common Area for special events without paying fees or charges (Section 13.9);

m. Unilaterally amend the Declaration (Section 16.2).

## The HOA

24. The HOA was incorporated on or around October 18, 2016.

25. The HOA filed a Charter, a copy of which is attached hereto as **EXHIBIT C**.

26. The HOA has Bylaws that incorporate the Declaration by reference. A copy of the Bylaws are attached hereto as **EXHIBIT D**.

27. According to the Charter, one of the purposes of the HOA is to "provide an entity for the ***furtherance of the interest of the Owners*** of Dwelling Units in Southern Springs" (emphasis added).

28. According to Section 1.4 of the Bylaws, the purpose of the HOA is to "own and operate the recreational and other common areas, to provide recreation facilities and activities, and to carry out other functions for the maintenance and governance of Southern Springs, an age-restricted community for fifty-five (55) and older."

29. The HOA is governed by a Board of Directors (the "Board").

30. Section 3.2 of the Bylaws state that during the Declarant Control Period, "**all of the Directors shall be appointed by the Declarant acting in its sole discretion and shall serve at the pleasure of the Declarant**." (Emphasis added.)

31. As of the filing of this Complaint, Pulte remains in complete control of the HOA.

32. The HOA's Board consists of 5 Pulte employees and 2 resident Owners/Members.

33. The HOA determines what assessments will be levied against the homeowners/members, how the homeowners/members' money will be spent, and how the homeowners/members will be governed.

## Southern Springs

34. Pulte initially represented to homeowners that Southern Springs would be limited to 600 homes. Pulte finished constructing the initial 600 residences in 2020-2021.

35. Pulte has since constructed an additional 200 residences in Southern Springs (without the homeowners' input or consent), and further sought to expand the subdivision by adding 138 more homes. For example, Pulte executed a Supplemental Declaration on October 5, 2022 annexing certain properties and making them subject to the Declaration (see **EXHIBIT E**), and it executed a Supplemental Declaration on December 17, 2024 (see **EXHIBIT F**) whereby it sought to "subject the provisions of the Declaration" to additional properties.

36. While Pulte expanded Southern Springs by 200 residences, the initial 600 Members continue to have no voting rights.

37. On information and belief, Pulte sold the last of those 800 houses in Southern Springs in 2023.

38. Despite the majority of residents living in Southern Springs for several years, they have absolutely no say in the HOA that they are supposed to govern.

39. The Declaration does not contain a date certain for Pulte to turn over control of the HOA to the homeowners/members.

40. As Pulte wrote the Declaration, Pulte could theoretically maintain control over the Association in perpetuity, so long as it holds or controls title to any portion of real property located in Southern Springs or within three (3) miles of *any* part of Southern Springs.

41. In addition to having no voting rights or control over their own subdivision, the Members' repeated requests to attend meetings of the Pulte-controlled Board have been denied.

42. In January 2024, 430-plus Members petitioned the HOA's Board of Directors to hold a special meeting to discuss, among other things, the transition of the HOA to the Members. The Board denied their request.

43. In addition to having no voting rights, no governance rights in the Association, and no access to the Pulte-controlled Board meetings, Ms. Longstreet has made multiple, repeated requests for various, specific HOA information and records since 2021, including, but not limited to, requests made on August 30, 2024, January 9, 2025 and in February and March 2025.

44. Certain of Ms. Longstreet's requests have been denied or ignored, and when responses have been provided, they have been delayed and/or incomplete.

45. Any financial information produced by the Board fails to fully explain several issues that concern Ms. Longstreet and other Members, including, but not limited to:

a. the basis of a purported $1,140,000 loan that is being paid by the HOA to Pulte, and all relevant facts relating thereto;

b. why the HOA has hired numerous different management companies in six or so years; and

c. why a significant percentage of the HOA's budget is going to "landscaping," and whether that expense is specific to Southern Springs.

46. Ms. Longstreet, and other Members, are concerned about the lack of financial transparency, and, in particular, Ms. Longstreet wishes to know all relevant details regarding the purported $1,140,000 loan that is being paid by the HOA to Pulte.

47. The HOA's Board of Directors created a Finance Committee that, on information and belief, includes three resident members that the Board selected. On information and belief, these committee members were required to sign non-disclosure agreements to serve on the Finance Committee.

48. Additionally, with respect to the speakers that pay a fee to speak to the Homeowners, the HOA has provided no clarity about the amount the HOA charges the speakers, and where the funds collected from the speaker fees go.

49. Ms. Longstreet has repeatedly raised her concerns with Pulte and the HOA. As a homeowner/Member of the HOA, Ms. Longstreet is entitled to participate in community decisions that affect her finances, and to receive full and transparent information about HOA payments.

50. In response to her demands, the HOA Board and the Management Company hired by the HOA and/or Pulte have retaliated against Ms. Longstreet for voicing her concerns by removing her from, or restricting her access to, the community website, and punitively assessing violations against her.

51. On August 4, 2023, the HOA Board of Directors told Homeowners in the association newsletter that they anticipated Pulte would turn over the HOA to residents at the end of 2024. A copy of that newsletter is attached hereto as **EXHIBIT G**.

52. As of the filing of this Complaint in April 2025, Pulte has not turned over the HOA to the Homeowners.

53. Pulte has unreasonably retained control of the HOA, and has failed to timely turn over control of the HOA to the owners/members.

**COUNT ONE**
**Breach of Contract/Failure to Turn Over Control to Members/ Injunctive Relief/Declaratory Judgment**

54. Ms. Longstreet incorporates Paragraphs 1-53 herein.

55. Ms. Longstreet respectfully requests that the Court determine that Pulte has breached the Declaration and/or the common law, and/or enter a Declaratory Judgment pursuant to Tenn. Code Ann. §29-14-101, *et seq.*, finding that Pulte has failed to reasonably turn over control of the HOA to the homeowners/members of Southern Springs, and require Pulte to turn over control of the HOA to the homeowners/Members, and/or declare the rights of the homeowners/members under the Declaration.

56. A court may exercise its equitable powers to fashion an appropriate remedy upon a finding that the developer of a common interest community has failed to turn over authority to the homeowner's association. *Conn v. Donlon*, E2022-00419-COA-R3-CV, 2023 WL 2398605 at *7 (Tenn. Ct. App. March 8, 2023).

57. A developer of a common interest community has a duty to turn over control of a homeowner's association after a reasonable period of time necessary to protect the developer's interest in completing and marketing the project. *Conn v. Donlon*, 2023 WL 2398605 at *6.

58. Pulte began developing the Southern Springs subdivision in 2016.

59. As of the filing of this Complaint, at least 800 homes in Southern Springs have either been constructed or sold.

60. As of the filing of this Complaint, Pulte still controls the HOA and has not turned it over to the resident Members.

61. Pulte's interest in completing and marketing the development has been more than protected. Currently, Pulte has no legitimate interest in maintaining control of the HOA. The homeowners/members, on the other hand, have a compelling interest in self-governance and financial accountability in regard to the operation of the HOA.

62. Absent judicial relief, the rights of Ms. Longstreet and other similarly situated Members will continue to be harmed. Specifically, because of Pulte's failure to turn over control of the HOA within a reasonable time, the Members have been prevented from obtaining the form of collective decision making that they bargained for when they purchased their homes in Southern Springs. See *Innerimages, Inc. v. Newman*, 579 S.W.3d 29, 47 (Tenn. Ct. App. 2019).

63. Pulte's conduct has been intentional and in bad faith, and, in part, on information and belief, has been to prevent scrutiny of its financial transactions.

64. Ms. Longstreet has attempted to avail herself of the dispute resolution provisions of the Declaration. Specifically, she has provided Pulte with written demands that Pulte and/or the HOA's Board of Directors meet with her to discuss these issues, and she has demanded that Pulte mediate the issues. However, neither Pulte nor the HOA's Board of Directors have met with her or mediated any of these issues. Given Pulte's response to Ms. Longstreet's demands, which response focuses on Pulte's plans to build four additional homes on the site of the existing sales center, Ms. Longstreet believes further demands to meet with the Board of Directors are futile. Pulte is unnecessarily extending the Development and Declarant Control Periods, and such an extension is not necessary to protect Pulte's interests. Specifically, Section 13.3 of the Declaration

contemplates that Pulte might build homes in the "twelve (12) months" **after** the conclusion of the Development Period, and provides Pulte a mechanism to "maintain and carry upon any Dwelling Unit owned by Declarant or a Builder or any portion of the Common Area such facilities and activities as, in the sole opinion of the Declarant, may be reasonably required, convenient, or incidental **to the construction** or sale of Dwelling Units or other real estate..." (emphasis added).

65. For all of these reasons, this honorable Court should find that Pulte has breached the Declaration and/or violated its legal duties to turn over control of the HOA to the homeowners/members, and should permanently enjoin Pulte and require it to turn over control of the HOA to the homeowners/members, and should grant Ms. Longstreet a Declaratory Judgment finding that Pulte has unreasonably retained control of the HOA and order the HOA to be immediately turned over to the resident homeowners/Members of Southern Springs. In addition, this honorable Court should award Ms. Longstreet compensatory damages, punitive damages, and an award of her attorney's fees and expenses pursuant to Section 14.8 of the Declaration.

**COUNT TWO**
**Breach of Fiduciary Duty**

66. Ms. Longstreet incorporates Paragraphs 1-65 herein.

67. The developer/declarant of a planned community in Tennessee has a fiduciary duty to the owners within the community.

68. A confidential fiduciary duty exists when one party exercises dominion and control over the other party.

69. By having the sole discretion to: appoint and remove the HOA's directors, who serve at the pleasure of the Declarant and who control what assessments are levied against homeowners; control homeowners' conduct; annually change the rules and regulations and home modification rules; change HOA management companies numerous times in the past six (6) years; control the common areas and properties; spend the homeowners'/members' money; and unilaterally amend the Declaration, Pulte has a confidential fiduciary duty to the homeowners/members because it exercises dominion and control over them.

70. Pulte has breached its fiduciary duty by:

a. failing to timely post complete financial reports for the homeowners to view;

b. failing to timely produce complete financial reports upon request;

c. failing to answer homeowners' questions regarding the finances of the HOA, including, but not limited to, questions about a large purported financial obligation of the HOA to Pulte;

d. failing to open HOA Board of Director meetings to homeowners;

e. failing to produce complete documents that have been requested by the homeowners;

f. retaliating against Ms. Longstreet, as set forth herein; and

g. failing to turn over the Association to the Members.

71. Pulte's conduct has been intentional and in bad faith, and, in part, on information and belief, has been to prevent scrutiny of its financial transactions.

72. As a result of this breach of fiduciary duty, Ms. Longstreet has been damaged in an amount to be determined at trial, and should receive judgment against

Pulte, injunctive relief against Pulte, and an award of compensatory damages, punitive damages, and attorney's fees and expenses.

**WHEREFORE, EILEEN LONGSTREET RESPECTFULLY REQUESTS:**

1. That this honorable Court enter judgment for Eileen Longstreet and against Pulte for breach of contract, breach of its obligations to turn over control of the HOA, and breach of fiduciary duty, and enter a permanent injunction requiring Pulte to turn over control of the HOA to the Members/homeowners of Southern Springs.

2. That this honorable Court award Ms. Longstreet compensatory damages against Pulte in an amount to be determined at trial, but not less than $10,000.

3. That this honorable Court award Ms. Longstreet prejudgment interest on all compensatory damages awarded.

4. That this honorable Court award Ms. Longstreet punitive damages against Pulte for is intentional, malicious, reckless and bad faith conduct.

5. That this honorable Court enter a Declaratory Judgment against Pulte declaring that Pulte unreasonably retained control over the HOA, that the Declarant Control Period is over, and that Pulte is ordered to turn over control of the HOA to the Members/homeowners of Southern Springs.

6. That this honorable Court require Pulte to pay Ms. Longstreet's attorney's fees and expenses.

7. That this Court tax all court costs and discretionary costs against Pulte.

8. That this honorable Court award Ms. Longstreet such other and further relief which is just and equitable.

**RESPECTFULLY SUBMITTED,**

**BELCHER SYKES HARRINGTON, PLLC**

By: ______________________________

John O. Belcher (BPR #018335)
Katherine Garro McCain (BPR #032459)
320 Seven Springs Way, Suite 110
Brentwood, TN 37027
(T): (615) 810-8777
(F): (615) 810-8770
jbelcher@bshlawyers.com
kmccain@bshlawyers.com
*Counsel for Plaintiff*

We acknowledge ourselves as surety for court costs and taxes in this case in accordance with Tenn. Code Ann. § 20-12-120.

**BELCHER SYKES HARRINGTON, PLLC**

By: ______________________________

John O. Belcher

## SPECIAL WARRANTY DEED

**BK/PG: R2518/741-742**

**18013969**

| | |
|---|---|
| 2 PGS:AL-WARRANTY DEED | |
| SUSIE BATCH: 204917 | 09/21/2018 - 10:00 AM |
| VALUE | 384135.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 1421.30 |
| RECORDING FEE | 10.00 |
| ARCHIVE FEE | 0.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 1.00 |
| TOTAL AMOUNT | 1434.30 |

STATE OF TENNESSEE, MAURY COUNTY
**JOHN FLEMING**
REGISTER OF DEEDS

DAVID R. A. ROETTGER STATE OF TENNESSEE NOTARY PUBLIC WILLIAMSON COUNTY

STATE OF TENNESSEE
COUNTY OF MAURY

THE ACTUAL CONSIDERATION OR VALUE, WHICHEVER IS GREATER, FOR THIS TRANSFER IS $384,135.00

Affiant

SUBSCRIBED AND SWORN TO BEFORE ME THIS 17 day of SEPTEMBER, 2018.

Notary Public

MY COMMISSION EXPIRES: 7-17-21
(AFFIX SEAL)

**THIS INSTRUMENT WAS PREPARED BY**
Foundation Title and Escrow Main , 277 Mallory Station Rd, Suite 102, Franklin, TN 37067

| ADDRESS NEW OWNER(S) AS FOLLOWS: | SEND TAX BILLS TO: | MAP-PARCEL NO(S). |
|---|---|---|
| Eileen H. Wilson-Longstreet, an unmarried woman | Eileen H. Wilson-Longstreet | 043A A 042.00 |
| (NAME)<br>133 Tipton Pass | (NAME)<br>9463 Cloverdale Ct | |
| (ADDRESS)<br>Spring Hill, TN 37174 | (ADDRESS)<br>Burke, VA 22015 | |
| (CITY) (STATE) (ZIP) | (CITY) (STATE) (ZIP) | |

For Good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned **Pulte Homes Tennessee Limited Partnership**, A Nevada Limited Partnership, hereinafter called the Grantor, has bargained and sold, and by these presents does transfer and convey unto **Eileen H. Wilson-Longstreet, an unmarried woman**, hereinafter referred to as Grantee, his/her/their heirs and assigns forever, all of its right, title and interest in the following described real estate, situated Maury County, State of Tennessee, described as follow, to-wit:

Being Lot No. 108, Southern Springs Phase 1 and 2 of record in Plat Book 21, page 113 as revised in Plat Book 21, Page 312, Register's Office for Maury County, Tennessee, to which reference is hereby made for a more complete and accurate description.

Being a portion of the same property conveyed to Pulte Homes Tennessee Limited Partnership, a Nevada limited partnership by Special Warranty Deed from Amber Lane Development, LLC, a Tennessee limited liability company, dated November 12, 2015 and recorded November 13, 2015 in Book R2346, Page 632, in said Register's Office for Maury County, Tennessee.

This conveyance is subject to (a) all restrictions of record; (b) all easements of record; (c) all visible easements; (d) all matters appearing on the plan(s) of record; and (e) all matters referenced in the master deed and by-laws; and (f) all applicable government and zoning regulations.

unimproved ☐
This is improved ☒ property, known as 133 Tipton Pass, Spring Hill, TN 37174

EXHIBIT A

TO HAVE AND TO HOLD the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to said GRANTEE(S), his/her/their heirs and assigns forever; and we do covenant with the said GRANTEE(S) that we are lawfully seized and possessed of said land in fee simple, have a good right to convey it, and the same is unencumbered, unless otherwise herein set out; and we do further covenant and bind ourselves, our heirs and representatives, to warrant and forever defend the title to the said land to the said GRANTEE(S), his/her/their heirs and assigns, against the lawful claims of all persons claiming by, through or under GRANTOR, but not otherwise. Wherever used herein, the singular form shall include the plural, the plural the singular, and the use of any gender-specific pronoun shall be applicable to all genders.

Witness our hands this 19 day of September, 2018.

Pulte Homes Tennessee Limited Partnership, a Nevada Limted Partnership

By: Pulte Homes Tennessee, Inc., a Michigan Corporation, its General Partner

BY: ______________________

Kay Davy, Title: Division Closing Coordinator

STATE OF Tennessee

County OF Williamson

Before me, the undersigned, a Notary Public of the State and County aforesaid, personally appeared Kay Davy, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged herself to be the Division Closing Coordinator of Pulte Homes Tennessee Limited Partnership, a Nevada Limited Partnership, By Pulte Homes Tennessee, Inc. a Michigan Corporation, its General Partner, the within named bargainor, a partnership and that she as such Division Closing Coordinator for the General Partner, executed the foregoing instrument for the purposes therein contained.

Witness my hand and official seal, this the 19 of September, 2018.

______________________

Notary Public

My Commission Expires: 8/10/2020

(SEAL) CHERYL ANGELA FIGLIO STATE OF TENNESSEE NOTARY PUBLIC CHEATHAM COUNTY My Commission Expires 08-10-2020

PICKUP: KATHLEEN WILSON

*This instrument prepared by:*

*Alvin L. Harris*
*201 Fourth Avenue, North, Ste. 1930*
*Nashville, TN 37219*

BK/PG: R2409/686-756
16017674

| | |
|---|---|
| 71 PGS:AL-RESTRICTIONS | |
| NANCY BATCH: 180981 | 12/27/2016 - 02:49 PM |
| VALUE | 0.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 355.00 |
| ARCHIVE FEE | 0.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| TOTAL AMOUNT | 357.00 |

STATE OF TENNESSEE, MAURY COUNTY
JOHN FLEMING
REGISTER OF DEEDS

# AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS FOR SOUTHERN SPRINGS

## SOUTHERN SPRINGS IS AN AGE RESTRICTED COMMUNITY INTENDED TO PROVIDE HOUSING FOR OLDER PERSONS

EXHIBIT
B

TABLE OF CONTENTS

ARTICLE I - DEFINITIONS ..... 1

1.1 Activity Card(s) ..... 2
1.2 Age-Qualified Occupant ..... 2
1.3 Area of Common Responsibility ..... 2
1.4 Articles of Incorporation or Articles ..... 2
1.5 Association ..... 2
1.6 Base Assessment ..... 2
1.7 Benefitted Assessment ..... 2
1.8 Board of Directors or Board ..... 2
1.9 Builder ..... 2
1.10 By-Laws ..... 2
1.11 Charges ..... 2
1.12 Common Area ..... 2
1.13 Common Expenses ..... 3
1.14 Community-Wide Standard ..... 3
1.15 Covenant to Share Costs ..... 4
1.16 Declarant ..... 4
1.17 Declarant Control Period ..... 4
1.18 Design Guidelines ..... 4
1.19 Development Period ..... 4
1.20 Dwelling Unit ..... 4
1.21 (Reserved) ..... 4
1.22 Governing Documents ..... 4
1.23 Home Owner ..... 4
1.24 Limited Common Area ..... 4
1.25 Limited Common Area Assessment ..... 5
1.26 Limited Common Area Expenses ..... 5
1.27 Master Plan ..... 5
1.28 Member ..... 5
1.29 Modifications Committee or MC ..... 5
1.30 Mortgage ..... 5
1.31 Owner ..... 5
1.32 Optional Services ..... 5
1.33 Neighborhood ..... 6
1.34 Neighborhood Assessment ..... 6
1.35 Neighborhood Expenses ..... 6
1.36 Neighborhood Facility ..... 6
1.37 Neighborhood Wide Services ..... 6
1.38 Person ..... 7
1.39 Plat ..... 7
1.40 Private Amenities ..... 7
1.41 Properties ..... 7
1.42 Public Records ..... 7
1.43 Regulated Work ..... 7
1.44 Resident or Qualified Resident ..... 7
1.45 Special Assessment ..... 7
1.46 Special Declarant Rights ..... 7
1.47 Special Services ..... 7
1.48 Supplemental Declaration or Supplement ..... 8
1.49 Voting Member ..... 8

ARTICLE II - PROPERTY RIGHTS ........ 8

2.1 Right to Use and Enjoy Common Area and Neighborhood Facilities ........ 8
2.2 Activity Cards ........ 9
2.3 No Partition ........ 9
2.4 Condemnation ........ 10
2.5 Age Restriction ........ 11
2.6 Easements, Leases, Licenses and Concessions and Rights ........ 11

ARTICLE III - MEMBERSHIP AND VOTING RIGHTS ........ 12

3.1 Function of Association ........ 12
3.2 Membership ........ 12
3.3 Voting ........ 12
3.4 Attendance at Board Meetings by Owner ........ 13

ARTICLE IV - RIGHTS AND OBLIGATIONS OF THE ASSOCIATION/VARIOUS DISCLOSURES AND DISCLAIMERS ........ 13

4.1 Common Area ........ 13
4.2 Personal Property and Real Property for Common Use ........ 13
4.3 Rulemaking and Administrative Enforcement of Governing Documents ........ 14
4.4 Implied Rights; Board Authority ........ 15
4.5 Governmental, Educational, and Religious Interests ........ 15
4.6 Indemnification ........ 16
4.7 Dedication of Common Area ........ 16
4.8 Security ........ 16
4.9 Video, Data and Communication Service Agreements ........ 17
4.10 Assumption of Risk ........ 17
4.11 Change of Use of Common Area ........ 18
4.12 View Impairment ........ 18
4.13 Relationship with Tax-Exempt Organizations ........ 18
4.14 Recycling Programs ........ 19
4.15 Wildlife Control ........ 19
4.16 Sales Center ........ 19
4.17 Contract Memberships and Services ........ 19

ARTICLE V - MAINTENANCE ........ 19

5.1 Association's Responsibility ........ 19
5.2 Owner's Responsibility ........ 21
5.3 Special Services ........ 21
5.4 Neighborhood-Wide Services ........ 22
5.5 Standard of Performance ........ 22
5.6 Alterations, Additions or Improvements ........ 22

ARTICLE VI - INSURANCE AND CASUALTY LOSSES ........ 23

6.1 Association Insurance ........ 23
6.2 Owners' Insurance ........ 26

ARTICLE VII - ANNEXATION AND WITHDRAWAL OF PROPERTY ........ 27

7.1 Annexation ........ 27
7.2 Withdrawal of Property ........ 27

7.3 Amendment ..... 28
7.4 Post Development Period Authority ..... 28

ARTICLE VIII - ASSESSMENTS ..... 28

8.1 Creation of Assessments ..... 28
8.2 Declarant Not Obligated for Assessments; Discretionary Advances & Annual Advance Reimbursements... .29
8.3 Annual Budget Preparation and Computation of Assessments ..... 29
8.4 Annual Budget Approval/Disapproval Process ..... 30
8.5 Special Assessments ..... 31
8.6 Benefitted Assessments ..... 32
8.7 Creation and Enforcement of Lien and Personal Obligation ..... 32
8.8 Non-Payment of Charges ..... 33
8.9 Lien for Charges Subordinated to Mortgages ..... 33
8.10 Date of Commencement of Assessments ..... 33
8.11 Failure to Assess or Provide Notice ..... 33
8.12 Exempt Property ..... 34
8.13 Utility Costs Billed to Owners ..... 34
8.14 New Member Fee ..... 34
8.15 Initial Capitalization Fee ..... 36

ARTICLE IX - ARCHITECTURAL STANDARDS ..... 36

9.1 General ..... 36
9.2 Architectural and Design Review ..... 36
9.3 Guidelines and Procedures ..... 37
9.4 Submission of Plans and Specifications ..... 38
9.5 No Waiver of Future Approvals ..... 39
9.6 Variance ..... 39
9.7 Limitation of Liability ..... 39
9.8 Enforcement ..... 40

ARTICLE X - USE RESTRICTIONS ..... 41

10.1 Signs ..... 41
10.2 Vehicles and Parking ..... 41
10.3 Occupants Bound ..... 42
10.4 Animals and Pets ..... 42
10.5 Quiet Enjoyment ..... 43
10.6 Unsightly or Unkempt Conditions ..... 43
10.7 Antennae ..... 43
10.8 Fences and Dog Runs ..... 44
10.9 Exterior Lighting ..... 44
10.10 Temporary Structures ..... 44
10.11 Storage ..... 44
10.12 Subdivision of Dwelling Unit and Time-Sharing ..... 44
10.13 Firearms/Fireworks ..... 44
10.14 Wetlands, Lakes, and Other Water Bodies ..... 44
10.15 Business Use and Leasing ..... 45
10.16 Occupancy ..... 46
10.17 Trash Containers and Collection ..... 46
10.18 Clothes Drying Facilities ..... 46
10.19 Snowmobiles, ATV's, and Unlicensed Motorized Vehicles Regulated ..... 46
10.20 Unlawful Acts or Omissions ..... 47
10.21 Bird and Squirrel Houses ..... 47
10.22 Flagpoles ..... 47

10.23 Above-Ground Pools .......... 47
10.24 Irrigation/Wells .......... 47
10.25 Drainage-and Septic Systems .......... 47
10.26 Air Conditioning Units .......... 47
10.27 Artificial Vegetation, Exterior Sculpture, and Similar Items .......... 47

ARTICLE XI - EASEMENTS .......... 48

11.1 Easements of Encroachment .......... 48
11.2 Easements for Utilities .......... 48
11.3 Easements to Serve Additional Property .......... 49
11.4 Easements for Declarant Signage .......... 49
11.5 Easements for Cross-Drainage .......... 49
11.6 Right of Entry .......... 49
11.7 Easements for Maintenance and Enforcement .......... 50
11.8 Easements for Exterior Landscaping and Maintenance .......... 50
11.9 Rights to Stormwater Runoff, Effluent and Water Reclamation .......... 50
11.10 Easements for Free Standing Retaining Walls .......... 50
11.11 Easements Appearing on the Plats .......... 51

ARTICLE XII - MORTGAGEE PROVISIONS .......... 51

12.1 Notices of Action .......... 52
12.2 No Priority .......... 52
12.3 Notice to Association .......... 52
12.4 Failure of Mortgagee to Respond .......... 52

ARTICLE XIII - SPECIAL DECLARANT RIGHTS .......... 52

13.1 Special Declarant Rights .......... 52
13.2 Transfer of Special Declarant Rights .......... 53
13.3 Models, Sales Offices and Management Offices .......... 54
13.4 Construction of Improvements/Removal of Property .......... 54
13.5 Other Covenants Prohibited .......... 54
13.6 Master Planned Community .......... 54
13.7 Explore Del Webb Homes .......... 54
13.8 Equal Treatment .......... 55
13.9 Right to Use Common Area for Special Events .......... 56
13.10 Sales By Declarant .......... 56
13.11 Activity Cards for Marketing or Promotion .......... 56

ARTICLE XIV - DISPUTE RESOLUTION AND LIMITATION ON LITIGATION .......... 56

14.1 Prerequisites to Actions Against Declarant .......... 56
14.2 Consensus for Association Litigation .......... 57
14.3 Alternative Method for Resolving Disputes .......... 57
14.4 Claims .......... 57
14.5 Mandatory Procedures .......... 58
14.6 Allocation of Costs of Resolving Claims .......... 59
14.7 Enforcement of Resolution .......... 59
14.8 Attorneys' Fees .......... 59

ARTICLE XV - PRIVATE AMENITIES .......... 59

15.1 Right to Use .......... 59

15.2 Assumption of Risk and Indemnification .......... 60
15.3 View Impairment .......... 60
15.4 (Reserved) .......... 60
15.5 Limitations on Amendments .......... 60

ARTICLE XVI - GENERAL PROVISIONS .......... 61

16.1 Term .......... 61
16.2 Amendment .......... 61
16.3 Severability .......... 62
16.4 Cumulative Effect; Conflict .......... 62
16.5 Use of the Words "Southern Springs" .......... 62
16.6 Del Webb Marks .......... 62
16.7 Compliance .......... 62
16.8 Notice of Sale or Transfer of Title .......... 63

## AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR SOUTHERN SPRINGS

.This Amended and Restated Covenants, Conditions and Restrictions for Southern Springs (the "Declaration") is made this 19th day of December, 2016, by **Pulte Homes Tennessee Limited Partnership,** a Michigan corporation ("Declarant").

WITNESSETH:

WHEREAS, Declarant previously recorded the Declaration of Covenants, Conditions and Restrictions for Southern Springs in Book R2398, page 55, of the Register's Office for Maury County, Tennessee;

WHEREAS, pursuant to Section 16.2 of the Declaration, Declarant currently has the right to unilaterally amend the Declaration; and

WHEREAS, the Declarant desires to amend and restate the Declaration in the manner stated herein.

Declarant is the owner of the "Properties" described in Exhibit A, which is attached hereto and incorporated herein by reference. This Declaration imposes upon the Properties mutually beneficial restrictions under a general plan of development and improvement for the benefit of the owners of any portion of the Properties, and establishes a flexible and reasonable procedure for the overall development, administration, maintenance and preservation of the Properties. In furtherance thereof, this Declaration provides for the creation of the Southern Springs Community Association, a Tennessee not-for- profit corporation, to own, operate and maintain the Common Area, and to administer and enforce the provisions of the Governing Documents.

Declarant hereby declares that all of the Properties described in Exhibit A and any additional Properties subjected to this Declaration by a Supplemental Declaration (collectively "Southern Springs") shall be held, sold, used and conveyed subject to the following easements, restrictions, covenants, and conditions, which shall run with the land and title to the real property subjected to this Declaration. This Declaration shall be binding upon all parties having any right, title, or interest in any portion of the Properties, their heirs, successors, successors-in-title, and assigns, and shall inure to the benefit of each owner of any portion of the Properties.

## ARTICLE I
## DEFINITIONS

The terms in this Declaration and the exhibits to this Declaration shall generally be given their natural, commonly accepted definitions except as otherwise specified. Capitalized terms shall be defined as set forth below.

1.1 Activity Card(s): Those certain cards which are issued by the Association in accordance with the terms and conditions set forth in **Section 2.2** and which confer upon the holder rights of access to and use of recreational facilities and other Common Areas within the Properties.

1.2 Age-Qualified Occupant: Any individual (i) 50 years of age or older who owns and occupies a Dwelling Unit and was the original purchaser of the Dwelling Unit from the Declarant; or (ii) 55 years of age or older who occupies a Dwelling Unit. The terms "occupy," occupies,"or "occupancy" shall mean staying overnight in a particular Dwelling Unit for at least ninety (90) days in any consecutive twelve (12) month period.

1.3 Area of Common Responsibility: The Common Area and such other areas, if any, for which the Association has or assumes responsibility for maintenance pursuant to the terms of this Declaration, any Supplemental Declaration or other applicable covenants, contract, or agreement.

1.4 Articles of Incorporation or Articles: The Articles of Incorporation of Southern Springs Community Association, as filed with the Secretary of State of the State of Tennessee, as amended from time to time.

1.5 Association: Southern Springs Community Association, a Tennessee not-for-profit corporation, its successors or assigns.

1.6 Base Assessment: Assessments levied on all Dwelling Units subject to assessment under **Article VIII** to fund Common Expenses for the general benefit of all Dwelling Units.

1.7 Benefitted Assessment: Assessments levied in accordance with **Section 8.8.**

1.8 Board of Directors or Board: The body responsible for administration of the Association, selected as provided in the By-Laws and serving the same role as a board of directors under a Tennessee not-for-profit corporation.

1.9 Builder: Any Person which purchases one or more parcels of land within the Properties for subdivision, development, construction of homes and/or resale in the ordinary course of such Person's business other than for personal residential use.

1.10 By-Laws: The By-Laws of Southern Springs Community Association, as amended from time to time.

1.11 Charges: The Base Assessment, Limited Common Area Assessment, Benefitted Assessments, any Special Assessment levied by the Association and/or any other charges or amounts which an Owner is required to pay or for which an Owner is liable under this Declaration or the By-Laws, including fines imposed as provided under **Section 4.3**.

1.12 Common Area: Those portions of the Properties which are described and designated as "Common Area" in Exhibit A hereto or on any recorded Plat, as this Declaration or the Plats may be amended or supplemented from time to time, together with all improvements located above and below the ground and rights appurtenant thereto. The Common Area shall generally include community wide recreational facilities, open space, detention areas, wetlands and green areas. The Common Area shall not include any public streets and roads, streetlights, water mains or sanitary sewers or other improvements which have been dedicated to and are accepted by a municipality or governmental agency; provided, however, in the event anydedicated public street or road is not accepted for maintenance by the municipality or governmental agency within ninety (90) days after the date on which the sreet or road is submitted by the Declarant for acceptance, the Declarant may transfer and convey that street or road and any improvements located thereon to the Association as Common Areaat any time thereafter. Common Area may be on a separate subdivided lot or may be part of a Dwelling Unit. The Declarant may from time to time make additional real estate subject to this Declaration as Common Area pursuant to **Article VII**. The Declarant shall have the right, power and authority to convey any portion of the Properties to the Association as "Common Area" at any time Declarant deems appropriate, acting its sole discretion, and the Declartant shall not be required to provide notice to the Members or to obtain any consent or approval from the Members before any transfer or conveyance. Declarant, in its sole discretion, may maintain and convey Common Area to the Association in its natural and unimproved state.

1.13 Common Expenses: The expenses of administration, operation, maintenance, repair, replacement, landscaping and snow removal of the Common Area (other than Limited Common Area); expenses incurred in connection with exercise of rights in and to easements created for the benefit of the Association; the cost of insurance, water, electricity, telephone, gas and other necessary utility expenses for the Common Area (other than Limited Common Area), including electricity to operate street lights; the costs of membership or services provided for the benefit of Owners pursuant to contracts entered into by the Declarant or the Association; the cost of general and special real estate taxes and assessments levied or assessed against any portion of the Common Area (other than Limited Common Area) owned by the Association; the cost of, and the expenses incurred for, the maintenance, repair and replacement of personal property acquired and used by the Association in connection with the operation of the Common Area (other than Limited Common Area); the cost of maintenance of the landscaping of the rights-of-way and medians of streets, roads or highways, within or adjoining the Properties; any expenses designated as Common Expenses by this Declaration; if not specifically charged to the Owners, the cost of waste removal and scavenger services to the Properties; and any other expenses lawfully incurred by the Association for the common benefit of all of the Owners (including, without limitation, costs incurred for management, administrative, legal or other professional services). Common Expenses may include costs and expenses incurred by the Association in connection with the administration, operation, repair, maintenance, or replacement of areas and improvements within the Properties, which have been identified or designated as Common Area prior to any formal transfer or conveyance of title or responsibility to those areas or improvements by the Declarant to the Association. Common Expenses shall not include Limited Common Area Expenses.

1.14 Community-Wide Standard: The standard of conduct, maintenance, or other activity generally prevailing throughout the Properties. Such standards may be defined in the Design Guidelines or rules and regulations of the Board. Such standards may be specifically determined, and modified, by the Declarant at any time during the Declarant Control Period and thereafter by the Board and/or the Modifications Committee.

1.15 Covenant to Share Costs: Any declaration or agreement executed by Declarant and recorded in the Public Records, which grants rights or creates easements for the benefit of the Association and the present and future owners of the real estate subject thereto and which obligates the Association and such owners to share the costs related to or incurred in connection with real estate described therein.

1.16 Declarant: Pulte Home Corporation, a Michigan corporation, or any successor, successor-in-title, or assign who takes title to any portion of the real estate described on Exhibits A or B for the purpose of development and/or sale and who is designated as the Declarant in a recorded instrument executed by the immediately preceding Declarant.

1.17 Declarant Control Period: The period commencing upon the recording of this Declaration and ending upon the first to occur of:

(a) The end of the Development Period; or

(b) The date designated in a written notice recorded by the Declarant in the Public Records as being the end of the Declarant Control Period.

1.18 Design Guidelines: Any written design and construction guidelines and application and review procedures applicable to the Properties promulgated and administered pursuant to **Article IX**, as modified from time to time.

1.19 Development Period: The period of time commencing upon the recording of this Declaration and ending at such time as Declarant no longer holds or controls title to any portion of the real estate which is described in Exhibit B.

1.20 Dwelling Unit: A portion of the Properties which is described and designated as a Dwelling Unit in Exhibit A, in any Supplemental Declaration, or on any Plat. A Dwelling Unit will either be (a) a subdivided lot or portion thereof which is legally described in the deed which conveys such portion to the first purchaser thereof and which is, or is planned to be, improved with a single family attached or detached home or (b) a condominium unit.

1.21 (Reserved):

1.22 Governing Documents: A collective term including the Declaration, the By-Laws, the Articles, the Design Guidelines, and rules or regulations adopted by the Board, as any such documents may be amended from time to time.

1.23 Home Owner: An Owner other than the Declarant or a Builder.



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 34 of 126 PageID #: 39

1.24 Limited Common Area: A portion of the Common Area which is designated for the exclusive use of the Owners and/or Residents of one or more Dwelling Units as designated in this Declaration, in any Supplemental Declaration or any Plat. By way of example, a Limited Common Area may be a fence, retaining wall, landscaped buffer area or other real estate or improvements thereto which serve or benefit one or more, but less than all Dwelling Units.

1.25 Limited Common Area Assessment: Assessments levied on the Dwelling Units which have the right to use or benefit from a particular Limited Common Area to pay the associated Limited Common Area Expenses and to accumulate reserves for such expenses as more fully described in **Article VIII**.

1.26 Limited Common Area Expenses: With respect to a particular Limited Common Area, the expenses of administration (including management, legal and other professional services), maintenance, operation, repair, and replacement thereof; the cost of insurance, real estate taxes and other assessments, if any, water, waste removal, electricity, telephone and other necessary utility expenses for the Limited Common Area; the cost of and the expenses incurred for the maintenance, repair and replacement of personal property used by the Association only in connection with the maintenance or operation of the Limited Common Area; any expense designated as a Limited Common Area Expense in this Declaration or any Exhibit hereto, as supplemented or amended from time to time or any Supplement hereto; and any expenses incurred by the Association which, pursuant to generally accepted accounting principles, can reasonably be allocated to the Limited Common Area. Limited Common Area Expenses shall not be deemed to be, and shall not be deemed to include, Common Expenses. In the event that certain expenses are incurred by the Association in connection with the operation of a particular Limited Common Area and another Limited Common Area and/or the Common Area (other than Limited Common Area), the allocation of expenses between the various Limited Common Area Expenses and the Common Expenses shall be made by the Board based on generally accepted accounting principles, and any allocation so made shall be final and binding.

1.29 Master Plan: Declarant's conceptual land use plan for the development of Southern Springs, as it may be amended from time to time, which plan shall include the real estate described in Exhibit A and may include a portion or all of the real estate described in Exhibit B and other real estate. **DECLARANT EXPRESSLY RESERVES THE RIGHT TO MODIFY, AMEND AND REVISE THE MASTER PLAN AT ANY TIME DURING THE DEVELOPMENT PERIOD AS IT, IN ITS SOLE DISCRETION, DEEMS APPROPRIATE.** Inclusion of real estate on the Master Plan shall not, under any circumstances, obligate Declarant to subject such real estate to this Declaration as part of the Properties, nor shall the exclusion of real estate from the Master Plan bar its later inclusion therein.

1.30 Member: A Person entitled to membership in the Association pursuant to **Section 3.2.**

1.31 Modifications Committee or MC: The committee established by the Board pursuant to **Section 9.2(b)** to review applications for modifications to Dwelling Units.

1.32 Mortgage: A first mortgage, a deed of trust, a deed to secure debt, or any other form of security instrument affecting title to any Dwelling Unit. A "Mortgagee" shall refer to a beneficiary or holder of a Mortgage.

1.33 Neighborhood: A portion of the Properties which is described and designated as a "Neighborhood" or "Village" in Exhibit A hereto, in any Supplemental Declaration, or on a Plat. A Neighborhood may consist of Dwelling Units and a portion of the Common Area. The Declarant may make real estate which is added to the Properties part of a Neighborhood at the time it is annexed as provided in **Article VII**, or thereafter as permitted herein.

1.34 Neighborhood Assessment: Assessments levied on the Dwelling Units located within a particular Neighborhood or to pay the associated Neighborhood Expenses and to accumulate reserves for such expenses, as more fully provided in **Article VIII**.

1.35 Neighborhood Expenses: The expenses of administration (including professional services), maintenance, operation and replacement of a Neighborhood Facility (if any); the cost of insurance, real estate taxes and other real estate assessments, if any; water, waste removal, electricity, telephone, gas, or other necessary utility expenses for the Neighborhood Facility, the cost of and the expenses incurred for the maintenance and repair and replacement of personal property used by the Association in connection with the operation of the Neighborhood Facility or the provision of Neighborhood Wide Services to all Dwelling Units in the Neighborhood; the cost of furnishing Neighborhood Wide Services to all Dwelling Units in the Neighborhood; any expense designated as a Neighborhood Expense by this Declaration or any Exhibit hereto, as supplemented or amended from time to time, or any Supplement hereto; any expenses incurred by the Association which, pursuant to generally accepted accounting principles, can be reasonably allocated to the Neighborhood; and any other expenses lawfully incurred by the Association for the common benefit of the Owners of Dwelling Units in the Neighborhood. Neighborhood Expenses shall be determined on a Neighborhood by Neighborhood basis and no expenses incurred for any one (1) Neighborhood shall be deemed to be a Neighborhood Expense for any other Neighborhood. Neighborhood Expenses shall not be deemed to be, and shall not be deemed to include, Common Expenses or Limited Common Area Expenses. In the event that certain expenses are incurred by the Association in connection with the operation of a given Neighborhood Facility and another Neighborhood Facility and/or the Common Area, the allocation of expenses between the Common Expenses, the various Limited Common Area Expenses, and the various Neighborhood Expenses shall be made by the Board based on generally accepted accounting principles, and any allocations so made shall be final and binding.

1.36 Neighborhood Facility: A portion of the Properties which is part of a Neighborhood and which is described and designated as a "Neighborhood Facility" in Exhibit A or any Supplemental Declaration together with all improvements thereon, rights appurtenant thereto, and all personal property used in connection with the operation thereof. By way of example, a Neighborhood Facility may be a swimming pool, tennis court, park area, or other recreational facility which is available for use primarily or exclusively by Residents of a Neighborhood and their guests, a security gate or similar structure which serves a Neighborhood or other facilities which serve or are used exclusively by Residents of Dwelling Units in the Neighborhood. A

Neighborhood Facility may be on a separate subdivided lot or parcel or may be part of a Dwelling Unit. A Neighborhood Facility shall not be deemed to be part of the Common Area.

1.37 Neighborhood Wide Services: Those services which are described and designated as "Neighborhood Wide Services" (a) in a Supplemental Declaration or (b) by action of the Board pursuant to a request signed by Owners of at least two-thirds (2/3rds) of the Owners of Dwelling Units in the Neighborhood. Neighborhood Wide Services shall be furnished to the Dwelling Units in a Specific Neighborhood by the Association as a Neighborhood Expense.

1.38 Owner: One (1) or more Persons, which may include the Declarant or a Builder, who hold the record title to a Dwelling Unit, but excluding in all cases any party holding an interest merely as security for the performance of an obligation.

1.39 Optional Services: As defined in **Section 5.4.**

1.40 Person: A natural person, corporation, partnership, limited liability company, trustee, or any other legal entity.

1.41 Plat: A plat of subdivision for a portion of the Properties which is recorded in the Public Records. **DECLARANT EXPRESSLY RESERVES THE RIGHT TO REVISE, MODIFY, RECONFIGURE OR WITHDRAW ANY RECORDED PLAT AT ANY TIME DURING THE DEVELOPMENT PERIOD AS IT, IN ITS SOLE DISCRETION, DEEMS APPROPRIATE.**

1.42 Private Amenities: Real estate and any improvements and facilities thereon located adjacent to or in the vicinity of the Properties, developed by the Declarant or an affiliate or designee of the Declarant, which are privately owned and operated by Persons other than the Association for recreational and related purposes, on a club membership basis, use fee basis, or otherwise. A Private Amenity shall not be part of the Properties. However, a Private Amenity may be made part of the Properties pursuant to the provisions of Article VII, in which case it shall no longer be deemed to be a Private Amenity hereunder.

1.43 Properties: The real estate described on Exhibit A, and any such additional real estate as is annexed to this Declaration after the initial recording hereof by a Supplemental Declaration, as provided in **Article VII.**

1.44 Public Records: The Register's Office for Maury County, Tennessee.

1.45 Regulated Work: As defined in **Section 9.1.**

1.46 Resident or Qualified Resident: Any of the following Persons occupying a Dwelling Unit:

(a) any Age-Qualified Occupant;

(b) any Person 19 years of age or older occupying a Dwelling Unit with an Age-Qualified Occupant; and

(c) any Person 19 years of age or older who occupied a Dwelling Unit with an Age-Qualified Occupant and who continues, without interruption, to occupy the same Dwelling Unit after termination of the Age-Qualified Occupant's occupancy thereof.

The term "occupy" or "occupancy" shall have the same meaning as set forth in **Section 1.2.** An individual who occupies a Dwelling Unit but does not satisfy the criteria of (a), (b) or (c) above shall not be deemed to be a Resident and shall not be entitled to any rights or privileges granted to a Resident hereunder.

1.47 Special Assessment: Assessments levied in accordance with **Section 8.7.**

1.48 Special Declarant Rights: As defined in **Article XIII.**

1.49 Special Services: As defined in **Section 5.3.**

1.50 Supplemental Declaration or Supplement: An amendment or addition to this Declaration filed in the Public Records pursuant to **Article VII** which subjects additional real estate to this Declaration as part of the Properties, identifies any Common Area and Dwelling Units within the additional real estate, and/or imposes or modifies, expressly or by reference, additional covenants, conditions, restrictions, easements or obligations on the real estate described in such instrument.

1.51 Village: A portion of the Properties which is described and designated as a "Village" or "Neighborhood" in Exhibit A hereto, in any Supplemental Declaration, or on a Plat. A Village may consist of Dwelling Units and a portion of the Common Area. The Declarant may make real estate which is added to the Properties part of a Village at the time it is annexed as provided in **Article VII**, or thereafter as permitted herein.

1.52 Voting Member: As defined in **Section 3.3.**

## ARTICLE II
## PROPERTY RIGHTS

2.1 Right to Use and Enjoy Common Area. Each Resident shall have the non-exclusive right and easement to use and enjoy the Common Area (except the Limited Common Area). Each Resident shall have the non-exclusive right and easement to use and enjoy any Limited Common Area assigned to his Dwelling Unit, in common with the Owners of other Dwelling Units to which such Limited Common Area is assigned. Such rights and easements shall run with the land, shall be appurtenant to and pass with title to every Dwelling Unit, and shall be subject to and governed by the following:



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 38 of 126 PageID #: 43

(a) This Declaration or any Supplement or amendment hereto, the By-Laws, and all Governing Documents;

(b) Any covenants, committments, provisions, restrictions or limitations contained in any deed conveying Common Area to the Association or in the Development Agreement;

(c) Rules and regulations adopted as more fully provided in **Section 4.3**;

(d) The right of the Board to impose fines and to suspend the rights, services and privileges of an Owner or Resident including, without limitation, the right to use recreational facilities pursuant to **Section 4.3**;

(e) The right of the Association, acting through the Board, to dedicate or transfer all or any part of the Common Area;

(f) The right of the Board to impose reasonable membership requirements and charge reasonable admission fees or other use fees for the use of any recreational facility situated upon the Common Area;

(g) The right of the Board to permit use of any Common Area by Persons other than Members upon payment of use fees estabished by the Board;

(h) The right of the Board to create, enter agreements with, and grant easements to tax-exempt organizations under **Section 4.13**;

(i) The right of the Association, acting through the Board, to mortgage, pledge, or hypothecate any or all of its real or personal property as security for Association obligations;

(j) The right of the Association to rent, lease, or make available, with or without charge, for any purpose, any portion of any clubhouse and other recreational facilities within the Common Area to any Person approved by the Board for such uses as may be approved by the Board, including, without limitation, the leases referred to in **Section 2.6** and in **Article IV**;

(k) The requirement that access to and use of recreational facilities within the Properties shall be subject to the presentation of an Activity Card issued by the Association for such purpose; and

(l) The rights of the Declarant hereunder.

2.2 Activity Cards.

(a) Issuance by the Board. One (1) Activity Card shall be allocated to each Qualified Resident of a Dwelling Unit, up to a maximum of two (2) Activity Cards per Dwelling Unit. No

Activity Cards shall be allocated to any Dwelling Unit which is not occupied by a Qualified Resident. The Board shall determine entitlement to Activity Cards on an annual basis. Activity Cards shall be renewed annually without charge, provided the Dwelling Unit continues to be occupied by a Qualified Resident and all applicable assessments and other charges pertaining to the Dwelling Unit have been paid. The Board may establish policies, limits, and charges with regard to the issuance of additional or duplicate cards and guest privilege cards. The Board may issue Activity Cards to persons who have signed binding contracts to purchase a Dwelling Unit, subject to such policies as the Board may determine from time to time.**Notwithstanding the forgoing, Board may delay the initial issuance of Activity Cards until a reasonable time after construction of the amenity center is complete, and it is open for use.**

(b) Assignment of Rights. The right to an Activity Card is based upon occupancy of a Dwelling Unit. Any Owner who leases or otherwise transfers occupancy of his or her Dwelling Unit shall be deemed to have assigned his or her rights to an Activity Card to the Qualified Residents of such Dwelling Unit. Any Owner who leases or otherwise transfers the right to occupy his or her Dwelling Unit shall provide the Association with immediate written notice thereof and shall surrender to the Association his or her previously issued Activity Card. Activity Cards shall be surrendered by any holder who ceases to occupy a Dwelling Unit, or at any time upon written notification from the Association that the holder no longer is entitled to hold an Activity Card.

(c) Explore Del Webb Homes. Each Explore Del Webb Home, as described in **Section 13.7**, located within the Properties shall be allocated two (2) Activity Cards for use by the temporary occupants of the Explore Del Webb Home. Explore Del Webb Homes located adjacent to the Properties may be issued Activity Cards based on the arrangements set forth in the contract or Covenant to Share Costs between the Association and the owner of such Explore Del Webb Home. Additional Activity Cards shall be issued to the Declarant upon request with payment of the then current charge for additional Activity Cards. In the event that no such charge is in effect at the time of such request, the charge for additional Activity Cards for Explore Del Webb Homes shall be determined in the reasonable discretion of the Declarant. The Declarant is under no obligation to construct any Explore Del Webb Homes, and this subsection shall apply only if the Declarant, in its sole discretion, decides to do so.

(d) Issuance to the Declarant. During the Development Period, the Association shall provide the Declarant, free of charge, with as many Activity Cards as the Declarant, in its sole discretion, deems necessary for the purpose of marketing the Properties or the property described on Exhibit B or for use by its employees. The Declarant may transfer the Activity Cards to prospective purchasers of Dwelling Units subject to such terms and conditions as it, in its sole discretion, may determine. Activity Cards provided to the Declarant shall entitle the bearer to use all Common Area subject to the payment of admission fees or other use fees charged to Qualified Residents holding Activity Cards.

2.3 No Partition. Except as permitted in this Declaration, the Common Area shall remain undivided, and no Person shall bring any action for partition of the whole or any part thereof. This Section shall not prohibit the Board from acquiring and disposing of tangible

personal property or from acquiring and disposing of real estate which may or may not be subject to this Declaration.

2.4 Condemnation. In the case of a taking or condemnation by competent authority of any part of the Common Area, the proceeds awarded in such condemnation shall be paid first to satisfy any indebtedness secured by a mortgage or other lien encumbering such portion of the Common Area and the balance to the Association. The proceeds, if any, paid to the Association, together with any reserve being held for such part of the Common Area shall be used first to restore or replace any improvements taken or condemned, and the balance, if any, shall, in the discretion of the Board, either (i) be distributed to the Owners who have the right to use such Common Area and their respective Mortgagees, as their interests may appear, in equal shares, or (ii) be used for the mutual benefit of such Owners, as determined by the Board in its reasonable discretion; provided, that, during the Development Period, any such action shall be consented to by the Declarant.

2.5 Age Restriction. Southern Springs is intended to provide housing primarily for persons 55 years of age or older, subject to the rights reserved to Declarant in **Section 13.10**. The Properties shall be operated as an age restricted community in compliance with all applicable state and federal laws. No person under 19 years of age shall stay overnight in any Dwelling Unit for more than ninety (90) days in any consecutive twelve (12) month period. Subject to **Section 13.10**, each Dwelling Unit, if occupied, shall be occupied by at least one (1) individual 55 years of age or older; provided, however, that once a Dwelling Unit is occupied by an Age-Qualified Occupant, other Qualified Residents of that Dwelling Unit may continue to occupy the Dwelling Unit, regardless of the termination of the Age-Qualified Occupant's occupancy. Notwithstanding the above, at all times, at least eighty percent (80%) of the Dwelling Units within the Properties shall be occupied by at least one (1) individual 55 years of age or older. The Board shall establish policies and procedures from time to time as necessary to monitor and maintain its status as an age restricted community under state or federal law. The Association shall provide, or contract for the provision of those facilities and services designed to meet the physical and social needs of older persons as may be required under such laws. The provisions of this Section may be enforced by the Association administratively under **Section 4.3** and/or by an action in law or in equity, including, without limitation, an injunction requiring specific performance hereunder.

2.6 Easements, Leases, Licenses and Concessions and Rights: The Board shall have the right and power from time to time (a) to lease or grant easements, licenses, concessions or other rights with regard to any portions or all of the Common Area or Limited Common Area for such uses and purposes as the Board deems to be in the best interests of the Owners including, without limitation, the right to grant easements relating to installation and operation of utilities, communication systems, satellite or cable television systems, and similar and related purposes and/or (b) with the agreement of the beneficiary or grantee of the easement, and any Owner whose Dwelling Unit is benefitted thereby, cancel, alter or modify any easement which affects any Common Area, Limited Common Area, as the Board in its discretion shall determine.Any and all proceeds from leases, easements, licenses, concessions or other rights received by the Association with respect to the Common Area shall be used to pay the Common Expenses or Limited Common Area Expenses, as applicable. Each Person, by acceptance of a deed,

mortgage, trust deed, other evidence of obligation, or other instrument relating to a Dwelling Unit, shall be deemed to grant a power coupled with an interest to the Board, as attorney-in-fact, to exercise the powers as provided for in this Section. Any instrument executed pursuant to the power granted herein shall be executed by the President and attested to by the Secretary of the Association (or other appropriate officer) and duly recorded in the Public Records.

## ARTICLE III
## MEMBERSHIP AND VOTING RIGHTS

3.1 Function of Association. The Association shall be the entity responsible for management, maintenance, operation and control of the Area of Common Responsibility; the primary entity responsible for compliance with and enforcement of the Governing Documents; and, to the extent provided for in **Article IX**, shall be responsible for exercising architectural control and for administering, monitoring compliance with, and enforcing all architectural standards, including any Design Guidelines. The Association shall perform its functions in accordance with the Governing Documents and the laws of the State of Tennessee.

3.2 Membership. Every Owner shall be a "Member" of the Association and shall hold one (1) membership for each Dwelling Unit owned. If a Dwelling Unit is owned by more than one (1) Person, all co-Owners shall share the privileges of such membership, subject to reasonable Board regulation, such reasonable fees as may be established in **Section 2.1**, and the restrictions on voting set forth in **Section 3.3** and in the By-Laws. All such co-Owners shall be jointly and severally obligated to perform the responsibilities of Owners. The membership rights of an Owner which is not a natural person may be exercised by any officer, director, partner, manager or trustee, or by any other individual having apparent authority or designated from time to time by the Owner in a written instrument provided to the Secretary of the Association. The Declarant shall be a member of the Association during the Development Period.

3.3 Voting.

(a) **DURING THE DECLARANT CONTROL PERIOD, ALL OF THE VOTING RIGHTS OF THE OWNERS AT ANY MEETING OF THE MEMBERS OF THE ASSOCIATION OR OTHERWISE EXERCISED OR CAST AS BY LAW ALLOWED SHALL BE VESTED EXCLUSIVELY IN THE DECLARANT, AND OWNERS OTHER THAN THE DECLARANT SHALL HAVE NO VOTING RIGHTS.**

(b) **AFTER THE END OF THE DECLARANT CONTROL PERIOD,** all of the voting rights at any meeting of the Members of the Association or otherwise exercised or cast as by law allowed shall be vested in the Voting Members and each Voting Member shall have one (1) vote for each Dwelling Unit which the Voting Member represents. One (1) individual shall be designated by each Owner to be the "Voting Member" with respect to each Dwelling Unit owned by the Owner. If no designation is made and more than one (1) person seeks to be the Voting Member for a Dwelling Unit, the Board may either recognize one (1) individual as the Voting Member or suspend the vote for the Dwelling Unit (which shall still be counted for

purposes of determining whether a quorum is present) until the issue has been resolved. Any action may be taken by the Voting Members at any meeting at which a quorum is present (as provided in the By-Laws) upon an affirmative vote of a majority of the votes represented at the meeting by the Voting Members present at such meeting, except as otherwise provided herein or in the By-Laws. Voting Members may vote directly or by proxy as provided in the By-Laws. The Board shall determine from time to time whether votes shall be cast in person, by mail, or by other means permitted by law.

(c) Certain Special Declarant Rights, including the right to approve, or withhold approval of, certain actions proposed under this Declaration, the By-Laws and the Articles during the Development Period and the right and power, during the Declarant Control Period, to appoint all members of the Board are specified in the relevant sections of this Declaration, the By-Laws and the Articles. To the extent those rights conflict or are inconsistent with any provision of this section, those rights shall control.

3.4 Attendance at Board Meetings by Owners. Members may attend meetings of the Board only to the extent permitted by the Board in its discretion.

## ARTICLE IV
## RIGHTS AND OBLIGATIONS OF THE ASSOCIATION, VARIOUS DISCLOSURES AND DISCLAIMERS

4.1 Common Area. The Association, subject to the rights of the Owners set forth in this Declaration, shall manage and control the Common Area and all improvements thereon (including, without limitation, furnishings, equipment, and other personal property of the Association used in connection with the Common Area), and shall keep the Common Area in good, clean, attractive, and sanitary condition, order, and repair, pursuant to this Declaration and the By-Laws and consistent with the Community-Wide Standard. Common Area that is conveyed to the Association in an unimproved and natural state may be maintained in the same state after it is conveyed to the Association. The Board is specifically authorized, but not obligated, to retain or employ professional management to assist in carrying out the Association's responsibilities under this Declaration.

4.2 Personal Property and Real Property for Common Use. The Association, through action of its Board, may acquire, hold, and dispose of tangible and intangible personal property and real property. The Declarant and its designees may convey to the Association improved or unimproved real estate, or interests in real estate, personal property and leasehold and other property interests to be part of Common Area, regardless of whether such real estate is specifically or formally designated as Common Area. Such property shall be accepted by the Association and thereafter shall be maintained by the Association at its expense for the benefit of its Members, subject to any restrictions of record or as set forth in the deed or other instrument transferring such property to the Association. Upon written request of Declarant, the Association shall reconvey to Declarant any unimproved portions of the Properties originally conveyed to the

Association for no consideration, to the extent conveyed by Declarant in error or needed by Declarant to make minor adjustments in property lines.

4.3 Rulemaking and Administrative EnforcementofGoverningDocuments.

(a) Rulemaking. The Association, through the Board, may make, modify, amend, cancel, limit, create exceptions to and enforce reasonable rules and regulations governing the use of the Properties, consistent with the rights and duties established by the Governing Documents, including, without limitation, rules limiting the use of the Common Area by visitors, including visiting children. Such rules shall be binding upon all Owners, Residents, guests, invitees, and licensees, if any, until and unless overruled, canceled, or modified in a regular or special meeting of the Association by the vote of a majority of the total vote in the Association. The Board shall have no obligation to call such a meeting except as provided for in the Bylaws. Rules established shall be deemed part of the Governing Documents.

(b) Enforcement. The Board, or the Covenants Committee, if any, established pursuant to the By-Laws, may impose sanctions for violations of the Governing Documents (including failure to pay charges due and owing to the Association), after notice and a hearing in accordance with the procedures set forth in Section 3.24 of the By-Laws. The Board shall establish a schedule and/or a range of penalties for violations of the Governing Documents. Any range or schedule established by the Board may be changed, modified or adjusted as the Board, in its sole discretion, deems appropriate; provided, however, that changes, modification and adjustments may be applied or imposed prospectively only. Such sanctions may include, without limitation:

(i) imposing a graduated range of reasonable monetary fines which, until paid, shall constitute a lien upon the violator's Dwelling Unit. In the event that any Resident, guest or invitee of a Dwelling Unit violates the Governing Documents and a fine is imposed, the fine shall be assessed against and the obligation of the Resident, guest or invitee and the Owner, jointly and severally; and enforceable as a Benefitted Assessment;

(ii) suspending an Owner's right to vote;

(iii) suspending any Person's right to use any recreational facilities within the Common Area; provided, however, nothing herein shall authorize the Board to limit ingress, egress or access to or from a Dwelling Unit;

(iv) suspending any rights, services, or privileges provided by the Association to an Owner or the Owner's Dwelling Unit; and

(v) levying Benefitted Assessments to cover costs incurred in bringing a Dwelling Unit into compliance in accordance with **Section 8.8(b)**.

The above rights and remedies are cumulative and supplement all other rights of enforcement under applicable law. In addition, and by way of illustration and not limitation, the Board may elect to enforce any provision of the Governing Documents by self-help (specifically

including, but not limited to, the towing of vehicles that are in violation of parking rules and regulations in accordance with any applicable ordinance or requiring immediate abatement of violating activity) or by suit at law or in equity to enjoin any violation or to recover monetary damages, or both, without the necessity of compliance with the procedures set forth in the By-Laws. In any action or proceeding to enforce the provisions of the Governing Documents, if the Association prevails, it shall be entitled to recover all costs, including, without limitation, attorneys fees and court costs, reasonably incurred in connection with or in the course of such action.

The decision to pursue enforcement action in any particular case shall be left to the Board's discretion, except that the Board shall not be arbitrary or capricious in taking enforcement action. Without limiting the generality of the foregoing sentence, the Board may determine that, under the circumstances of a particular case:

(i) the Association's position is not strong enough to justify taking any or further action;

(ii) although a technical violation may exist or may have occurred, it is not of such a material nature as to be objectionable to a reasonable person or to justify expending the Association's resources; or

(iii) that it is not in the Association's best interests, based upon hardship, expense, or other reasonable criteria, to pursue enforcement action.

Such a decision shall not be construed a waiver of the Association's right to enforce such provision at a later time under other circumstances or preclude the Association from enforcing any other covenant, restriction or rule.

The Association, by contract or other agreement, may enforce applicable state and local laws and ordinances and governmental bodies may enforce their respective laws and ordinances within the Properties for the benefit of the Association and its Members.

4.4 Implied Rights; Board Authority. The Association may exercise any right or privilege given to it expressly by the Governing Documents, or reasonably implied from or reasonably necessary to effectuate any such right or privilege. Except as otherwise specifically provided in the Governing Documents, all rights and powers of the Association may be exercised by the Board without any notice to or a vote of the membership.

4.5 Governmental, Educational, and Religious Interests. During the Development Period, the Declarant may designate sites within the Properties, including portions of the Common Area, for government, education or charitable activities and interests, including without limitation, fire, police, and utility facilities, schools and educational facilities, parks and other public facilities. In the event of such a designation, the Association shall take whatever action is required with respect to such site to permit such use, including dedication or conveyance of the site, if so directed by Declarant.

4.6 Indemnification. The Association shall indemnify every officer, director, and committee member and the Association's managing agent and its employees and agents against all damages and expenses, including counsel fees, reasonably incurred in connection with any action, suit, or other proceeding (including settlement of any suit or proceeding, if approved by the then Board of Directors) to which it, he or she may be a party by reason of being or having been an officer, director, or committee member, except that such obligation to indemnify shall be limited to those actions for which liability is limited under this Section and/or Tennessee law.

The officers, directors, committee members and managing agent shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct, or bad faith. The officers and directors shall have no personal liability with respect to any contract or other commitment made or action taken in good faith on behalf of the Association. The Association shall indemnify and hold each such officer, director, committee member and managing agent harmless from any and all liability to others on account of any such contract, commitment or action to the maximum extent permitted by Tennessee law. This right to indemnification shall not be exclusive of any other rights to which any present or former officer, director, committee member and managing agent may be entitled. The Association shall, as a Common Expense, maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such insurance is available at a reasonable cost. Decisions whether to institute litigation are no different from other decisions directors make. There is no independent legal obligation to bring a civil action against another party, and no provision of the Governing Documents shall be construed to impose a duty upon the Board to sue under any circumstances.

4.7 Dedication of Common Area. The Association, acting by and through the Board, may dedicate portions of the Common Area to Maury County, Tennessee, or to any other local, state, or federal governmental or quasi-governmental entity. The Declarant shall have the right, power and authority to dedicate or transfer any portion of the Properties to Maury County, Tennessee or to any other local, state, or federal governmental or quasi-governmenatal entity at any time the Declarant deems, in its sole discretion, such a tranfer or dedication to be appropriate.

4.8 Security. It is the goal of all Owners, including Declarant, to have a safe and healthy environment. However, no written or oral representations regarding the safe and secure nature of Southern Springs shall be construed in whole or in part as guarantees thereof, it being recognized that circumstances which are beyond the control of the Declarant, the Association, or the managing agent may arise. The Association may maintain or support certain activities within the Properties designed to make the Properties safer than they otherwise might be; provided, however, that the Association shall not be obligated to maintain or support such activities nor shall any action taken by the Association in this regard be deemed or construed to create or give rise to any duty or obligation beyond any that exists under the law independent of the Association's action.

**The Association, the managing agent, or the Declarant shall not in any way be considered insurers or guarantors of security within the Properties. None of the foregoing shall be held liable for any loss or damage by reason of failure to provide adequate security**



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 46 of 126 PageID #: 51

**or ineffectiveness of security measures undertaken. No representation or warranty is made that any fire protection system, entry gate, patrol, alarm system or other security system or measures, including any mechanism or system for limiting or monitoring access to the Properties, can not be compromised or circumvented, nor that any such systems or security measures undertaken will in all cases prevent loss or provide the detection or protection for which the system is designed or intended.**

**Each Owner acknowledges, understands and covenants to inform all Residents, tenants, guests, and invitees of the Owner's Dwelling Units that the Association, its Board of Directors and committees, the Declarant, and the managing agent are not insurers or guarantors of security within the Properties. Each Owner and all Residents, tenants, guests, and invitees of the Owner's Dwelling Unit assume all risks for injury, loss or damage to persons, to Dwelling Units, and to the contents of Dwelling Units and further acknowledge that the Association, its Board and committees, the managing agent, and the Declarant have made no representations or warranties, nor has any Owner, or any Resident, tenant, guest, or invitee of any Dwelling Unit relied upon any representations or warranties, expressed or implied, relative to any entry gate, patrolling of the Properties, any fire protection system, burglar alarm system, or other security systems recommended or installed or any security measures undertaken within the Properties.**

4.9 Video, DataandCommunicationServiceAgreements. The Association has or may hereafter enter into agreements for the provision of cable television and/or other communication services in order to obtain access to benefits and services for the benefit of Owners and Dwelling Units located on the Properties. Payment for services and benefits provided pursuant to video, data and/or communication service agreements executed pursuant to this paragraph will be made from assessments levied and collected by the Association pursuant to the authority granted in **ARTICLE VIII**. While Owners are free to obtain the same or similar services from a provider of their choice, no Owner may avoid paying any portion of assessments levied based on non-use of video, data or communication services provided and paid for by the Association with assessments.

4.10 Assumption of Risk. The Association may, but shall not be obligated to, maintain or support certain activities within the Properties designed to promote the health, safety and welfare of the Owners and Residents. Notwithstanding anything contained in the Governing Documents or any other document binding the Association, none of the Association, the Board, the managing agent, or the Declarant shall be liable or responsible for, or in any manner a guarantor or insurer of, the health, safety or welfare of any Owner or Resident of any Dwelling Unit or any tenant, guest or invitee of any Owner or Resident or for any property of any such Persons. Each Owner and Resident of a Dwelling Unit and each tenant, guest and invitee of any Owner or Resident shall assume all risks associated with the use and enjoyment of the Properties, including all recreational facilities.

**The Association, the Board, the managing agent, or the Declarant shall not be liable or responsible for any personal injury, illness or any other loss or damage caused by the presence or malfunction of utility lines, facilities or equipment on, adjacent to, near, over, or on the Properties. Each Owner and Resident of a Dwelling Unit and each tenant, guest, and invitee of any Owner or Resident shall assume all risk of personal injury, illness, or**

**other loss or damage arising from the presence of utility lines, facilities or equipment and further acknowledges that the Association, the Board, the managing agent, and the Declarant have made no representations or warranties, nor has any Owner or Resident, or any tenant, guest, or invitee of any Owner or Resident relied upon any representations or warranties, expressed or implied, relative to the condition or impact of utility lines, facilities or equipment.**

No provision of the Governing Documents shall be interpreted as creating any duty or obligation of the Association, the Board, the managing agent, or the Declarant to protect or further the health, safety or welfare of any individuals, even if the funds of the Association are used for any such purpose.

Each Owner (by virtue of his or her acceptance of title to his or her Dwelling Unit) and each other Person having an interest in or lien upon, or making any use of, any portion of the Properties (by virtue of accepting such interest or lien or making such use) shall be bound by this Section and shall be deemed to have waived any and all rights, claims, demands and causes of action against the Association, the managing agent, and the Declarant, their directors, officers, committee members, employees, agents, contractors, subcontractors, successors and assigns arising from or connected with any matter for which the liability has been disclaimed.

4.11 Change of Use of Common Area. During the Declarant Control Period, the Board shall have the power and right to change the use and/or configuration of portions of the Common Area or Limited Common Area without the approval or consent of the Members. After the Declarant Control Period, if the Board adopts a resolution which states that a change in use or configuration will not have an adverse effect on the Association and the Owners, the Board may give notice of the change to all Owners. The notice shall give the Owners a right to submit written objections to the change within thirty (30) days of the notice. If ten percent (10%) or more of the Members who will be affected by the change submit written objections, the change shall not be effective unless and until it is approved by the Membership as provided in Section 3.3(b).

4.12 View Impairment. Neither the Declarant nor the Association guarantees or represents that any view from any Dwelling Unit will be preserved without impairment. Neither the Declarant nor the Association shall have the obligation to relocate, prune, or thin trees or other landscaping except as set forth in Article V. **Any express or implied easements for view purposes or for the passage of light and air are hereby expressly disclaimed.**

4.13 Relationship with Tax-Exempt Organizations. The Association may create, enter into agreements or contracts with, or grant exclusive and/or non-exclusive easements over the Common Area to non-profit, tax-exempt organizations for the benefit of the Properties, the Association, its Members and Residents. The Association may contribute money, real or personal property or services to any such entity. Any such contribution shall be a Common Expense of the Association and included as a line item in the Association's annual budget.

For the purposes of this Section, a "tax-exempt organization" shall mean an entity which is exempt from federal income taxes under the Internal Revenue Code ("Code"), such as, but not

limited to, entities which are exempt from federal income taxes under Sections 501(c)(3) or 501(c)(4), as the Code may be amended from time to time.

4.14 Recycling Programs. The Board may establish a recycling program and recycling center within the Properties, and in such event, all Residents shall support such program by recycling, to the extent reasonably practical, all materials which the Association's recycling program or center is designed to accommodate. The Association may, but shall have no obligation to, purchase recyclable materials in order to encourage participation, and any income received by the Association as a result of such recycling efforts shall be used to reduce Common Expenses.

4.15 Wildlife Control. Declarant and the Association reserve the right to undertake such measures as may be appropriate to control wildlife within the Properties including, but not limited to, the taking of deer, turkeys, beaver and large birds so long as such measures are consistent with all applicable legal requirements. Without limiting the foregoing, Declarant or the Association may, in their discretion, establish regular control programs such as, for example, the use of dogs to prevent non-migratory geese and other species from nesting within and/or causing damage to the Properties or the Private Amenities or otherwise becoming a nuisance and may limit, control or prohibit the placement or distribution of food or other items consumed by or attractive to wildlife. The Association shall also have the right and power, but not the obligation, to take such actions and adopt such rules as may be necessary for control, relocation and management of wildlife, snakes, rodents, and pests, within the Properties.

4.16 Sales Center. Declarant reserves all rights with respect to the sales center after Declarant no longer requires the sales center for sales and marketing purposes. Without limiting the foregoing, Declarant may, but shall not be obligated to, sell the property to the Association or to a third party for any use permitted under applicable law or may destory or remove the sales center as Declarant, in its sole discretion, deems appropriate.

4.17 ContractMembershipsandServices. The Declarant and the Association shall have the right to enter into contracts with organizations, clubs and other service providers to obtain products and services which the Declarant or the Board, acting in their sole discretion, determine will benefit the Owners and the costs and expenses of any products or services provided pursuant to such contracts shall be a Common Expense.

## ARTICLE V
## MAINTENANCE

5.1 Association's Responsibility. The Association shall maintain and keep in good repair the Area of Common Responsibility, which shall include, but need not be limited to:

(a) all Common Area (including Limited Common Area); provided, however, that nothing herein shall mandate a particular method or level of maintenance and it is expressly understood that portions of the Common Area may be maintained to different

standards or left "rustic" or "natural" (not maintained) as the Board in its sole discretion deems appropriate from time to time.

(b) all water service facilities included in the Common Area;

(c) all perimeter walls or fences constructed by the Declarant surrounding the Properties or which separate a Dwelling Unit from the Common Area regardless of whether such wall or fence is located on the Common Area or on a Dwelling Unit; provided that Owners shall be responsible for maintaining the interior surface of the perimeter wall or fence located on such Owner's Dwelling Unit as provided in **Section 5.2**. A perimeter wall or fence shall not be a Party Wall as set forth in **Section 5.7**;

(d) if, and to the extent, required under applicable Maury County ordinances, landscaping, street lights and signage within public rights-of-way abutting the Properties;

(e) landscaping and other flora within any public utility easements and scenic easements within the Common Area (subject to the terms of any easement agreement relating thereto);

(f) any additional property included within the Area of Common Responsibility as may be required under the terms of this Declaration, any Supplemental Declaration, any Plat, or any contract or agreement for maintenance thereof entered into by, or which is binding upon, the Association;

(g) any property or facility owned by the Declarant and made available, on a temporary or permanent basis, for the primary use and enjoyment of the Association and its Members and identified by written notice from the Declarant to the Association until the Declarant revokes such privilege by written notice to the Association;

(h) mail boxes installed by Declarant;

(i) freestanding retaining walls constructed by the Declarant located on Dwelling Units and within Easement Areas as specifically provided for in **Section 11.10**, a freestanding retaining wall located within an Easement Area shall not be a Party Wall as set forth in **Section 5.7;**

(j) any and all public streets and roadways within the Properties until such time as responsibility for theirmaintenance is accepted and assumed by Maury County or other governmental authority. **Declarant makes no guarantee or representation that the streets and roadways within the Properties will be accepted by Maury County or any municipality or governmental authority for maintenance, and should this not occur, the Association will remain responsible for the maintenance all public streets and roadways. In the event any dedicated public street or roadway is not accepted for maintenance by Maury County or another governmental agency within ninety (90) days after the date on which the street or road is submitted by the Declarant for acceptance, the Declarant may transfer and convey that street or road and any**

**improvements located thereon to the Association as Common Area at any time thereafter;** and

(k) any private roads, paved areas and parking lots located on property owned by the Association.

The Association may also maintain other property which it does not own, including, without limitation, rights-of-way and other property dedicated to public use, if the Board determines that such maintenance is necessary or desirable to maintain the Community-Wide Standard and if otherwise permitted by applicable law and any governmental entity directly responsible therefor.

Except as hereinafter provided in this Section, the costs of maintenance, repairs and replacement of (i) the Common Area and Areas of Common Responsibility shall be Common Expenses, and (ii) Limited Common Area shall be Limited Common Area Expenses which shall be paid by the Owners of Dwelling Units who have the right to use the Limited Common Area in equal shares for each Dwelling Unit.

If during the Development Period the Association fails to properly perform its maintenance responsibilities hereunder, the Declarant may, upon not less than ten (10) days notice and opportunity to cure such failure, cause such maintenance to be performed and in such event, the Association shall reimburse Declarant for all costs incurred.

5.2 Owner's Responsibility. Each Owner shall maintain his or her Dwelling Unit and all improvements and easements located thereon in a manner consistent with the Community-Wide Standard and all applicable buffer requirements and covenants, unless such maintenance responsibility is otherwise expressly assumed by or assigned to the Association hereunder or pursuant to a Supplemental Declaration. Unless expressly designated as part of the Common Area, each Owner shall be responsible for maintaining the area located within the public right-of-way adjacent to his or her Dwelling Unit and between the perimeter boundary of the Dwelling Unit and the paved portion of the roadway located thereon. Maintenance of this area within the public right-of-way shall be consistent with the Community Wide Standard, as well as all requirements and ordinances of Maury County, if any.

In addition to any other enforcement rights, if an Owner fails to perform properly his or her maintenance responsibility, the Association shall have the right to come upon such Owner's Dwelling Unit and perform such maintenance responsibilities and assess all costs incurred as a Benefitted Assessment in accordance with **Section 8.8**. The Association shall afford the Owner reasonable notice and an opportunity to cure the problem prior to entry, except when entry is required due to an emergency or other situation where injury, harm or damage is imminent, which determination shall be made by the Board, acting in its sole discretion.

5.3 Special Services: The Association, acting by and through the Board, may offer "Special Services" to a Dwelling Unit or a group of Dwelling Units from time to time. Nothing herein shall obligate the Association to offer any Special Services. By way of example and not by way of limitation, a Special Service may include snow removal from driveways/or walkways

on a Dwelling Unit. Acceptance of Special Services offered is optional. If Special Services are accepted by an Owner or Owners, the Association may require that Owner or Owners to pay in full and in advance for any Special Services provided or may assess the costs of the Special Service provided to the benefitted Owner or Owners as a Benefitted Assessment under **Section 8.8.**Nothing herein shall obligate the Association to offer any Special Services, and the Association, acting by and through Board and in its sole discretion, may discontinue providing any Special Service at any time.

5.4 Neighborhood-Wide Services: To the extent allowed under **Section 1.38**, the Association may furnish "Neighborhood-Wide Services to any Neighborhood designated or identified as provided in **Section 1.33**. By way of example and without limitation, a Neighborhood-Wide Service may include snow removal from driveways and/or walkways on all Dwelling Units in the designated Neighborhood, or grass cutting or maintenance of landscaping on all Dwelling Units in a designated Neighborhood. The cost of furnishing a Neighborhood-Wide Service shall be Neighborhood Expenses as defined in **Section 1.36** which shall be assessed and collected as provided in **Section 8.4** No assurance or guarantee is made that the Association will continue to provide Neighborhood-Wide Services. The Association may, by Board action and in its sole discretion, suspend, modify, or discontinue providing a Neighborhood-Wide Service in which case each Owner may be required to furnish the Neighborhood-Wide Service to the Dwelling Unit at Owner's sole cost and expense. If the Association is furnishing a Neighborhood-Wide Service to a Dwelling Unit, but a portion of the Dwelling Unit with respect to which the Neighborhood-Wide Service is to be furnished is obstructed with temporary or permanent improvements, personal property or other obstructions which make it difficult or impractical for the Association's agent or contractor to furnish the Neighborhood-Wide Service, the Association shall not furnish the Neighborhood-Wide Service and, in such case, the Owner shall be responsible for furnishing the Neighborhood-Wide Service to such portion of the Dwelling Unit at the Owner's sole cost and expense, so that the appearance of such portion of the Dwelling Unit is similar to that of those portions where the Neighborhood-Wide Services are furnished by the Association and for the ongoing payment of Neighborhood-Wide Assessments without reduction or adjustment.

5.5 Standard of Performance. Maintenance, as used in this Article, shall include, without limitation, repair and replacement as needed, as well as such other duties, which may include irrigation, as the Board may determine necessary or appropriate to satisfy the Community-Wide Standard. All maintenance shall be performed in a manner consistent with the Community-Wide Standard and all applicable covenants, as determined by the Board. Without limiting the foregoing, the Board may establish standards for maintenance of portions of the Properties which are higher than those generally required under the Community Wide Standard.

Notwithstanding anything to the contrary contained herein, neither the Association, any Owner, nor the managing agent shall be liable for property damage or personal injury occurring on, or arising out of, the condition of property which it does not own unless, and only to the extent that, it has been negligent in the performance of its maintenance responsibilities.

5.6 Alterations, Additions or Improvements. Alterations, additions or improvements to the Common Area (other than Limited Common Area) may be made by the Board without the

consent or approval of any of the Owners. The cost of any such alterations, additions or improvements to Common Area (other than Limited Common Area) shall be charged to all Owners of Dwelling Units in equal amounts. During the Declarant Control Period, alterations, additions or improvements to Limited Common Areamay be made by the Board without the consent or approval of any Owners, including those who have the right to use the affected Limited Common Area. After the Declarant Control Period, alterations, additions or improvements to Limited Common Area shall be approved by the Board and the Owners of two-thirds (2/3) of the Dwelling Units that have the right to use the affected Limited Common Area. The cost of any alterations, additions or improvements to Limited Common Area shall be charged to the Owners of the Dwelling Units who have the right to use the affected Limited Common Area in equal amounts.

## ARTICLE VI
## INSURANCE AND CASUALTY LOSSES

6.1 Association Insurance.

(a) Required Coverages. The Association, acting through its Board or its duly authorized agent, shall obtain and continue in effect the following types of insurance, if reasonably available, or if not reasonably available, the most nearly equivalent coverages as are reasonably available:

(i) Blanket property insurance covering "risks of direct physical loss" on a "special form" basis (or comparable coverage by whatever name denominated) for all insurable improvements within the Area of Common Responsibility to the extent that it has assumed responsibility for maintenance, repair and/or replacement in the event of a casualty, regardless of ownership. If such coverage is not generally available at reasonable cost, then "broad form" coverage may be substituted. All property insurance policies obtained by the Association shall have policy limits sufficient to cover the full replacement cost of the insured improvements under current building ordinances and codes; provided, however, that this coverage may include and provide for a deductible in a commercially reasonable amount as determined by the Board from time to time.

(ii) Commercial general liability insurance on the Area of Common Responsibility, insuring the Association and its Members for damage or injury caused by the negligence of the Association or any of its Members, employees, agents, or contractors while acting on its behalf. If generally available at reasonable cost, the commercial general liability coverage (including primary and any umbrella coverage) shall have a limit of at least $2,000,000.00 per occurrence with respect to bodily injury, personal injury, and property damage; provided, should additional coverage and higher limits be available at reasonable cost which a reasonably prudent person would obtain, the Association shall obtain such additional coverages or limits;

(iii) Workers compensation insurance and employer's liability insurance, if and to the extent required by law;

(iv) Directors' and officers' liability coverage;

(v) Commercial crime insurance, including fidelity insurance covering all Persons responsible for handling Association funds in an amount determined in the Board's best business judgment but not less than an amount equal to one-sixth (1/6) of the total annual assessments then in effect, plus reserves on hand. Fidelity insurance policies shall contain a waiver of all defenses based upon the exclusion of individuals serving without compensation; and

(vi) Such additional insurance as the Board, in its business judgment, determines advisable.

Premiums for all insurance specified above shall be Common Expenses and shall be included in the Base Assessment, except that premiums for property insurance relating to Limited Common Area may be Limited Common Area Expenses if reasonably separable and economically feasible. Further, premiums for all insurance specified above which is obtained or maintained by the Association in connection with any Neighborhood, Neighborhood Facility or Neighborhood Services shall be a Neighborhood Expense.

(b) Policy Requirements. The Association shall arrange for an annual review of the sufficiency of insurance coverage by one (1) or more qualified individuals, at least one (1) of whom must be familiar with insurable replacement costs in the Middle Tennessee area. All Association policies shall provide for a certificate of insurance to be furnished, upon request, to each Member insured, to the Association and each Mortgagee.

The policies may contain a reasonable deductible and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the policy limits satisfy the requirements of **Section 6.1(a)**. In the event of an insured loss, the deductible shall be treated as a Common Expense or a Limited Common Area Expense in the same manner as the premiums for the applicable insurance coverage. However, if the Board reasonably determines, after notice and an opportunity to be heard in accordance with the By-Laws, that the loss is the result of the negligence or willful misconduct of one (1) or more Owners or Residents, or their guests, pets, invitees, or lessees, then the Board may specifically assess the full amount of such deductible as a Benefitted Assessment against such Owner(s) and their Dwelling Units pursuant to **Article VIII**.

All insurance coverage obtained by the Board shall:

(i) be written with a company authorized to do business in the State of Tennessee which satisfies the requirements of the Fannie Mae, or such other secondary mortgage market agencies or federal agencies as the Board deems appropriate;

(ii) be written in the name of the Association as trustee for the benefitted parties. Policies on the Common Areas shall be for the benefit of the Association and its Members;

(iii) not be brought into contribution with insurance purchased by Owners, Residents, or their Mortgagees individually;

(iv) contain an inflation guard endorsement;

(v) include an agreed amount endorsement, if the policy contains a co-insurance clause;

(vi) provide that each Owner is an insured person under the policy with respect to liability arising out of such Owner's interest in the Common Area or membership in the Association;

(vii) provide a waiver of subrogation under the policy against each Owner and each Resident;

(viii) include an endorsement precluding cancellation, invalidation, suspension, or non-renewal by the insurer on account of any one (1) or more individual Owners, or on account of any curable defect or violation without prior written demand to the Association to cure the defect or violation and allowance of a reasonable time to cure; and

(ix) include an endorsement precluding cancellation, invalidation, or condition to recovery under the policy on account of any act or omission of any one (1) or more individual Owners, unless such Owner is acting within the scope of its authority on behalf of the Association.

In addition, the Board shall use reasonable efforts to secure insurance policies which list the Owners as additional insureds and provide:

(i) a waiver of subrogation as to any claims against the directors, committee members, officers, employees, and the Association's manager, the Owners, Residents and their respective tenants, servants, agents, and guests;

(ii) a waiver of the insurer's rights to repair and reconstruct instead of paying cash;

(iii) an endorsement excluding Owners' individual policies from consideration under any "other insurance" clause;

(iv) an endorsement requiring at least thirty (30) days' prior written notice to the Association of any cancellation, substantial modification, or non-renewal;

(v) a cross liability provision; and

(vi) a provision vesting in the Board exclusive authority to adjust losses; provided, however, no Mortgagee having an interest in such losses may be prohibited from participating in the settlement negotiations, if any, related to the loss.

(c) Damage and Destruction. Immediately after damage or destruction to all or any part of the Properties covered by insurance written in the name of the Association, the Board or its duly authorized agent may file and adjust all insurance claims and obtain reliable and detailed estimates of the cost of repair or reconstruction. Repair or reconstruction, as used in this paragraph, means repairing or restoring the property to substantially the condition in which it existed prior to the damage, allowing for changes or improvements necessitated by changes in applicable building codes.

Any damage to or destruction of the Common Area shall be repaired or reconstructed at the Association's expense. Any insurance proceeds remaining after paying the costs of repair or reconstruction and expenses in making and administering the claim, or after such settlement as is necessary and appropriate, shall be retained by the Associaton and used as the Board in its discretion deems appropriate. If insurance proceeds are insufficient to cover the costs of repair or reconstruction, the Board of Directors may, without a vote of the Members, levy Special Assessments to cover the shortfall against those Owners responsible for sharing in the cost of the premiums for the applicable insurance coverage under **Section 6.1(a).**

6.2 Owner's Insurance. By virtue of taking title to a Dwelling Unit, each Owner covenants and agrees with all other Owners and with the Association to carry property insurance for the full replacement cost of all structures and insurable improvements on his or her Dwelling Unit, less a reasonable deductible, unless (i) the Association is expressly required to maintain insurance for the Dwelling Units; or (ii) the Association voluntarily carries such insurance. If the Association assumes responsibility for obtaining any insurance coverage on behalf of Owners, the premiums for such insurance shall be levied as a Benefitted Assessment against the benefitted Dwelling Unit and the Owner thereof pursuant to **Section 8.8.**

Each Owner further covenants and agrees that if the Owner is required to carry property insurance for his or her Dwelling Unit, in the event of damage to or destruction of structures on or comprising his Dwelling Unit, the Owner shall proceed promptly to repair or to reconstruct in a manner consistent with the original construction or such other plans and specifications as are approved in accordance with **Article IX**, regardless of whether the insurance proceeds are sufficient to pay the cost of such work. Alternatively, the Owner shall clear the Dwelling Unit and maintain the Dwelling Unit in a neat and attractive, landscaped condition consistent with the Community-Wide Standard. The Owner shall pay any costs which are not covered by insurance proceeds.

In addition to the property insurance required above, each Owner shall carry general liability insurance in an amount not less than $100,000.00.

The Board may request that Owners provide evidence of insurance as required in this subsection at reasonable intervals.



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 56 of 126 PageID #: 61

## ARTICLE VII
## ANNEXATION AND WITHDRAWAL OF PROPERTY

7.1 Annexation. During the Development Period, the Declarant may unilaterally subject to the provisions of this Declaration as part of the Properties all or any portion or portions of the real estate described in Exhibit B, as amended from time to time. The Declarant reserves the right, but shall not be obligated, to unilaterially amend Exhibit B to add additional real estate which is adjacent to real estate then described in Exhibit B or separated from such real estate by a dedicated right of way, forest preserve or other real estate which is dedicated to or owned by a governmental entity. Any portion of the real estate described in Exhibit B which is not made part of the Properties may be developed and used for any purposes not prohibited by law, including, without limitation, as a commercial development or as a residential development which is not part of Southern Springs.

Declarant may transfer or assign this right to annex property, provided that the transferee or assignee is the developer of at least a portion of the real estate described in Exhibit B and that such transfer is memorialized in a written instrument executed by Declarant and filed in the Public Records. Nothing in this Declaration shall be construed to require the Declarant or any successor to annex or develop any of the real estate set forth in Exhibit B, any Private Amenities or any other real estate in the vicinity of Southern Springs owned by Declarant or an affiliate of the Declarant in any manner whatsoever.

Annexation shall be accomplished by filing in the Public Records a Supplemental Declaration describing the real estate being annexed. Such Supplemental Declaration shall not require the consent of the Members, but shall require the consent of any owner of such real estate other than Declarant. Any such annexation shall be effective upon the filing in the Public Records of such Supplemental Declaration unless otherwise provided therein. Each Dwelling Unit subject to this Declaration, whether initially described on Exhibit A or annexed and added through a Supplemental Declaration, shall have an equal, pro rata share of liability for Base Assessments, Limited Common Area Assessments and Neighborhood Assessments levied with respect to the Dwelling Unit.

Any Supplemental Declaration may contain covenants, conditions, restrictions and easements which apply only to the real estate being annexed and/or may create exceptions to, or otherwise modify, the terms of this Declaration as they may apply to the real estate being annexed in order to reflect the different or unique character and/or intended use of such real estate.

7.2 Withdrawal of Restrictions. The Declarant reserves the unilateral right during the Development Period to amend this Declaration to withdraw any portion of the Properties from the coverage of this Declaration whether originally described on Exhibit A or added and annexed by a Supplemental Declaration; provided, no property which includes a Dwelling Unit shall be withdrawn after the Dwelling Unit has been conveyed by Declarant to any Person other than an affiliate of the Declarant or a Builder. Such amendment shall not require the consent of any Person other than the Owner of the real estate to be withdrawn, if not the Declarant. If the real



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 57 of 126 PageID #: 62

estate is Common Area, the Association shall consent to such withdrawal upon the request of the Declarant.

7.3 Amendment. This Article shall not be amended during the Development Period without the prior written consent of Declarant.

7.4 Post-Development Period Authority. After the Development Period, the Association may add and annex real estate to the Properties or withdraw and transfer real estate from the Properties pursuant to action approved by a vote of a majority of the votes represented by Voting Members present at a duly called annual or special meeting of the Members.

## ARTICLE VIII
## ASSESSMENTS

8.1 Creation of Assessments. The Association may levy assessments against each Dwelling Unit for Association expenses as the Board may specifically authorize from time to time. There shall be five (5) types of assessments: (a) Base Assessments to fund Common Expenses for the general benefit of all Dwelling Units; (b) Neighborhood Assessments; (c) Limited Common Area Assessments for Limited Common Area Expenses; (d) Special Assessments; and (e) Benefitted Assessments. Each Owner, by accepting a deed or entering into a recorded contract of sale for any portion of the Properties, is deemed to covenant and agree to pay these assessments.

The assessments levied by the Association pursuant to the authority granted in this **Article VIII**, shall be used exclusively to promote the recreation, health, safety, and welfare of the Owners and other residents of the Properties to the fullest extent authority or responsibility is granted to the Association hereunder and to discharge all rights, privileges, and duties assigned or allowed to the Association hereunder, including, without limitation, the payment of Common Expenses as defined under **Section 1.13.** Without limiting the generality of the foregoing, assessments may be used for the leasing, acquisition, improvement, maintenance, and operation of the Properties and the provision of services and facilities devoted to this purpose and related to the use and enjoyment of the Properties, including, without limitation, as specified in **Articles II, IV** and **V**; the administration of architectural standards and review, including, without limitation, as specified in **Article IX**; the administration and enforcement of the Governing Documents as defined in **Section 1.22**; the administration and exercise of privileges, licenses, and easements granted to or reserved by the Association, including, without limitation, as provided in **Article XI**; payment of taxes and governmental assessments on the Common Area; payment of insurance premiums for the insurance policies maintained by the Association in accordance with the Governing Documents; payment of sums due in connection with street lights or other utilities serving the Properties for which the Association has responsibility hereunder; payment of management fees to a property manager; the employment of attorneys, architects, accountants, and other professionals to represent or assist the Association as deemed necessary or appropriate by the Board; the cost of utilities and fuel used in operating facilities in the Common Area; the

cost of maintenance and upkeep of the Properties as provided in **Section 5.1**; and for the accumulation of reserves to carry out the purposes and duties of the Association, the Board, or the Modifications Committee as provided for in the Governing Documents.

Assessments shall be paid in such manner and by such dates as the Board may establish. Unless the Board otherwise provides, the Base Assessment, and any Limited Common Area Assessment for a Dwelling Unit shall be due and payable in advance on the first day of the Association's fiscal year; provided, that, upon the first conveyance of a Dwelling Unit to a purchaser for value, the pro rata portion of such assessments for the balance of the fiscal year shall be due and payable upon conveyance of the Dwelling Unit. If any Owner is delinquent in paying any assessments or other charges levied on his or her Dwelling Unit, the Board may accelerate and require any unpaid installments of all outstanding assessments to be paid in full immediately.

The Association shall, upon request by an Owner, furnish to any Owner liable for any type of assessment a certificate in writing signed by an Association officer setting forth whether such assessment has been paid and any delinquent amount. Such certificate shall be conclusive evidence of payment. The Association may require the advance payment of a reasonable processing fee for the issuance of such certificate.

No Owner may exempt himself or herself from liability for assessments by non-use of Common Area, abandonment of his or her Dwelling Unit, or any other means. The obligation to pay assessments is a separate and independent covenant on the part of each Owner. No diminution or abatement of assessments or set-off shall be claimed or allowed for any alleged failure of the Association or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or improvements, or from any other action it takes.

8.2 Declarant Not Obligated for Assessments; Discretionary Advances and Annual Advance Reimbursement. During the Declarant Control Period, the Declarant shall have no obligation to pay any assessments or other charges to the Association. Declarant may, but shall not be required to, advance funds to the Association to pay operating expenses and/or to establish approved reserves. All funds advanced by the Declarant to the Association shall be treated as loans regardless of whether they are memorialized in a promissory note or other separate document and shall be repayable upon demand.

8.3 AnnualBudgetPreparationandComputation of Assessments. The Board shall prepare a budget that must cover the Common Expenses estimated to be incurred during the year to which the proposed budget applies and which may include Neighborhood Expenses and Limited Common Area Expenses that are expected to be incurred during the year to which the budget applies. The Board may also make amendments to the budget from time to time. Common Expenses may, but shall not be required to, include contributions to fund reserves for future needs. Limited Common Area Expenses may, but shall not be required to, include a contribution to establish a reserve fund for repair and replacement of items maintained as a Limited Common Area Expense, if any.

The Base Assessment shall be levied equally against all Dwelling Units subject to assessment and shall be set at a level which is reasonably expected to produce total income for the Association equal to the total budgeted Common Expenses, including contributions to reserves. In determining the level of assessments, the Board, in its discretion, may consider other sources of funds available to the Association. In addition, the Board shall take into account the number of Dwelling Units subject to assessment under **Section 8.12** on the first day of the fiscal year for which the budget is prepared and the number of Dwelling Units reasonably anticipated to become subject to assessment during the fiscal year.

Neighborhood Expenses shall be allocated equally among all Dwelling Units within the Neighborhood benefitted thereby and levied as a Neighborhood Assessment. If specified in the Supplemental Declaration applicable to such Neighborhood or if so directed by petition signed by the Owners of a majority of the Dwelling Units within the Neighborhood, any portion of the assessment intended for exterior maintenance of structures, insurance on Dwelling Units or other structures, or replacement reserves which pertain to particular structures shall be levied on each of the benefitted Dwelling Units in proportion to the benefit received. Such proportion shall be specified in the Supplemental Declaration applicable to such Neighborhood, or if not so specified, shall be approved by the Owners of a majority of the Dwelling Units within the Neighborhood, and Declarant, as long as Declarant owns any real estate within such Neighborhood.

Limited Common Area Expenses shall be allocated equally among all Dwelling Units benefitted thereby.

8.4 Annual Budget Approval/Disapproval Process. Each year, the budget prepared and made available as provided in **Section 8.3**and any amendments thereto, shall be subject to approval or disapproval as provided herein.

(a) **During the Declarant Control Period,** the budget and any amendments thereto must only be approved by the Declarant, and once approved by the Declarant, the budget and all assessments levied based on the budget shall be binding upon all Members.

(b) **After the Declarant Control Period,** the budget prepared by the Board and any amendments thereto and the Base Assessments, Neighborhood Assessments and Limited Common Area Assessments levied based upon the budget shall be deemed approved unless the budget and proposed assessments are disapproved at a meeting of the Members upon the vote of Voting Members representing at least two thirds (2/3) of the total Association vote and, if during the Development Period, by the Declarant. There shall be no obligation to call a meeting for the purpose of considering the budget and proposed assessment except on petition of the Voting Members as provided for special meetings in Section 2.4 of the By-Laws, which petition must be presented to the Board within thirty (30) days after notice of the proposed assessments. If the proposed budget is disapproved or the Board fails for any reason to establish the budget for any year, then the budget in effect for the immediately preceding year shall continue until a new budget is prepared, made available and approved as provided herein.



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 60 of 126 PageID #: 65

If, during the course of a budget year, the Board determines that the Base Assessments, Neighborhood Assessments or Limited Common Area Assesments are insufficient to meet the financial obligations of the Association, a Neighborhood or to satisfy Limited Common Area mainteance needs, the Association may increase the amount of any such Assessments. Such increase shall be deemed approved unless disapproved at a meeting of the Members upon the vote of Voting Members representing at least two thirds (2/3) of the total Association vote and, if during the Development Period, by the Declarant.

Notwithstanding the provisions above, portions of a budget andany proposed Neighborhood Assessment for the payment of Neighborhood Expenses which are attributable to services requested by Owners may be disapproved by a majority vote of the Voting Members who represent Dwelling Units in the Neighborhood to which the proposed Neighborhood Assessment applies. There shall be no obligation to call a meeting for the purpose of considering the Neighborhood budget except on petition of Voting Members representing at least twenty-five percent (25%) of the votes in such Neighborhood, which petition must be presented to the Board within thirty (30) days after notice of the proposed Neighborhood Assessment. The right to disapprove a portion of a budget and proposed assessment providing for the payment of Neighborhood Expenses and any proposed Neighborhood Assessments shall apply only to those line items in the budget which are attributable to services requested by Owners within a Neighborhood and shall not apply to Neighborhood Expenses for services the Association is required to provide under the terms of this Declaration or any Supplemental Declaration. In the event the Owners within any Neighborhood disapprove any line item of a budget, the Association shall not be obligated to provide the services anticipated to be funded by such line item of the budget. If the Board fails for any reason to provide for Neighborhood Expenses and to levy Neighborhood Assessments for any year, then the last budget which covers and includes Neighborhood Expenses and provides for the payment of those Neighborhood Expenses through a Neighborhood Assessment shall continue for the current year until a new budget is prepared and approved.

8.5 Special Assessments. In addition to other authorized assessments, the Board may levy Special Assessments from time to time to cover unbudgeted expenses or expenses in excess of those budgeted, including unbudgeted capital expenditures. Any such Special Assessment may be levied against all Dwelling Units, if such Special Assessment is for Common Expenses or against Dwelling Units which have the right to use Limited Common Area, if such Special Assessment is for Limited Common Area Expenses. Special Assessments may be levied against the Dwelling Units within a Neighborhood if the Special Assessment is for Neighborhood Expenses. Special Assessments shall be payable in such manner and at such times as determined by the Board, and may be payable in installments extending beyond the fiscal year in which the Special Assessment is approved. During the Declarant Control Period, Special Assessments shall require the approval of the Board only and shall not require the consent or approval of any of the Members. After the Declarant Control Period, all Special Assessments levied must be approved by the Board and the vote of Voting Members representing at least a majority of the total votes allocated to Dwelling Units which will be subject to such Special Assessment. During the Development Period all Special Assessments must be approved by the Declarant.

8.6 Benefitted Assessments. The Board may levy "Benefitted Assessments" against particular Dwelling Units for expenses incurred or to be incurred by the Association, as follows:

(a) to cover the costs, including overhead and administrative costs, of providing benefits, items or Special Services to the Dwelling Unit or Residents thereof, which assessments may be levied in advance of the provision of the requested benefit, item or service as a deposit against charges to be incurred by the Owner; and

(b) to cover costs incurred in bringing a Dwelling Unit or Dwelling Units into compliance with the terms of the Governing Documents, or costs incurred as a consequence of the conduct of the Owner or Residents of the Dwelling Unit, their agents, contractors, employees, licensees, invitees, or guests; provided, the Board shall give the Dwelling Unit Owner prior written notice and an opportunity for a hearing, in accordance with the By-Laws, before levying any Benefitted Assessment under this subsection (b).

(c) as may be otherwise provided in this Declaration or any Supplemental Declaration.

8.7 Creation and Enforcement of Lien and Personal Obligation: The Declarant for each Dwelling Unit hereby covenants, and each Owner of a Dwelling Unit by acceptance of a deed therefor (whether or not it shall be so expressed in any such deed or other conveyance) shall be and is deemed to covenant and hereby agrees to pay to the Association all Charges made with respect to the Owner or the Owner's Dwelling Unit. Each Charge, together with interest thereon, late charges, and reasonable costs of collection (including reasonable attorney's fees), if any, as hereinafter provided, shall be a continuing lien upon the Dwelling Unit against which such Charge is made and also shall be the personal obligation of the Owner of the Dwelling Unit at the time when the Charge becomes due. The lien or personal obligation created under this Section shall be in favor of and shall be enforceable by the Association.

In the event an Owner fails to pay any Charge within thirty (30) days of the date on which it is due, the Association may pursue all actions and remedies allowed by law to enforce and collect the Charge. The enforcement rights of the Association shall include, but not be limited to, the filing of a Notice of Claim of Lien in the Public Records, which lien may thereafter be immediately foreclosed in the same manner as a mortgage under Tennessee law. The Association may also bring an action of law against any Owner personally obligated to pay all or any portion of the Charges due. The amount secured and recoverable shall include (a) all Charges accrued at the date of filing and those accruing thereafter through the date of judgment, (b) all additional charges as provided and permitted in **Section 8.10**, and (c) reasonable attorney's fees and collection costs. All enforcement rights of the Association shall be cumulative.

In addition to all of the rights and remedies provided in this Declaration and otherwise by law and notwithstanding any other provision in this Declaration (including, without limitation, **Section 4.3(b)**), the Association, through the Board, may suspend any Person's right to use any recreational facilities within the Common Area and/or suspend any rights, services, or privileges provided by the Association to an Owner or the Owner's Dwelling Unit during any period that

Charges are delinquent under **Section 8.10**. Neither notice to the delinquent Owner nor any hearing shall be required before the suspension of right, services, or privileges by the Association for non-payment of Charges. All rights, privileges, and/or services suspended as permitted under this section shall be restored after payment of all outstanding Charges, including any costs, expenses or fees incurred by the Association to implement the suspension and/or to restore the rights, privileges, and/or services suspended.

8.8 Non-Payment of Charges: Any Charge which is not paid to the Association when due shall be deemed delinquent. Any Charge which is delinquent for thirty (30) days or more shall bear interest at eighteen (18%) percent (or the maximum allowed by law, if less), per annum from the due date to the date when paid. In addition, the Association may assess from any delinquent Owner (a) reasonable late fees, (b) the reasonable attorney's fees and collection costs it incurs, and (c) any administrative or collection service fees charged to the Association by its management company or any third party agent providing collection services.

8.9 Lien for Charges Subordinated to Mortgages: The lien for a Charge, provided for in **Section 8.9**, shall be subordinate to a Mortgage on the Dwelling Unit which was recorded prior to the date that the lien for any such Charge attached. Except as hereinafter provided, the lien for Charges, provided for in **Section 8.9**, shall not be affected by any sale or transfer of a Dwelling Unit, regardless of whether the notice permitted under **Section 8.9** is filed at the time of the sale or transfer. Where title to a Dwelling Unit is transferred pursuant to a decree of foreclosure of the Mortgage, such transfer of title shall extinguish the lien for unpaid Charges which became due prior to the date of the transfer of title. However, the transferee of the Dwelling Unit shall be personally liable for his share of the Charges with respect to which a lien against his Dwelling Unit has been extinguished pursuant to the preceding sentence where such Charges are reallocated among all the Owners pursuant to a subsequently adopted annual or revised Base Assessment, Neighborhood Assessment, Limited Common Area Assessment, Benefitted Assessment, Special Assessment, and non-payment thereof shall result in a lien against the transferee's Dwelling Unit, as provided in this Article.

8.10 Date of Commencement of Assessments. The obligation to pay assessments shall commence as to each Dwelling Unit on the first day of the month following: (a) the month in which the Dwelling Unit is made subject to this Declaration, or (b) the month in which the Board first determines a budget and levies assessments pursuant to this Article, whichever is later. The first annual Base Assessment, Neighborhood Assessment, and Limited Common Area Assessment, if any, levied on each Dwelling Unit shall be adjusted according to the number of months remaining in the fiscal year at the time assessments commence on the Dwelling Unit.

8.11 Failure to Assess or Provide Notice. Failure of the Board to prepare a budget, to fix assessment amounts or rates or to provide notice shall not be deemed to be a waiver, modification, or release of any Owner from the obligation to pay assessments. In such event, each Owner shall continue to pay Base Assessments, Neighborhood Assessments, Limited Common Area Assessments, and Benefitted Assessments on the same basis as during the last period for which an assessment was made, if any, until a new assessment is levied, at which time the Association may retroactively assess any shortfalls in collections.

8.12 Exempt Property. The following property shall be exempt from payment of Base Assessments, Limited Common Area Assessments, Benefitted Assessments and Special Assessments:

(a) All Common Area;

(b) Such portions of the Properties owned by the Declarant; and

(c) Any property dedicated to and accepted by any governmental authority or public utility.

In addition, the Declarant and/or the Association shall have the right, but not the obligation, to grant exemptions to certain Persons qualifying for Section 501(c) status under the Internal Revenue Code so long as such Persons own property subject to this Declaration for purposes listed in Section 501(c).

8.13 Utility Costs Billed to Owners: Certain utility charges incurred in connection with the use, operation and maintenance of the Common Area may not be separately metered to the Common Area. If such charges are metered to an individual Dwelling Unit rather than being separately metered for the Common Area, then the following shall apply:

(a) If, in the opinion of the Board, each Owner is sharing in a fair and equitable manner the cost of such service, then no adjustment shall be made and each Owner shall pay his own bill; or

(b) If, in the opinion of the Board, the Owner of a Dwelling Unit is being billed disproportionately for costs allocable to the Common Area, then the Association shall pay, or reimburse such Owner, an amount equal to the portion of the bill which in the reasonable determination of the Board is properly allocable to the Common Area, as the case may be, and the amount thereof shall be Common Expenses or Limited Common Area Expenses hereunder, as applicable.

Any determinations or allocations made hereunder by the Board shall be final and binding on all parties.

8.14. NewMemberFee.

**NOTE WELL: This section provides for the collection of a New Member Fee which is payable at the closing of each and every transfer of title to a Dwelling Unit, unless the transaction is specifically exempted under Subsection (d). While expressly payable by the grantor, the Association's lien securing payment of the New Member Fee shall survive the passage and transfer of title in the event the fee is not collected and paid to the Association at closing.**

(a) Authority. As an additional funding source inaddition to the administrative or transfer fee collected to cover administrative costs of membership transfer; the Association shall



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 64 of 126 PageID #: 69

collect a New Member Fee upon each and every transfer of title to a Dwelling Unit, other than exempt transfers as set forth herein. The New Member Fee shall be charged to and payable by the grantor of the Dwelling Unit at the closing of the transfer, and shall be secured by the Association's lien for assessments, which lien shall not be affected by the transfer of title. Each Owner transferring a Dwelling Unit shall notify the Association's secretary or designee at least seven days prior to the scheduled closing. Such notice shall include the name of the buyer, the date of title transfer, and other information the Association may reasonably require.

(b) Fee Amount. The fee shall equal the Base Assessment levied under this **Article VIII** for the year in which the transfer occurs, and shall be due upon the transfer of title to the Dwelling Unit.

(c) Purpose. New Member Fees shall be used for purposes which the Association Board deems beneficial to meet the general operating needs of the Association. By way of example and not limitation, New Member Fees may be used to assist the Association or one or more tax-exempt entities in funding operating and maintenance costs for recreational facilities, common areas open space preservation and all other funding needs for operating the Association.

(d) Exempt Transfers. Notwithstanding the above, no New Member Fee shall be levied upon transfer of title to property:

(i) by or to the Declarant;

(ii) by a builder or developer holding title solely for purposes of development and resale;

(iii) by a co-owner to any Person who was a co-owner immediately prior to such transfer;

(iv) to the Owner's estate, surviving spouse, or heirs at law upon the death of the Owner;

(v) to an entity wholly owned by the grantor or to a family trust created by the grantor for the direct benefit of the grantor and his or her spouse and/or heirs at law; provided, upon any subsequent transfer of an ownership interest in such entity, the New Member Fee shall become due;

(vi) to an institutional lender as security for the performance of an obligation pursuant to a Mortgage; or

(v) to or by the Association.

8.15. InitialCapitalizationFee.

The Association may charge an Initial Capitalization Fee to any purchaser or entity acquiring title to a Dwelling Unit from the Declarant. The amount of this Initial Capitalization Fee shall be set by the Board from time to time but shall not exceed the amount of the Base Assessment levied under this **Article VIII** for the year in which the transfer occurs. Initial Capitalization Fees may be used by the Board for any purpose that the Board, acting in its sole discretion, deems reasonable or appropriate including, without limitation to the meet the general operating needs of the Association.

## ARTICLE IX
## ARCHITECTURAL STANDARDS

**NOTE WELL:The provisions of this Article IX are broad and sweeping and an extremely wide range of activities are regulated hereby. Owners are advised to review this Article carefully to ensure that they comply with all of its requirements before commencing any work or engaging in any activity on or in connection with their Dwelling Unit to ensure they comply with all of the provisions set forth. Regulated work commenced, performed, or completed without prior approval as required herein or otherwise in violation of the terms of this Declaration or applicable law may subject the Owner of the Dwelling Unit to substantial costs, expenses, fees, and penalties, which may be in addition do a requirement that the Dwelling Unit be restored to its original condition.**

9.1 General. For purposes hereof "Regulated Work" shall consist of and include (1) excavating, filling, grading, installation or alteration of landscaping; (2) construction, installation, or placement of any building, driveway, walkway, fence, porch, patio, deck, balcony, statuary, sign or other advertising or promotional devices or any other temporary or permanent improvement or structure on or to any portion of the Properties; or (3) any modification, alteration, major repair, renovation, addition or removal of or to any of the foregoing which is visible from outside of a Dwelling Unit. Regulated Work shall not include repainting the exterior of a structure in accordance with the originally approved color scheme or rebuilding of a damaged Dwelling Unit in accordance with originally approved plans and specifications. Regulated Work shall also not include work done by the Declarant during the Development Period.

During the Development Period, this Article may not be amended without the Declarant's written consent.

9.2 Architectural and Design Review. Responsibility for administration of the Design Guidelines, as defined below, and review of all applications to do Regulated Work under this Article shall be as described in subsections (a) and (b). The Reviewing Entity (defined below), may establish and charge reasonable fees for review of applications hereunder and may require such fees to be paid in full prior to review of any application. Such fees may include the reasonable costs incurred in having any application reviewed by architects, engineers or other professionals. The Declarant and the Association may employ architects, engineers, or other persons as deemed necessary to perform the review. The Board may, in its discretion, include

all or a portion of the compensation paid to such persons employed by the Association in the Association's annual operating budget as a Common Expense.

(a) Declarant Control. During the Development Period, the Declarant shall have exclusive right and power to review and approve or disapprove any and all proposed Regulated Work. The Declarant may (but shall not be obligated to), in its sole discretion, delegate all or a portion of its reserved rights under this Article to the MC (defined below) to review modifications to existing structures. Any such delegation shall be in writing, specifying the scope of responsibilities delegated, and shall be subject to (i) the right of Declarant to revoke such delegation at any time and reassume jurisdiction over the matters previously delegated; and (ii) the right of Declarant to veto any decision which it determines, in its sole discretion, to be inappropriate or inadvisable for any reason. Until the end of the Development Period, the jurisdiction of the MC shall be limited to such matters as are specifically delegated to it. In acting pursuant to this subparagraph the Declarant shall be acting solely in its interests and shall owe no duty to the Association or any Owner or Resident.

(b) Modifications Committee. The Board of Directors may establish a committee, which may consist of Residents (the "Modifications Committee" or "MC"). Until the end of the Development Period, the MC shall only have such rights and powers to review and approve or disapprove modifications or alterations to be made to existing structures as may be delegated to it by the Declarant. The MC shall assume exclusive jurisdiction over all Regulated Work at the end of the Development Period. During the Development Period, the Declarant shall have the right to veto any action taken by the MC which the Declarant determines, in its sole discretion, to be inconsistent with the Design Guidelines. The Board may serve as The Modificiations Committee.

(c) For purposes of this Article, the term "Reviewing Entity" shall mean the Declarant or the MC, as applicable.

9.3 Guidelines and Procedures. During the Development Period, the Declarant, and after the end of the Development Period, the MC, may prepare and may amend Design Guidelines which shall apply to all Regulated Work within the Properties. Any amendments to the Design Guidelines shall apply to Regulated Work commenced after the date of such amendment only and shall not apply to require modifications to or removal of Regulated Work previously approved once the approved construction or modification has commenced. There shall be no limitation on the scope of amendments to the Design Guidelines; the Design Guidelines may be amended to remove requirements previously imposed or otherwise to make the Design Guidelines less restrictive.

The Design Guidelines may contain general provisions applicable to all of the Properties, as well as specific provisions which vary from one portion of the Properties to another depending upon the location, unique characteristics, intended use, the Master Plan, and any other applicable zoning ordinances. The Design Guidelines are intended to provide guidance to Owners and Builders regarding matters of particular concern in considering applications hereunder. The

Design Guidelines are not the exclusive basis for decisions of the Reviewing Entity and compliance with the Design Guidelines does not guarantee approval of any application.

The Association shall make the Design Guidelines available to Owners and Builders who seek to engage in development or construction within the Properties and all such Persons shall conduct their activities in accordance with such Design Guidelines. In the Declarant's discretion, such Design Guidelines may be recorded in the Public Records, in which event the recorded version, as it may unilaterally be amended from time to time, shall control in the event of any dispute as to which version of the Design Guidelines was in effect at any particular time.

All Regulated Work shall be done in strict compliance with the Design Guidelines in effect at the time the plans for the Regulated Work are submitted to and approved by the Declarant or the MC, as applicable, unless a variance has been granted in writing pursuant to **Section 9.6**. So long as the Reviewing Entity has acted in good faith, its findings and conclusions with respect to appropriateness of, applicability of or compliance with the Design Guidelines and this Declaration shall be final.

9.4 Submission of Plans and Specifications.

(a) Prior to commencing any Regulated Work, an Owner shall submit an application for approval of the proposed Regulated Work to the appropriate Reviewing Entity. Such application shall be in the form required by the Reviewing Entity and shall include detailed plans and specifications ("Plans") showing site layout, structural design, exterior elevations, exterior materials and colors, signs, landscaping, drainage, lighting, irrigation, utility facilities layout and screening therefor and other features of proposed construction, as applicable. The Reviewing Entity may, in its discretion, require an Owner to obtain and provide a professional engineering report and/or a certificate or opinion from a professional engineer for the benefit of the Association, with respect to all or a portion of the Regulated Work. The Design Guidelines shall set forth the procedure and any additional information for submission of the Plans. Before the Owner may begin the proposed Regulated Work, the application must be approved by the Reviewing Entity in accordance with the procedures described below.

(b) In reviewing each submission, the Reviewing Entity may consider whatever factors it deems relevant. The Declarant or the MC, as applicable, may require relocation of native plants within the construction site or the installation of an irrigation system for the landscaping including the natural plant life on the Dwelling Unit as a condition of approval of any submission.

The Reviewing Entity shall advise the party submitting the application at an address specified by such party at the time of submission, of (i) the approval of Plans, (ii) the rejection of Plans and the reasons therefor, (iii) the partial rejection of the Plans identifying aspects of the Plans determined to be unacceptable and the reasons therefor, or (iv) the approval of Plans with conditions imposed by the MC. **All responses must be in writing.** No application or Plans shall be deemed "accepted" or "approved" based on any inaction or failure of the Reviewing Entity to respond. All Regulated Work shall be in strict accordance with all applicable laws, statutes, ordinances, environmental rules or regulations regardless of whether the response or Design Guidelines so state.

(c) If construction does not commence on a project for which Plans have been approved within one hundred twenty (120) days of such approval, such approval shall be deemed withdrawn, and it shall be necessary for the Owner to resubmit the Plans to the Reviewing Entity for reconsideration. If construction is not completed on a project for which plans have been approved within the period set forth in the Design Guidelines or in the approval, such approval shall be deemed withdrawn, and such incomplete construction shall be deemed to be in violation of this Article and subject to the enforcement provisions of this Article.

(d) If landscaping is not installed, or not to be installed, by the Declarant or Builder, each Owner of a Dwelling Unit shall, within a period of two hundred ten (210) days from the conveyance of the Dwelling Unit to the Owner by the Declarant or a Builder, install full landscaping in the Owner's yard in accordance with plans approved by the Reviewing Entity and meeting the minimum requirements set forth in the Design Guidelines.

9.5 No Waiver of Future Approvals. Each Owner acknowledges that the persons reviewing applications will change from time to time and that opinions on aesthetic matters, as well as the interpretation, application and enforcement of the Design Guidelines, may vary accordingly. Approval of proposals, plans and specifications, or drawings for any work done or proposed, or in connection with any other matter requiring approval, shall not be deemed to constitute a waiver of the right to withhold approval as to any similar proposals, plans and specifications, drawings, or other matters subsequently or additionally submitted for approval.

9.6 Variance. The Reviewing Entity may authorize variances from its guidelines and procedures, but only: (a) in accordance with duly adopted rules and regulations, (b) when unique circumstances dictate, such as unusual topography, natural obstructions, hardship or aesthetic or environmental considerations, and (c) when construction in accordance with the variance would be consistent with the purposes of the Declaration and compatible with existing and anticipated uses of adjoining properties. **All variances must be in writing.** Inability to obtain or the terms of any governmental approval, or the terms of any financing shall not be considered a hardship warranting a variance. Notwithstanding the above, during the Development Period, the MC may not authorize variances without the written consent of the Declarant.

9.7 Limitation of Liability. The standards and procedures established by this Article are intended as a mechanism for maintaining and enhancing the over all aesthetics of Southern Springs; they do not create any duty to any Person. Review and approval of any application pursuant to this Article is made on the basis of aesthetic considerations only, and the Reviewing Entity shall not bear any responsibility for ensuring the structural integrity or soundness of approved construction or modifications, nor for ensuring compliance with building codes and other governmental requirements, nor for ensuring that all dwellings are of comparable quality, value or size, of similar design, or aesthetically pleasing or otherwise acceptable to neighboring property owners.

Declarant, the Association, the Board, any committee, or member of any of the foregoing shall not be held liable for soil conditions, drainage or other general site work; any defects in

plans revised or approved hereunder; any loss or damage arising out of the action, inaction, integrity, financial condition or quality of work of any contractor or its subcontractors, employees or agents, whether or not Declarant has approved or featured such contractor as a builder in Southern Springs; or any injury, damages, or loss arising out of the manner or quality or other circumstances of approved construction on or modifications to any Dwelling Unit. In all matters, the Declarant, the Board, the MC, and the members of each shall be defended and indemnified by the Association as provided in **Section 4.6**.

9.8 Enforcement. Any construction, alteration or other work done without prior written approval or otherwise in violation of this Article or the Design Guidelines shall be deemed to be non-conforming. Upon written request from the Declarant, the MC, or the Board, Owners shall, at their own cost and expense and within such reasonable time frame as set forth in such written notice, cure such nonconformance to the satisfaction of the requester or restore the property, Dwelling Unit and/or Dwelling Units to substantially the same condition as existed prior to the non-conforming work. Should an Owner fail to remove and restore as required, the Declarant, the Association or its designees shall have the right to enter the property, remove the violation, and restore the property to substantially the same condition as previously existed. All such costs, together with the interest at the rate established by the Board (not to exceed the maximum rate then allowed by law), may be assessed against the benefitted Dwelling Unit and collected as a Benefitted Assessment unless otherwise prohibited in this Declaration.

All approvals granted hereunder shall be deemed conditioned upon completion of all elements of the approved work and all work previously approved with respect to the same Dwelling Unit, unless approval to modify any application has been obtained. In the event that any Person fails to commence and diligently pursue to completion all approved work by the deadline set forth in the approval, the Declarant or the Association shall be authorized, after notice to the Owner of the Dwelling Unit and an opportunity to be heard in accordance with the By-Laws, to enter upon the Dwelling Unit and remove or complete any incomplete work and to assess all costs incurred against the Dwelling Unit and the Owner thereof as a Benefitted Assessment unless otherwise prohibited in this Declaration.

The above rights to enter and correct shall be in addition to and not in lieu of all the rights and remedies available to the Association under this Declaration or applicable law. If an Owner's failure to act make entry necessary or desirable, neither the Declarant, the Association, nor its designees shall incur any liability to the Owner for doing so, all potential liability and/or claims being expressly waived and released.

All acts by any contractor, subcontractor, agent, employee, or invitee of an Owner shall be deemed as an act done by or on behalf of such Owner. Any contractor, subcontractor, agent, employee, or other invitee of an Owner who fails to comply with the terms and provisions of this Article and the Design Guidelines may be excluded from the Properties, subject to the notice and hearing procedures contained in the By-Laws. In such event, none of the Declarant, the Association, its officers, or directors shall be held liable to any Person for exercising the rights granted by this paragraph.

The Association shall be primarily responsible for enforcement of this **Article IX**. If, however, in the discretion of the Declarant, the Association fails to take appropriate enforcement action, as authorized herein, within a reasonable time period, the Declarant, during the Development Period, may, but shall not be obligated to, exercise enforcement rights in the same manner as set forth above. In addition to the foregoing, the Association and the Declarant shall have the authority and standing to pursue all legal and equitable remedies available to enforce the provisions of this Article and the decisions of the Reviewing Entity.

## ARTICLE X
## USE RESTRICTIONS

**NOTE WELL: Any improvement or activity on a Dwelling Unit which constitutes Regulated Work as defined under Article IX which may be permissible under this Article X, nevertheless remains subject to regulation, review and approval pursuant to Article IX whether or not reference is made to Article IX in any of the sections and provisions of this Article X.**

The Properties shall be used only for residential, recreational, and related purposes (which may include, without limitation, offices for any managing agent or agents retained by the Association or business offices for the Declarant or the Association consistent with this Declaration and any Supplemental Declaration). Any Supplemental Declaration or rules and regulations of the Board may impose stricter standards than those contained in this Article and the Association shall have standing and the power to enforce such standards.

10.1 Signs. No sign shall be erected, placed or displayed within the Properties, either inside or outside of buildings or improvements, without the written consent of the Board, except those required by law, including, without limitation, "For Sale" signs, "For Rent" signs, "For Lease" signs, political signs, posters, circulars and billboards. If permission is granted to any Person to erect a sign within the Properties, the Declarant or MC, as applicable, shall have the right to restrict the size, color, lettering, and placement of such sign. The Declarant shall have the right to erect signs as they, in their discretion, deem appropriate, including, without limitation, "for sale," entry and directional signs.

10.2 Vehicles and Parking. No automobile, truck, commercial vehicle, recreational vehicle, motorcycle, other motorized vehicle or cart, boat, trailer or other wheeled vehicle or equipment, whether motorized or not motorized, shall be parked, placed or stored on any portion of the Properties except as expressly provided for in subsections (a) and (b) below or in rules and regulations adopted by the Board in the exercise of the rulemaking authority granted to the Board herein.

(a) Passenger automobiles, motorcycles, standard pickup trucks (3/4 ton or less), golf carts or neighborhood electric vehicles ("NEV's") may be parked, placed or kept on the paved driveway of a Dwelling Unit or in a garage.

(b) Heavy trucks (greater than 3/4 ton), commercial vehicles, recreational vehicles, boats, water crafts, boat trailers, utility trailers and other wheeled vehicles or equipment, whether



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 71 of 126 PageID #: 76

motorized or not motorized not expressly allowed to be parked in a driveway under Subsection (a) may be parked and kept at all times inside a garage with the garage doors closed except when entering or leaving the garage. Notwithstanding the foregoing, heavy trucks (greater than 3/4 ton), commercial vehicles, recreational vehicles, boats, water crafts, boat trailers, utility trailers and other wheeled vehicles or equipment, whether motorized or not motorized may be parked on the paved driveway of a Dwelling Unit at times and for perioods expressly and specifically permitted by the Board in writing or in rules and regulations adopted by the Board. For purposes of this Declaration, "commercial vehicle" shall include any vehicle bearing any commercial or business markings <u>or</u> which is used, in whole or in part, for any commercial or business purpose, regardless of its markings or configuration.

(c) All vehicles, personal property, or equipment placed, parked or left on driveways shall at all times be operable and properly licensed and inspected as by law required. The Board may request and the Owner shall provide evidence or verification of operability or proper license or inspection, from time to time.

(d) The Board shall have the authority to adopt additional rules and regulations regarding the presence and use of vehicles, trailers, personal property or equipment on any portion of the Properties, including, without limitation, parking or periods during which Dwelling Unit garage doors must be closed.

10.3 <u>Occupants Bound</u>. All provisions of the Governing Documents shall also apply to all Residents, tenants, lessees, guests, and invitees of any Dwelling Unit ("Occupant"). Every Owner shall cause all Occupants comply with the foregoing, and every Owner shall be responsible for all violations, losses, or damages caused by an Occupant, notwithstanding the fact that such Occupant is fully liable and may be sanctioned for any violation. In addition to all other remedies available to the Association in the event of a violation by an Occupant, the Association may require that the Occupant be removed from and not allowed to return to the Properties and/or that any lease, agreement or permission given allowing the Occupant to be present be terminated.

10.4 <u>Animals and Pets</u>. No animals of any kind, including livestock and poultry, shall be raised, bred, or kept on any portion of the Properties, except that for each Dwelling Unit there shall be permitted up to a total of three (3) dogs or three (3) cats or a combination of dogs and cats not to exceed three (3) in total, no more than two (2) birds, and a reasonable number, as determined by the Board, of other usual and common household pets, subject to compliance with applicable local laws, codes and ordinances. In no event, however, shall monkeys, snakes, pigs, or ferrets be permitted in any Dwelling Unit.

Fecal waste deposited by any pet on portions of the Properties other than the Dwelling Unit of the Owner must be immediately removed and properly disposed of by the Owner. Pets which are permitted to roam free, or which, in the sole discretion of the Board, makeobjectionable noise, endanger the health or constitute a nuisance or inconvenience to the Owners of other Dwelling Units or the owner of any portion of the Properties shall be removed from the Properties upon request of the Board. If the Owner fails to honor such request, the pet may be removed by the Board.

The Board may adopt reasonable rules designed to minimize damage and disturbance to other Owners and Residents, including rules requiring damage deposits, waste removal, leash controls, noise controls, pet occupancy limits based on size and facilities of the Dwelling Unit and fair share use of the Common Area; provided, however, any rule prohibiting the keeping of ordinary household pets shall apply prospectively only and shall not require the removal of any pet which was being kept on the Properties in compliance with the rules in effect prior to the adoption of such rule. Nothing in this provision shall prevent the Association from requiring removal of any animal that presents an actual threat to the health or safety of Residents or from requiring abatement of any nuisance or unreasonable source of annoyance. No pets shall be kept, bred, or maintained for any commercial or business purpose.

10.5 Quiet Enjoyment. Nothing shall be done or maintained on any part of a Dwelling Unit which emits foul or obnoxious odors outside the Dwelling Unit or creates noise or other conditions which tend to unreasonably disturb the peace, quiet, safety, comfort, or serenity of the Residents and invitees of other Dwelling Units. No activity shall be carried on upon any portion of the Properties, which in the reasonable determination of the Board tends to cause embarrassment, discomfort, annoyance, or nuisance to persons using the Common Area or to the Residents and invitees of other Dwelling Units, as may be determined in the sole discretion of the Board.

10.6 Unsightly or Unkempt Conditions. All portions of a Dwelling Unit outside of enclosed structures shall be kept in a clean and tidy condition at all times. No rubbish or debris of any kind shall be placed or permitted to accumulate upon or adjacent to any Dwelling Unit so as to render any such property or any portion thereof, or activity thereon, unsanitary, unsightly, offensive or detrimental to any other portion of the Properties. No other nuisance shall be permitted to exist or operate upon any Dwelling Unit so as to be offensive or detrimental to any other portion of the Properties. No activities shall be conducted upon or adjacent to any Dwelling Unit or within improvements constructed thereon which are or might be unsafe or hazardous to any Person or property. No open fires shall be lighted or permitted on the Properties, except in a barbecue unit while attended and in use for cooking purposes or within a safe and well designed interior fireplace. No Owner shall engage in any activity which materially disturbs or destroys the vegetation, wildlife, or air quality within the Properties or which result in unreasonable levels of sound or light pollution. The determination as to whether a condition or activity violates this section shall be made by the Board acting in its sole discretion.

10.7 Antennae. Standard TV antennas and other over-the-air reception devices (including satellite dishes) of less than one (1) meter in diameter shall be permitted upon the Properties. **All other antennae, signal transmission devices or signal reception devices are prohibited.** Location and installation of permitted devices shall comply with any and all Design Guidelines, or other applicable rules and guidelines adopted pursuant to Article IX; provided, however, that such rules or regulations do not unreasonably delay or increase the cost of installing, maintaining, or using such devices. Declarant and the Association shall have the right, without obligation, to erect an aerial, satellite dish, or other apparatus (of any size) for a master antenna, cable, or other communication system for the benefit of all or any portion of Southern Springs, should any master system or systems require such exterior apparatus.

10.8 Fences and Dog Runs. No wall, dog run, animal pen, or fence of any kind shall be constructed on any Dwelling Unit, except as approved in accordance with **Article IX.**

10.9 Exterior Lighting. Except for seasonal holiday decorative lights, which may be displayed between November 15 and January 15 only, all exterior lights must be approved in accordance with **Article IX** of this Declaration.

10.10 Temporary Structures. Tents, shacks, or other structures of a temporary nature shall not be permitted on any Dwelling Unit, except as approved in accordance with **Article IX** or as may be authorized by the Declarant during initial construction within the Properties. Temporary structures used during the construction or repair of a Dwelling Unit or other improvements shall be removed immediately after the completion of construction or repair.

10.11 Storage. Placement or storage of furniture, fixtures, appliances, machinery, equipment or other goods and chattels on the Common Area is prohibited. Placement or storage of furniture, fixtures, appliances, machinery, equipment or other goods and chattels not in active use on any portion of a Dwelling Unit which is visible from outside the Dwelling Unit shall not be permitted, except as approved in accordance with **Article IX.** Storage buildings, sheds, and any other structures detached from the primary residential dwelling are prohibited.

10.12 Subdivision of Dwelling Unit and Time-Sharing. No Dwelling Unit shall be subdivided or its boundary lines changed except with the prior written approval of the Board; provided, however, the Declarant, its successors and assigns hereby expressly reserve the right unilaterally to subdivide, change the boundary line of, and re-plat any Dwelling Unit(s) owned by Declarant, its successors and assigns during the Development Period.

No Dwelling Unit shall be made subject to any type of timesharing, fraction-sharing, or similar program whereby the right to exclusive use of the Dwelling Unit rotates among members of the program on a fixed or floating time schedule over a period of years. However, the Declarant hereby reserves the right for itself and its assigns to operate such a program.

10.13 Firearms/Fireworks. The discharge of firearms or fireworks within the Properties is prohibited. The term "firearms" includes "B-B" guns, pellet guns, paintball markers, and other firearms of all types, regardless of size. Nothing herein shall be construed to prohibit the Declarant or the Association from using portions of the Common Area from time to time to put on a fireworks show.

10.14 Wetlands, Lakes, and Other Water Bodies. The lakes, ponds, streams and other water bodies within the Properties are primarily aesthetic and intended for limited uses such as recreational fishing, canoeing, and kyacking, pursuant to rules and regulations established by the Board. **Fossil fuel powered boats, water craft, and vessels of any type are expressly prohibited.** In addition, use of lakes, ponds, streams, or other water bodies within the Properties is expressly restricted by separate governmental regulations, restrictions, agreements, and ordinances, all of which must be observed by all Persons who make use of the lakes, ponds, streams, or other water bodies within the Properties, as those governmental regulations,

restrictions, agreements, and ordinances may be changed from time to time. The Association shall not be responsible for any loss, damage, or injury to any person or property arising out of any use of lakes, ponds, streams or other bodies of water within or adjacent to the Properties.

10.15 Business Use and Leasing. No commercial activity, business trade, or similar activity shall be conducted in or from any Dwelling Unit, except that an Owner or Resident may conduct ancillary business activities within the Dwelling Unit so long as: (a) the existence or operation of the business activity is not apparent or detectable by sight, sound, or smell from outside the Dwelling Unit; (b) the business activity conforms to all zoning requirements for the Properties; (c) the business activity does not involve regular visitation of the Dwelling Unit by clients, customers, suppliers, or other business invitees or door-to-door solicitation of residents of the Properties; and (d) the business activity is consistent with the residential character of the Properties and does not constitute a nuisance, or a hazardous or offensive use, or threaten the security or safety of other residents of the Properties, as may be determined in the sole discretion of the Board. "Business and trade" shall be construed to have their ordinary, generally accepted meanings and shall include, without limitation, any occupation, work, or activity undertaken on an ongoing basis which involves the provision of goods or services to Persons other than the family of the producer of such goods or services and for which the producer receives a fee, compensation, or other form of consideration, regardless of whether (a) such activity is engaged in full or part time, (b) such activity is intended to or does generate a profit, or (c) a license is required.

This Section shall not apply to any activity conducted by the Declarant or a Builder approved by the Declarant with respect to its development and sale of the Properties or its use of any Dwelling Units which it owns within the Properties, including the operation of a timeshare or similar program.

The leasing of a Dwelling Unit shall not be considered a business or trade within the meaning of this subsection. "Leasing," for purposes of this Declaration, is defined as occupancy of a Dwelling Unit by any person other than the Owner, for which the Owner receives any consideration or benefit, including, but not limited to, a fee, service, gratuity, or emolument. Dwelling Units may be leased only in their entirety. No fraction or portion of any Dwelling Unit may be leased or rented. There shall be no subleasing of Dwelling Units or assignment of leases unless prior written approval is obtained from the Board. All leases shall be in writing and shall contain such terms as the Board may prescribe from time to time. All leases shall provide that they may be terminated in the event of a violation of the Governing Documents by a tenant or a tenant's family, guests or invitees, and the Board, in its discretion, may require termination by the Owner and eviction of the tenant in such event.

All leases shall be for an initial term of no less than six (6) months, except: (a) with the prior written consent of the Board or (b) as initially authorized by Declarant in a Supplemental Declaration for certain Dwelling Units. The Owners may not amend this provision to prohibit leasing of Dwelling Units authorized by Declarant for rental to transient tenants and for a term less than six (6) months until the end of the Development Period. Any Owner who leases a Dwelling Unit pursuant to the authority set forth herein is specifically referred to **Section 10.1** which, among other things, regulates signage in connection with the leasing of Dwelling Units.

Notice of any lease, together with a complete copy of the lease and such additional information as may be required by the Board, shall be given to the Board by the Dwelling Unit Owner within ten (10) days of execution of the lease. The Owner must make available to the lessee copies of the Governing Documents. The Board may adopt reasonable rules regulating or restricting leasing and subleasing.

The barter, sale, or exchange of new or used personal property at any Dwelling Unit (by way of description and not limitation, such events are commonly referred to as "yard sales," "moving sales," "attic sales," or "garage sales") will be allowed only if (a) sponsored by the Association, or (b) expressly authorized in writing by the Association. The Association may, but it is not required to, adopt rules and regulations regarding such sales.

In addition to any other remedy to which the Association is entitled, in the event of a violation of this Section 10.15, or upon the violation of any provision of the Governing Documents by any occupant, family member, pet, guest or invitee to a leased Dwelling Unit, the Association may, at the sole option and discretion of the Board, terminate the lease of the Dwelling Unit and commence an eviction proceeding in a court of competent jurisdiction located in Maury County, Tennessee. In any such proceeding, the Association shall be entitled to a judgment against the Owner and all adult occupants of the Dwelling Unit for the Association's expenses of enforcement of the Governing Documents (whether incurred before, during or after any litigation) including without limitation the Association's reasonable attorney's fees.

10.16 <u>Occupancy</u>. Dwelling Units shall not be occupied by more than two (2) persons per bedroom in the Dwelling Unit.**NO DWELLING UNIT SHALL BE USED FOR HOTEL, TEMPORARY OR TRANSIENT HOUSING.**

10.17 <u>Trash Containers and Collection</u>. No garbage or trash shall be placed or kept on any Dwelling Unit, except in covered containers of a type, size and style which are approved in accordance with **Article IX** or as required by the applicable governing jurisdiction and, if applicable, the private collection contractor. In no event shall such containers be maintained so as to be visible from outside the Dwelling Unit unless they are being made available for collection and then only for the shortest time reasonably necessary to effect such collection. All rubbish, trash, or garbage shall be removed from the Dwelling Units and shall not be allowed to accumulate thereon. No outdoor incinerators shall be kept or maintained on any Dwelling Unit.

10.18 <u>Clothes Drying Facilities</u>. Outside clotheslines or other outside facilities for drying or airing clothes shall not be erected, placed or maintained on any Dwelling Unit and no clothes, sheets, blankets or laundry of any kind shall be hung outside on any portion of the Properties.

10.19 <u>Snowmobiles, ATV's, and Unlicensed Motorized Vehicles Regulated</u>. The operation of snowmobiles, ATV's or other unlicensed or motorized vehicles within the Properties is prohibited except as expressly permitted in writing by the Board.

10.20 Unlawful Acts or Omissions. Any act or omission which is in violation of any law, code, ordinance, governmental rule or regulation, shall not be done, permitted or allowed to remain or continue.

10.21 Bird and Squirrel Houses. No Dwelling Unit shall be allowed to have more than three (3) bird houses and/or feeders. Permitted bird houses and feeders shall all be hung from an approved structure or mounted on a single pole. In no event shall any permitted bird house or feeder be hung or mounted higher than the height of the eave of the residence on the Dwelling Unit. With the exception of the foregoing, residents shall not house or feed wildlife or create or maintain conditions or structures which attract wildlife to the Properties.

10.22 Flagpoles. No Dwelling Unit shall be allowed to have a free standing flagpole of any type. Flags on Dwelling Units must be flown only on poles mounted to the side of the residence by a bracket. Notwithstanding the forgoing, one portable, removable United States flag may be displayed in a respectful manner and consistent with 36 U.S.C. Sections 171-178, as amended, on each Dwelling Unit.

10.23 Above-Ground Pools. The installation of an above-ground swimming pool (perimeter extended higher than surrounding, natural grade) on any Dwelling Unit is prohibited. The foregoing does not apply to indoor or outdoor jacuzzis and hot-tubs included within a deck, screened from view from neighboring Dwelling Units and installed with the prior approval in accordance with **Article IX**.

10.24 Irrigation/Wells. No sprinkler or irrigation system of any type which would draw water from creeks, streams, rivers, lakes, ponds, wetlands, canals or other ground or surface waters within the Properties shall be installed, constructed or operated within the Properties. All sprinkler and irrigation systems shall be subject to approval in accordance with **Article IX** of this Declaration. Private wells are prohibited on the Properties. The provisions of this Section shall not apply to wells or irrigation systems installed or authorized by Declarant or Maury County.

10.25 Drainage-and Septic Systems. Catch basins and drainage areas are for the purpose of natural flow of water only. No obstructions or debris shall be placed in these areas. No Person other than Declarant may obstruct or re-channel the drainage flows after location and installation of drainage swales, storm sewers, or storm drains. Declarant hereby reserves a perpetual easement across the Properties for the purpose of altering drainage and water flow; provided, such easement right shall not be exercised in such a manner as to unreasonably interfere with the use of any Dwelling Unit without the affected Owner's consent. Private septic or sewage disposal systems are prohibited on the Properties.

10.26 Air Conditioning Units. Except as may be permitted by the Board or its designee, no window air conditioning units or window fans may be installed in any Unit.

10.27 Artificial Vegetation, Exterior Sculpture, and Similar Items. No artificial vegetation shall be permitted on the exterior of any portion of the Properties. Exterior sculpture, fountains, flags, and similar items must be approved in accordance with **Article IX** of this Declaration. Notwithstanding the forgoing, one portable, removable United States flag may be



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 77 of 126 PageID #: 82

displayed in a respectful manner and consistent with 36 U.S.C. Sections 171-178, as amended, on each Dwelling Unit.

## ARTICLE XI
## EASEMENTS

11.1 Easements of Encroachment. The Declarant reserves to itself and grants to the Association and to each Dwelling Unit reciprocal appurtenant easements of encroachment, and for maintenance and use of any permitted encroachment, between each Dwelling Unit and any adjacent Common Area and between adjacent Dwelling Units due to the unintentional placement or settling or shifting of the improvements constructed, reconstructed, or altered thereon (in accordance with the terms of these restrictions) to a distance of not more than three (3) feet, as measured from any point on the common boundary along a line perpendicular to such boundary. However, in no event shall an easement for encroachment exist if such encroachment occurred due to willful and knowing conduct on the part of, or with the knowledge and consent of, the Person claiming the benefit of such easement.

11.2 Easements for Utilities.

(a) There are hereby reserved to the Declarant during the Development Period, and granted to the Association, and the designees of each (which may include, without limitation, any governmental or quasi-governmental entity and any utility company) perpetual non-exclusive easements upon, across, over, and under all of the Properties to the extent reasonably necessary to install, replace, repair, and maintain internet wiring, cable, fiber optic cable and related equipment, cable television systems, master television antenna systems, security and similar systems, roads, walkways, bicycle pathways, trails, lakes, ponds, wetlands, drainage systems, street lights, signage, and all utilities, including, but not limited to, water, sewers, meter boxes, telephone, gas, and electricity. The Declarant and/or the Association may assign these rights to any local utility supplier, cable company, security company or other company providing a service or utility to the Properties subject to the limitations herein.

This easement shall not entitle the holders to construct or install any of the foregoing systems, facilities, or utilities over, under or through any Dwelling Unit, and any damage to a Dwelling Unit resulting from the exercise of this easement shall promptly be repaired by, and at the expense of, the Person exercising the easement. The exercise of this easement shall not unreasonably interfere with the use of any Dwelling Unit and, except in an emergency, entry onto any Dwelling Unit shall be made only after reasonable notice to the Owner or Resident.

Declarant specifically grants to the local utility suppliers easements across the Properties for ingress, egress, installation, reading, replacing, repairing, and maintaining utility meters and boxes. However, the exercise of this easement shall not extend to permitting entry into the structures on any Dwelling Unit, nor shall any utilities be installed or relocated on the Properties, except as approved by the Board or Declarant.



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 78 of 126 PageID #: 83

(b) There is hereby reserved to the Declarant during the Development Period, the non-exclusive right and power to grant such specific easements as may be necessary, in the sole discretion of Declarant, in connection with the orderly development of any real estate described on Exhibits A or B.

11.3 Easements to Serve Additional Property. During the Development Period, the Declarant hereby reserves for itself and its duly authorized agents, representatives, and employees, successors, assigns, licensees, and mortgagees, an easement over the Common Area for the purposes of enjoyment, use, access, and development of the real estate described in Exhibit B, whether or not such real estate is made part of the Properties. This easement includes, but is not limited to, a right of ingress and egress over the Common Area for construction of roads and for connecting and installing utilities on such property. Declarant agrees that it and its successors or assigns shall be responsible for any damage caused to the Common Area as a result of vehicular traffic connected with development of such real estate. Declarant further agrees that if the easement is exercised for permanent access to such real estate and such real estate or any portion thereof benefitting from such easement is not made subject to this Declaration, the Declarant, its successors or assigns shall enter into a reasonable agreement with the Association to share the cost of any maintenance which the Association provides to or along any roadway providing access to such real estate.

11.4 EasementsforDeclarantSignage. The Declarant may reserve, grant or establish easements over the Common Areas for the purpose of constructing, installing and maintaining signage to advertise, promote or provide information regarding the Properties or any other neighborhood, development or real property owned or under development by the Declarant at any other location. During the Declarant Control Period, the Declarant shall have the right to require the Board of the Association to execute and record easements in favor of the Declarant for such purposes.

11.5 Easements for Cross-Drainage. The Declarant hereby reserves for itself and grants to the Association that an easement across every Dwelling Unit and all Common Area for natural drainage of storm water runoff from other portions of the Properties; provided, no Person shall alter the natural drainage on any Dwelling Unit to increase materially the drainage of storm water onto adjacent portions of the Properties without the consent of the Owner(s) of the affected property, the Board, and, during the Development Period, the Declarant.

11.6 Right of Entry. The Declarant hereby grants to the Association an easement of access and right, but not the obligation, to enter all portions of the Properties, including each Dwelling Unit, for emergency, security, and safety reasons. Such right may be exercised by the authorized agents of the Association, its Board, officers, or committees, and by all police officers, fire fighters, ambulance personnel, and similar emergency personnel in the performance of their duties. Except in emergencies, entry into a structure on a Dwelling Unit shall be only during reasonable hours and after notice to and permission from the Owner thereof, which shall not be unreasonably withheld. This easement includes the right to enter any Dwelling Unit to cure any condition which increases the risk of fire or other hazard if an Owner fails or refuses to cure the condition within a reasonable time after request by the Board, but does not authorize

entry into any structure on a Dwelling Unit without permission of the Owner, except by emergency personnel acting in their official capacities.

11.7 Easements for Maintenance and Enforcement. The Declarant hereby grants to the Association and its authorized agents, a perpetual easement and right to enter all portions of the Properties, including each Dwelling Unit to (a) perform its maintenance responsibilities under **Article V**, and (b) make inspections to ensure compliance with the Governing Documents. Except in emergencies, entry into a structure on a Dwelling Unit shall be only during reasonable hours and after notice to and permission from the Owner which shall not be unreasonably withheld. This easement shall be exercised with a minimum of interference to the quiet enjoyment to Owners' property, and any damage shall be repaired by the Association at its expense.

The Declarant grants to the Association an easement and the right to enter a Dwelling Unit to abate or remove, using such measures as may be reasonably necessary, any structure, thing or condition which violates the Governing Documents. All costs incurred, including reasonable attorneys' fees, shall be assessed against the violator as a Benefitted Assessment.

11.8 Easements for Exterior Landscaping and Maintenance. The Declarant hereby grants to the authorized agents of the Association the right to enter upon those portions of the Dwelling Unit outside of the home thereon to furnish services required or permitted to be furnished by the Association hereunder or under any Supplemental Declaration. Any damage caused by the exercise of this Easement shall be repaired by the Association at its expense.

11.9 Rights to Stormwater Runoff, Effluent and Water Reclamation. Declarant hereby reserves for itself and its designees all rights to ground water, surface water, storm water runoff, and effluent located or produced within the Properties, and each Owner agrees, by acceptance of a deed to a Dwelling Unit, that Declarant shall retain all such rights. Such rights shall include the reservation of an easement over the Properties for access, and for installation and maintenance of facilities and equipment to capture and transport such water, runoff, and effluent. This Section may not be amended without the consent of the Declarant or its successor, and the rights created in this Section shall survive termination of this Declaration.

11.10 Easements for Freestanding Retaining Walls. Declarant reserves to itself and grants to the Association a perpetual easement over all Easement Areas located on Dwelling Units for the purpose of maintenance, repair, and replacement of the freestanding retaining walls constructed by the Declarant. An "Easement Area," as defined herein, shall include all portions of each Dwelling Unit which provide any stability and/or support for a wall or which would affect or impact a wall if modified, changed or disturbed. Each Easement Area shall extend for a minimum distance of twenty feet (20') in every direction from each retaining wall, and shall include the area necessary to provide reasonable access from a public street to each retaining wall. The Easement Area shall burden any Dwelling Unit a portion of which falls within the Easement Area, including those that may be necessary for access to a retaining wall located on another Dwelling Unit. No person shall make any additions, changes, or modifications to any freestanding retaining wall or within any Easement Area, as defined herein, without first submitting a written request and obtaining written authorization from the Reviewing Entity as

provided in **Article IX** of this Declaration. As provided in **Section 9.4**, the Reviewing Entity may require an Owner to obtain and provide a professional engineering report and/or a certificate or opinion from a professional engineer for the benefit of the Association, with respect to all or a portion of the Regulated Work, that the proposed addition, change, modification, or other activity will not adversely load or affect the freestanding retaining wall, its stability or support, the geogrid surrounding it, or the drainage or surface water flow around the wall or within the Easement Area. The Board is specifically authorized to adopt rules and regulations with respect to these freestanding retaining walls, the Easement Areas, to address the unique circumstances and characteristics of each wall, and the potential impact of changes thereto or in the vicinity thereof.

11.11 Easements Appearing on the Plats. Declarant hereby reserves, for the benefit of itself, its successors in interest and assigns, and grants to the Association, its successors and assigns, the following nonexclusive perpetual easements over certain areas of the Property as shown on the Plats:

(a) "Storm Drainage Easements" (SDE) and "Public Drainage Easements" (PDE) to provide for the conveyance of water through the storm water control and management system for the Property.

(b) "Sanitary Sewer Easements" (SSE) for installation, maintenance of pipes, pumps, equipment or facilities for the conveyance and disposal of sewage and solid waste.

(c) "Landscape Easements" for the installation, maintenance and replacement of trees, shrubs and other vegetation and landscaping improvements and to allow access to these areas for these purposes.

(d) "Irrigation Easements"for the installation, maintenance, repair and replacement of irrigation system pipes, pumps, equipment and other components and to provide access to these areas for this purpose.

Owners shall not install, construct or place any structure, fence, wall or other property or improvement within any of these easements which hinders access to or use of the easement by the Declarant or the Association or which may hinder, prevent or interfere with the functioning of the easement for its intended purpose, including, without limitation, action which alters or impedes the flow of surface water. Owners in violation of this section shall be fully and solely responsible for all costs and expenses incurred by the Declarant or the Association as a result.

## ARTICLE XII
## MORTGAGEE PROVISIONS

The following provisions are for the benefit of holders, insurers and guarantors of first Mortgages on Dwelling Units in the Properties. The provisions of this Article apply to both this Declaration and to the By-Laws, notwithstanding any other provisions contained therein.

12.1 Notices of Action. An institutional holder, insurer, or guarantor of a first Mortgage who provides written request to the Association (such request to state the name and address of such holder, insurer, or guarantor and the street address of the Dwelling Unit to which its Mortgage relates, thereby becoming an "Eligible Holder"), will be entitled to timely written notice of:

(a) Any condemnation loss or any casualty loss which affects a material portion of the Properties or which affects any Dwelling Unit on which there is a first Mortgage held, insured, or guaranteed by such Eligible Holder;

(b) Any delinquency in the payment of assessments or charges owed by a Dwelling Unit subject to the Mortgage of such Eligible Holder, where such delinquency has continued for a period of sixty (60) days, or any other violation of the Declaration or By-Laws relating to such Dwelling Unit or the Owner or Resident which is not cured within sixty (60) days;

(c) Any lapse, cancellation, or material modification of any insurance policy maintained by the Association; or

(d) Any proposed action which would require the consent of a specified percentage of Eligible Holders.

12.2 No Priority. No provision of this Declaration or the By-Laws gives or shall be construed as giving any Owner or other party priority over any rights of the first Mortgagee of any Dwelling Unit in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Area.

12.3 Notice to Association. Upon request, each Owner shall be obligated to furnish to the Association the name and address of the holder of any Mortgage encumbering such Owner's Dwelling Unit.

12.4 Failure of Mortgagee to Respond. Any Eligible Holder who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Association does not receive a written response from the Eligible Holder within thirty (30) days of the date of the Association's request, provided such request is delivered to the Elibible Holder by certified or registered mail, return receipt requested.

## ARTICLE XIII
## SPECIAL DECLARANT RIGHTS

13.1 Special Declarant Rights. The Declarant reserves the following rights and powers ("Special Declarant Rights"):

(a) The rights and powers designated herein as being rights and powers of the Declarant to be exercised, during the Development Period, including, without limitation, the following:

(i) To complete, modify, revise or eliminate any improvements indicated on Plats, development plans filed with the Declaration, or the Master Plan; or to modify the Master plan and/or Plats as reserved in **Sections 1.29** and **1.42**.

(ii) To add or withdraw real property from the terms of this Declaration as provided in **Article VII**;

(iii) To maintain sales offices, management offices, signs advertising on the property described on Exhibits A and B, as set forth in **Section 13.3**;

(iv) To use easements through the Common Area for the purpose of making improvements within the real property described on Exhibits A and B, as set forth in **Section 13.4**;

(v) To use the Common Area for special events as set forth in **Section 13.9** without the payment of any fee or charge;

(vi) To exercise architectural control, as set forth in **Article IX**; and

(vii) To furnish maintenance services, including, without limitation, watering of grass and other landscaping on portions of the Properties.

(viii) To unilaterally amend this Declaration as provided in **Section 16.2.**

(ix) To unilaterally transfer and convey Common Area to Association at any time without notice to and without the consent or approval of the Members as provided in **Section 1.12.**

(b) The rights and powers designated herein as being rights and powers of the Declarant to be exercised during the Declarant Control Period including, without limitation, the right and power to appoint and remove any director or officer of the Association as provided in the By-Laws.

13.2 <u>Transfer of Special Declarant Rights</u>.

(a) <u>Assignment</u>. The Declarant may assign any Special Declarant Rights, or other special rights and obligations of the Declarant set forth in this Declaration or the By-Laws to any affiliate of the Declarant or a Builder, or Declarant may allow any affiliate of the Declarant or a Builder to exercise such rights on behalf of the Declarant. The method of exercising such rights shall be subject to the agreement of the parties thereto, which shall not require recordation in the Public Records.

(b) Transfer. Any or all of the Special Declarant Rights, or any of the other special rights and obligations of the Declarant set forth in this Declaration or the By-Laws may be transferred in whole or in part to other Persons, provided that the transfer shall not reduce an obligation nor enlarge a right beyond that which the Declarant has under this Declaration or the By-Laws. No such transfer shall be effective unless it is in a written instrument signed by the Declarant and duly recorded in the Public Records.

13.3 Models, Sales Offices and Management Offices. During the Development Period and for the period of twelve (12) months thereafter, the Declarant and Builders authorized by Declarant may maintain and carry on upon any Dwelling Unit owned by Declarant or a Builder or any portion of the Common Area such facilities and activities as, in the sole opinion of the Declarant, may be reasonably required, convenient, or incidental to the construction or sale of Dwelling Units or other real estate, including, but not limited to, business offices, signs, model units, marketing trails, and sales offices. The Declarant and authorized Builders shall have easements for access to and use of such facilities. Except as provided below, the Declarant's or Builder's right to use the Common Area for purposes stated in this paragraph shall not be exclusive and shall not unreasonably interfere with use of such Common Area by Owners.

13.4 Construction of Improvements/Removal of Property. The Declarant and its employees, agents and designees shall also have a right and easement during the Development Period over and upon all of the Common Area for the purpose of (a) making, constructing and installing such improvements to the Common Area as it deems appropriate in its sole discretion or (b) removing peat moss, dirt, gravel, trees, bushes, or other landscaping, and other material as the Declarant deems appropriate in its sole discretion. The Declarant shall not be obligated to pay or otherwise account to the Association for any material removed from the Common Area under (b) above.

13.5 Other Covenants Prohibited. During the Development Period, no Person shall record any declaration of covenants, conditions and restrictions, or similar instrument affecting any portion of the Properties without Declarant's prior written consent. Any instrument recorded without such consent shall result in such instrument being void and of no force and effect unless subsequently approved in writing by the Declarant and recorded in the Public Records.

13.6 Master Planned Community. Each Owner, by accepting title to a Dwelling Unit and becoming an Owner, and each other Person, by acquiring any interest in the Properties, acknowledges awareness that Southern Springs is a master planned community, the development of which is likely to extend over many years, and agrees not to protest or otherwise object to (a) zoning or changes in zoning or to uses of, or changes in density of, the Properties during the Development Period, or (b) changes in any conceptual or master plan for the Properties, including, but not limited to, the Master Plan; provided, such revision is or would be lawful (including, but not limited to, lawful by special use permit, variance or the like) and is not inconsistent with what is permitted by the Declaration (as amended from time to time).

13.7 Explore Del Webb Homes. The Declarant may, in its discretion, construct residential improvements for temporary residency in or adjacent to the Properties and designate such improvements as "Explore Del Webb Homes." Explore Del Webb Homes located outside

of the Properties shall not be Dwelling Units hereunder, and their owners shall not be Members of the Association; provided, however, persons residing in such Explore Del Webb Homes shall have access to the Common Area in consideration of the payment of such fees as provided by a contract or a Covenant to Share Costs.

Owners of Explore Del Webb Homes located within the Properties shall be Members of the Association. The Declarant may transfer or lease Explore Del Webb Homes and/or make Explore Del Webb Homes available for use by guests selected in its discretion. Residents of the Explore Del Webb Homes shall have a non-exclusive easement for use, access, and enjoyment in and to the Common Area, including but not limited to any recreational facilities within the Common Area. The Board shall assign activity or use privilege cards to the Declarant on behalf of all owners of Explore Del Webb Homes for the purpose of exercising such easement. Explore Del Webb Homes shall remain Explore Del Webb Homes until the Declarant otherwise provides in written notice to the owner of such Explore Del Webb Homes and to the Association.

13.8 Equal Treatment. During the Development Period, the Association shall not, without the prior written consent of the Declarant, adopt any policy, rule or procedure that:

(a) Limits the access of the Declarant, its successors, assigns and/or affiliates or their personnel and/or guests, including visitors, to the Common Areas;

(b) Limits or prevents the Declarant, its successors, assigns and/or affiliates or their personnel from advertising, marketing or using the Association or its Common Areas in promotional materials;

(c) Limits or prevents purchasers of new residential housing constructed by the Declarant, any Builder, their successors, assigns and/or affiliates in Southern Springs from becoming members of the Association or enjoying full use of its Common Areas, subject to the membership provisions of this Declaration and the By-Laws;

(d) Impacts the ability of the Declarant, its successors, assigns and/or affiliates, to carry out to completion its development plans and related construction activities for Southern Springs, as such plans are expressed in the Master Plan, as such may be amended and updated from time to time. Policies, rules or procedures affecting the provisions of existing easements established by the Declarant and limiting the establishment by the Declarant of easements necessary to complete Southern Springs shall be expressly included in this provision. Easements that may be established by the Declarant shall include but shall not be limited to easements for development, construction and landscaping activities and utilities; or

(e) Impacts the ability of the Declarant, its successors, assigns and/or affiliates to develop and conduct customer service programs and activities in a customary and reasonable manner.

The Association shall not exercise its authority over the Common Areas (including, but not limited to, any gated entrances and other means of access to the

Properties or the Exhibit B property) to interfere with the rights of the Declarant set forth in this Declaration or to impede access to any portion of the Properties or the Exhibit B property over the streets and other Common Areas within the Properties.

13.9 Right to Use Common Area for Special Events. During the Development Period, the Declarant shall have the right to use all Common Area, including recreational facilities, for up to twelve (12) days each year to sponsor special events for charitable, philanthropic, political, or marketing purposes as determined by the Declarant in its sole discretion. Any event described in this **Section 13.9** shall be subject to the following conditions:

(a) the availability of the facilities at the time a request is submitted to the Association;

(b) the Declarant shall pay all costs and expenses incurred and shall indemnify the Association against any loss or damage resulting from the special event; and

(c) the Declarant shall return the facilities and personal property owned by the Association and used in conjunction with the special event to the Association in the same condition as existed prior to the special events.

The Declarant shall have the right to assign the rights contained in this **Section 13.9** to charitable organizations or foundations selected by the Declarant. The Declarant's right to use the Common Area for special events shall be enforceable by injunction, by any other remedy in law or equity, and by the terms of this Declaration.

13.10 Sales By Declarant. Notwithstanding the restriction set forth in **Section 2.6**, Declarant reserves the right to sell Dwelling Units to Persons between the ages of 50 and 55, inclusive years of age; provided, such sales shall not affect Southern Springs' compliance with all applicable state and federal laws under which the Properties may be developed and operated as an age-restricted community.

13.11 ActivityCardsforMarketingorPromotion. During the Development Period, the Declarant may, in its sole discretion, issue Activity Cards to persons or entities as part of its sales, marketing, or promotional activities.

## ARTICLE XIV
## DISPUTE RESOLUTION AND LIMITATION ON LITIGATION

14.1 Prerequisites to Actions Against Declarant. Prior to any Owner or the Association filing a civil action, undertaking any action in accordance with **Section 14.4**, or retaining an expert for any such action against Declarant or any Builder or subcontractor of any portion of Southern Springs, the Owner or the Board, as appropriate, shall notify and meet with the Members to discuss the alleged problem or deficiency. Moreover, prior to taking any action, the potential adverse party shall be notified of the alleged problem or deficiency and provided reasonable opportunity to cure the problem.

14.2 Consensus for Association Litigation. Except as provided in this Section after the Declarant Control Period, the Association shall not commence a judicial or administrative proceeding without first providing at least twenty-one (21) days written notice to its Members of a special meeting to consider such proposed action. Taking such action shall require the vote of Owners of seventy-five percent (75%) of the total number of Dwelling Units in the Association. This Section shall not apply, however, to (a) actions brought by the Association to enforce the Governing Documents (including, without limitation, the collection of assessments and the foreclosure of liens); (b) counterclaims brought by the Association in proceedings instituted against it; or (c) actions to protect the health, safety, and welfare of the Members. This Section shall not be amended unless such amendment is approved by the percentage of votes, and pursuant to the same procedures, necessary to institute proceedings as provided above.

14.3 Alternative Method for Resolving Disputes. Declarant, the Association, and their respective officers, directors, and committee members, all Persons subject to this Declaration, and any Person not otherwise subject to this Declaration who agrees to submit to this Article (collectively, "Bound Parties") agree to encourage the amicable resolution of disputes involving the Properties, without the emotional and financial costs of litigation. Accordingly, each Bound Party covenants and agrees that those claims, grievances, or disputes described in **Section 14.2** (Claims") shall be resolved using the procedures set forth in **Section 14.4** in lieu of filing suit in any court.

14.4 Claims. Unless specifically exempted below, all Claims arising out of or relating to the interpretation, application, or enforcement of the Governing Documents, or the rights, obligations, and duties of any Bound Party under the Governing Documents or relating to the design or construction of improvements on the Properties shall be subject to the provisions of **Section 14.5.**

Notwithstanding the above, unless all parties thereto otherwise agree, the following shall not constitute a Claim and shall not be subject to the provisions of **Section 14.5**:

(a) any suit, action or proceeding by the Association against any Bound Party to collect charges payable pursuant to the provisions of **Article VIII**, or to enforce the provisions thereof;

(b) any suit, action or proceeding by the Association to obtain a temporary restraining order (or equivalent emergency equitable relief) and such other ancillary relief as the court may deem necessary in order to maintain the status quo and preserve the Association's ability to enforce the provisions of **Article VII** and **Article XIII**;

(c) any suit between Owners, which does not include Declarant or the Association as a party, if such suit asserts a Claim which would constitute a cause of action independent of the Governing Documents;

(d) any suit by an Owner concerning the aesthetic judgment of the Modifications Committee, the Association, or Declarant pursuant to their authority and powers under **Article IX**;

(e) any suit in which any indispensable party is not a Bound Party;

(f) any internal administrative process for the possible imposition of fines or suspension of rights, services or privileges as provided under **Section 4.3**; and

(g) any suit as to which any applicable statute of limitations would expire within ninety (90) days of giving the Notice required by **Section 14.5(a)**, unless the party or parties against whom the Claim is made agree to toll the statute of limitations as to such Claim for such period as may reasonably be necessary to comply with this Article.

With the consent of all parties thereto, any of the above may be submitted to the alternative dispute resolution procedures set forth in **Section 14.5**.

14.5 Mandatory Procedures.

(a) Notice. Any Bound Party having a Claim ("Claimant") against any other Bound Party ("Respondent") (collectively, the "Parties") shall notify each Respondent in writing (the "Notice"), stating plainly and concisely:

(i) the nature of the Claim, including the Persons involved and Respondent's role in the Claim;

(ii) the legal basis of the Claim (i.e., the specific authority out of which the Claim arises);

(iii) Claimant"s proposed remedy; and

(iv) that Claimant will meet with Respondent to discuss good faith ways to resolve the Claim.

(b) Negotiation and Mediation. The Parties shall make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation. If requested in writing, accompanied by a copy of the Notice, the Board may appoint a representative to assist the Parties in negotiation.

If the Parties do not resolve the Claim within thirty (30) days of the date of the Notice (or within such other period as may be agreed upon by the Parties) ("Termination of Negotiations"), Claimant shall have thirty (30) additional days to submit the Claim to mediation under the auspices of an independent agency providing dispute resolution services in the Middle Tennessee area.

If Claimant does not submit the Claim to mediation within such time, or does not appear for the mediation, Claimant shall be deemed to have waived the Claim, and Respondent shall be released and discharged from any and all liability to Claimant on account of such Claim; provided, nothing herein shall release or discharge Respondent from any liability to any Person other than the Claimant.

Any settlement of the Claim through mediation shall be documented in writing by the mediator and signed by the Parties. If the Parties do not settle the Claim within thirty (30) days after submission of the matter to the mediation, or within such time as determined by the mediator, the mediator shall issue a written notice of termination of the mediation proceedings. The notice of termination of mediation shall set forth that the Parties are at an impasse and the date that mediation was terminated.

14.6 Allocation of Costs of Resolving Claims. Each Party shall bear its own costs, including attorneys' fees, and each Party shall share equally all charges rendered by the mediator.

14.7 Enforcement of Resolution. After resolution of any Claim through negotiation or mediation, if any Party fails to abide by the terms of any agreement, then any other Party may file suit or initiate administrative proceedings to enforce such agreement without the need to comply with the procedures set forth in **Section 14.5** or **Section 14.2**. In such event, the Party taking action to enforce the agreement shall be entitled to recover from the non-complying Party (or if more than one (1) non-complying Party, from all such Parties pro rata) all costs incurred in enforcing such agreement, including, without limitation, attorneys' fees and court costs.

14.8 Attorneys' Fees. In the event of an action or proceeding instituted to enforce any of the obligations and provisions contained in the Governing Documents, the party prevailing in such action shall be entitled to recover from the other party thereto as part of the judgment, reasonable attorneys' fees and costs, including administrative and lien fees, of such action or proceeding. In the event the Association is a prevailing party in such action, the amount of such attorneys' fees and costs awarded against an Owner shall also be a Benefitted Assessment under **Section 8.8(c)** with respect to that Owner's Dwelling Unit(s).

## ARTICLE XV
## PRIVATE AMENITIES

15.1 Right to Use. Access to and use of the Private Amenities, if any, are strictly subject to the rules and procedures of the Private Amenities, and no Person automatically gains any right to enter or to use those facilities by virtue of membership in the Association, ownership of a Dwelling Unit, or occupancy of a Dwelling Unit.Rights to use the Private Amenities will be granted only to such persons, and on such terms and conditions, as may be determined by their respective owners. Such owners shall have the right, from time to time in their sole and absolute discretion and without notice, to amend or waive the terms and conditions of use of their respective Private Amenities and to terminate use rights altogether, except as may be provided in a restrictive covenant recorded against the Private Amenity for the benefit of Owners hereunder.

The ownership or operational duties of and as to the Private Amenities may change at any time and from time to time by virtue of, but without limitation, (a) the sale to or assumption of operations by an independent entity, (b) conversions of the membership structure to an "equity" club or similar arrangement whereby the members of a Private Amenity or an entity owned or controlled thereby become the owner(s) and/or operator(s) of the Private Amenity, or (c) the conveyance of a Private Amenity to one (1) or more subsidiaries, affiliates, shareholders, employees, or independent contractors of the Declarant. No consent of the Association, or any owner shall be required to effectuate such a transfer or conversion.

Except as expressly provided herein, no representations or warranties, either written or oral, have been or are made by the Declarant or any other Person with regard to the nature or size of improvements to, or the continuing ownership or operation of the Private Amenities. No purported representation or warranty, written or oral, in conflict with this Section shall be effective without an amendment to this Declaration executed or joined into by the Declarant or the owner(s) of the Private Amenities which are the subject thereof.

15.2 Assumption of Risk and Indemnification. Each Owner, by its purchase of a Dwelling Unit, hereby expressly assumes the risk of noise, personal injury or property damage caused by maintenance and operation of any Private Amenity.Each such Owner agrees that neither Declarant, the Association nor any of Declarant's affiliates or agents shall be liable to any Owner or any other person claiming any loss of damage, including, without limitation, indirect, special or consequential loss or damage arising from personal injury, destruction of property, trespass, loss of enjoyment or any other alleged wrong or entitlement to remedy based upon, due to, arising from or otherwise related to any Private Amenity, its maintenance, use or operation including, without limitation, any claim arising in whole or in part from the negligence of Declarant, any of Declarant's affiliates or agents or the Association. The Owner hereby agrees to indemnify and hold harmless Declarant, Declarant's affiliates and agents, and the Association against any and all claims by Owner's visitors, tenants and others upon such Owner's Dwelling Unit or the Properties at the request of Owner or with Owner's consent.

15.3 View Impairment. None of the Declarant, the Association, or the owner or operator of any Private Amenity guarantees or represents that any view over and across any Private Amenity from Dwelling Units will be preserved without impairment. No provision of this Declaration shall be deemed to create an obligation of the Association, the owner of any Private Amenity, nor the Declarant to prune or thin trees or other landscaping except as provided in **Article V**. The owner of any Private Amenity may, in its sole and absolute discretion, add trees and other landscaping to such Private Amenities from time to time. Any such additions or changes to Private Amenities may diminish or obstruct any view from the Dwelling Units and any express or implied easements for view purposes or for the passage of light and air are hereby expressly disclaimed.

15.4 (Reserved)

15.5 Limitations on Amendments. In recognition of the fact that the provisions of this Article are for the benefit of the Private Amenities, no amendment to this Article, and no

amendment in derogation of any other provisions of this Declaration benefitting any Private Amenity, may be made without the written approval of the owner of the Private Amenities affected thereby. The foregoing shall not apply, however, to amendments made by the Declarant.

## ARTICLE XVI

## GENERAL PROVISIONS

16.1 Term. Unless otherwise provided by Tennessee law, in which case such law shall control, this Declaration shall run with the land and have perpetual duration. This Declaration may be terminated only by an instrument signed by Owners of at least ninety percent (90%) of the total Dwelling Units within the Properties and, during the Development Period, the Declarant, which instrument is recorded in the Public Records. Nothing in this Section shall be construed to permit termination of any easement created in this Declaration without the consent of the holder of such easement.

16.2 Amendment. During the Declarant Control Period, Declarant may unilaterally amend this Declaration. After the Declarant Control Period, other than amendments which may be executed unilaterally by the Declarant during the Development Period in the exercise of its Development Rights, this Declaration may be amended only by the affirmative vote or written consent, or any combination thereof, of sixty-seven percent (67%) of the total vote in the Association, and the consent of the Declarant during the Development Period.

After the Declarant Control Period, but during the Development Period, the Declarant may unilaterally amend this Declaration if such amendment is necessary (i) to bring any provision into compliance with any applicable governmental statutes, rule, regulation, or judicial determination; (ii) to enable any reputable title insurance company to issue title insurance coverage on the Dwelling Units; (iii) to enable any institutional or governmental lender, purchaser, insurer or guarantor of mortgage loans, including, for example, the Fannie Mae or Federal Home Loan Mortgage Corporation, to make, purchase, insure or guarantee mortgage loans on the Dwelling Units; (iv) to enable any reputable private insurance company to insure mortgage loans on the Dwelling Units; (v) to satisfy the requirements of any local, state or federal governmental agency for the development, marketing, and sale of Dwelling Units or (vi) to correct errors, or resolve inconsistencies or ambiguities in this Declaration or any Exhibit hereto or any Supplemental Declaration.

Notwithstanding the above, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause. Amendments to this Declaration shall be prepared, executed, recorded and certified by the President of the Association.

No amendment may remove, revoke, or modify any right or privilege of the Declarant without the written consent of the Declarant during the Development Period.



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 91 of 126 PageID #: 96

If an Owner consents to any amendment to this Declaration or the By-Laws, it will be conclusively presumed that such Owner has the authority to consent, and no contrary provision in any Mortgage or contract between the Owner and a third party will affect the validity of such amendment. The affirmative vote or written consent of any one (1) Owner of a Dwelling Unit shall be deemed sufficient to constitute approval unless another Owner of the same Dwelling Unit objects or dissents in writing prior to the deadline established for votes to be cast or consents to be obtained.

Any amendment shall become effective upon recording in the Public Records, unless a later effective date is specified in the amendment. Any procedural challenge to an amendment must be made within one (1) year of its recordation or such amendment shall be presumed to have been validly adopted. In no event shall a change of conditions or circumstances operate to amend any provisions of this Declaration.

16.3 Severability. Invalidation of any provision of this Declaration, in whole or in part, or any application of a provision of this Declaration by judgment or court order shall in no way affect other provisions or applications.

16.4 Cumulative Effect; Conflict. The provisions of this Declaration shall be cumulative with any additional covenants and restrictions provided for in any Supplemental Declaration, and the Association may, but shall not be required to, enforce such additional covenants and restrictions. Nothing herein shall preclude any Supplemental Declaration or other recorded covenants and restrictions applicable to any portion of the Properties from containing additional restrictions or provisions which are more restrictive than the provisions of this Declaration, and the Association shall have the standing and authority to enforce the same.

16.5 Use of the Words "Southern Springs." No Person shall use the words Southern Springs or any derivative in any printed or promotional material without the Declarant's prior written consent. However, Owners may use the terms "Southern Springs" in printed or promotional matter where such term is used solely to specify that particular property is located within Southern Springs and the Association shall be entitled to use the words Southern Springs in its name.

16.6 Del Webb Marks. Any use by the Association of names, marks or symbols of Del Webb Corporation or any of its affiliates (collectively "Del Webb Marks") shall inure to the benefit of Del Webb Corporation and shall be subject to Del Webb Corporation's periodic review for quality control. The Association shall enter into license agreements with Del Webb Corporation, terminable with or without cause and in a form specified by Del Webb Corporation in its sole discretion, with respect to permissive use of certain Del Webb Marks. The Association shall not use any Del Webb Mark without Del Webb Corporation's prior written consent.

16.7 Compliance. Every Owner and Resident of any Dwelling Unit shall comply with this Declaration, the By-Laws, and the rules of the Association. Failure to comply shall be grounds for an action to recover sums due, for damages or injunctive relief, administrative imposition of fines and suspension of services or privileges provided in **Section 4.3** or for any

other remedy available at law or in equity, by the Association or, in a proper case, by any aggrieved Dwelling Unit Owner(s), subject, however, to the provisions of **Article XIV**.

16.8 Notice of Sale or Transfer of Title. Any Owner desiring to sell or otherwise transfer title to his or her Dwelling Unit shall give the Board prior written notice of the name and address of the purchaser or transferee, the date of such transfer of title, and such other information as the Board may reasonably require. The transferor shall continue to be jointly and severally responsible with the transferee for all obligations of the Owner of the Dwelling Unit, including assessment obligations, until the date upon which such written notice is received by the Board, notwithstanding the transfer of title. The transferor shall also provide the transferee with a copy of this Declaration and any Supplemental Declaration applicable to the Dwelling Unit transferred before the sale is closed or the transfer finalized.

IN WITNESS WHEREOF, the Declarant herein hereby executes this instrument under seal, this 19th day of December, 2016.

**DECLARANT**

PULTE HOMES TENNESSEE LIMITED PARTNERSHIP
A Nevada Limited Partnership

By: [signature]
Todd Doupona

Title: Director of Land Development (Nashville Division)
Radnor Homes, Inc., a Michigan corporation, General Partner of Pulte Homes Tennessee Limited Partnership

STATE OF TENNESSEE )
COUNTY OF Williamson )

Before me, the undersigned Notary Public in and for the County and State aforesaid, personally appeared Todd Doupona, with whom I am personally acquainted (or upon proof to me of satisfactory evidence), and acknowledged himself to be Director of Land Development of the Nashville Division of Radnor Homes, Inc., a Michigan corporation, that is the General Partner of Pulte Homes Tennessee Limited Partnership, a Nevada limited partnership which is the within named bargainor, and that he as such Director of Land Development of the Nashville Division of the General Partner, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing his name as Director of Land Development of the Nashville Division of the General Partner.

Witness my hand and seal, this 19th day of December, 2016.

[signature]
Notary Public
COMMISSION EXPIRES 9/24/2017

JILL LEE STATE OF TENNESSEE NOTARY PUBLIC WILLIAMSON COUNTY

## EXHIBIT A

### (Initial Property Subjected to Declaration)

Being all of the property depicted on the Final Plat for Southern Springs Phases 1 & 2 recorded in Book P21, page113, Register's Office for Maury County, Tennessee.

Being a portion of the same property conveyed to Pulte Home Corporation by deed recorded in Book R2346, page 632, Register's Office for Maury County, Tennessee.

**EXHIBIT B**

**(Additional Property Which May Be Subjected to Declaration)**

Any real property located within three (3) miles of any part of the Properties.

# CHARTER
# OF
# SOUTHERN SPRINGS HOMEOWNERS ASSOCIATION, INC.

Pursuant to the provisions of Section 48-52-101 of the Tennessee Nonprofit Corporation Act, as amended, the undersigned incorporator delivers the following charter for filing with the Secretary of State:

## ARTICLE 1
Name

The name of the corporation is Southern Springs Homeowners Association, Inc. (the "Association")

## ARTICLE 2
Mutual Benefit

The corporation is a mutual benefit corporation and is not organized for profit.

## ARTICLE 3
Principle Office

The address of the principal office of the corporation in the State of Tennessee is c/o Pulte Homes Tennessee Limited Partnership, 370 Mallory Station Road, Suite 500, Franklin, Williamson, County, Tennessee 37067.

## ARTICLE 4
Registered Agent and Office

The address of the registered office of the corporation shall be Pulte Homes Tennessee Limited Partnership, 370 Mallory Station Road, Suite 500, Franklin, Williamson County, Tennessee 37067. The registered agent at that office shall be Todd Doupona.

## ARTICLE 5
Purposes and Powers

In way of explanation and not of limitation, the purposes for which the Association is formed are:

(A) to be and constitute the Association to which reference is made in the Declaration of Covenants, Conditions and Restrictions for Southern Springs, as may now exist and as might have already or may hereafter by amended (hereinafter the "Declaration"), establishing a plan of development and being initially recorded in the Register's Office for Maury County, Tennessee, to perform all obligations and duties of the Association, and to exercise all rights and powers of the

EXHIBIT C

Association, as specified therein, in the Bylaws of the Association (the "Bylaws"), and as provided by law; and

(B) to provide an entity for the furtherance of the interests of the Owners of Dwelling Units in Southern Springs;

(C) to be and constitute a homeowners association within the meaning of Section 528 of the Internal Revenue Code of 1986.

In furtherance of its purposes, the Association shall have the following powers, which, unless indicated otherwise by the Declaration or Bylaws, may be exercised by the Board of Directors:

(a) all of the powers conferred upon nonprofit corporations by common law and the statutes of the State of Tennessee in effect from time to time;

(b) all of the powers necessary or desirable to perform the obligations and duties and to exercise the rights and powers set out in this Charter, the Bylaws, or the Declaration, including, without limitation, the following:

(i) to fix and to collect assessments or other charges to be levied against the properties subject to the Declaration;

(ii) to manage, control, operate, maintain, repair and improve the Common Area and facilities, and property subsequently acquired by the Association, or any property owned by another, for which the Association, by rule, regulation, declaration, or contract, has a right or duty to provide such services;

(iii) to enforce covenants, conditions, or restrictions affecting any property to the extent the Association may be authorized to do so under any Declaration or Bylaws;

(iv) to engage in activities which will actively foster, promote, and advance the common interests of all Owners of Dwelling Units in Southern Springs;

(v) to buy or otherwise acquire, sell, or otherwise dispose of, mortgage, or otherwise encumber, exchange, lease, hold, use, operate, and otherwise deal in and with real, personal, and mixed property of all kinds and any right or interest therein for any purpose of the Association;

(vi) to borrow money;

(vii) to enter into, make, perform, or enforce contracts of every kind and description, and to do all other acts necessary, appropriate, or advisable in carrying out any purpose of the Association, with or in association with any other association, corporation, or other entity or agency, public or private;

(viii) to act as agent, trustee, or other representative of other corporations, firms, or individuals, and as such to advance the business or ownership interest in such corporations, firms, or individuals;

(ix) to adopt, alter, and amend or repeal such Bylaws as may be necessary or desirable for the proper management of the affairs of the Association; provided, however, such Bylaws may not be inconsistent with or contrary to any provisions of the Declaration; and

(x) to provide any and all supplemental municipal services as may be necessary or proper.

The foregoing enumeration of powers shall not limit or restrict in any manner the exercise of other and further rights and powers which may now or hereafter be allowed or permitted by law; and the powers specified in each of the paragraphs of this Article 5 are independent powers, not to be restricted by reference to or inference from the terms of any other paragraph or provision of this Article 5.

## ARTICLE 6
Membership

The Association shall be a membership corporation without certificates or shares of stock. The Association shall have Members, and all Dwelling Unit Owners, by virtue of their ownership of Dwelling Units subject to the Declaration, shall be Members of the Association. The Association shall have one class of membership as set forth in the Declaration. The Members shall be entitled to vote for each Dwelling Unit in which they hold the interest required for membership, in accordance with the Declaration and in the Bylaws. Membership shall be appurtenant to and may not be separated from ownership of a Dwelling Unit.

## ARTICLE 7
Board of Directors

The business and affairs of the Association shall be governed by a board of directors, the number, qualification and method of election of which shall be as set forth in the Declaration and in the Bylaws. The Board may delegate such operating authority to such companies, individuals, or committees as it, in its discretion, may determine. The initial Board of Directors shall be composed of the following individuals:

Todd Doupona
370 Mallory Station Road, Suite 500
Franklin, Tennessee 37067

Will Coles
370 Mallory Station Road, Suite 500
Franklin, Tennessee 37067

Lori Hinesley
370 Mallory Station Road, Suite 500
Franklin, Tennessee 37067

## ARTICLE 8
Indemnification

The Association shall indemnify, to the fullest extent permitted by the Tennessee Nonprofit Corporation Act, any person who has been made, or is threatened to be made, a party to an action, suit, or proceeding, whether civil, criminal, administrative, investigative, or otherwise (including an action, suit or proceeding by or in the right of the Association), by reason of the fact that the person is or was a director or officer of the Association. In addition, the Association shall pay for or reimburse any expenses incurred by such persons who are parties to such proceedings, in advance of the final disposition of such proceedings, to the full extent permitted by the Tennessee Nonprofit Corporation Act.

## ARTICLE 9
Liability of Directors

To the fullest extent that the Tennessee Nonprofit Corporation Act, as it exists on the date hereof or as it may hereafter be amended, permits the limitation or elimination of the liability of directors, no director of the Association shall be personally liable to the Association or its members for monetary damages for breach of duty of care or other duty as a director. No amendment to or repeal of this Article shall apply to or have any effect on the liability or alleged liability of any director of the Association for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal. Any repeal or modification of this Article shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director of the Association with reference to any event or events preceding or state of facts existing at the time of such repeal or modification.

## ARTICLE 10
Dissolution

The Association may be dissolved as by law provided pursuant to resolution duly adopted by the Board of Directors with the assent given in writing and signed by not less that two-thirds (2/3) of each class of Members. Upon the dissolution of the corporation, all assets of the corporation shall be distributed to a public body or non-profit organization with purposes similar to those of the corporation. Such organization to be chosen by the Board of Directors of the corporation as part of the plan of dissolution of the corporation.

## ARTICLE 11
Amendments

This Charter may be amended pursuant to resolution duly adopted by the Board of Directors, and by at least two-thirds (2/3) of the votes which Members present in person or by proxy at a duly called meeting are entitled to cast; provided, however, that no amendment shall be in conflict with the Declaration, and provided further that no Members (unless otherwise required by applicable provisions of the Tennessee Nonprofit Association Act) shall be entitled to vote on amendments to this Charter which are enacted for the sole purpose of complying with the requirements of the Federal Housing Authority, the Department of Veterans Affairs, the Federal National Mortgage Association or the Federal Home Loan Mortgage Association, or any other governmental or quasi-governmental entity authorized to fund or guarantee mortgages on individual residences, as such requirements may exist from time to time, which amendments may be adopted at a meeting of the Board of Directors alone upon receiving the vote of a majority of the Directors then in office.

## ARTICLE 12
Incorporator

The name and address of the incorporator is

Alvin L. Harris
201 Fourth Avenue North, Suite 1930
Nashville, Tennessee 37219

## ARTICLE 13
Definitions

Unless otherwise defined herein, the words used in this Charter shall have the same meaning as set forth in the Declaration.

[SIGNATURE ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned, having capacity to contract and acting as the Incorporator under the Tennessee Nonprofit Corporation Act, submits the foregoing Charter for Southern Springs Homeowners Association, Inc.

Dated this 18th day of October, 2016.

Alvin L. Harris, Incorporator

# BY-LAWS

# OF

# SOUTHERN SPRINGS HOMEOWNERS ASSOCIATION, INC.

EXHIBIT D

**BY-LAWS**

**OF**

**SOUTHERN SPRINGS HOMEOWNERS ASSOCIATION, INC.**

## ARTICLE 1
## Name, Principal Office, and Definitions

1.1 Name. The name of the association shall be Southern Springs Homeowners Association, Inc. (hereinafter referred to as the "Association").

1.2 Principal Office. The principal office of the Association shall be located in Davidson County, State of Tennessee. The Association may have such other offices as the Board may determine or as the affairs of the Association may require.

1.3 Definitions. The words used in these By-Laws shall be given their normal, commonly understood definitions. Capitalized terms shall have the same meaning as set forth in the office of the Register of Deeds or Davidson County, Tennessee ("Declaration"), unless the context indicates otherwise.

1.4 Purpose. The purpose of the Association shall be to own and operate the recreational and other common areas, to provide recreation facilities and activities, and to carry out other functions for the maintenance and governance of Southern Springs, an age-restricted community for fifty-five (55) and older.

## ARTICLE II
## Association: Membership, Meetings, Quorum, Voting, Proxies

2.1 Membership. Every Owner shall be a Member of the Association. The provisions pertaining to membership in the Declaration are incorporated herein by this reference.

2.2 Place of Meetings. Meetings of the Association shall be held within the Properties or at such other suitable place within Davidson County, State of Tennessee as may be designated by the Board.

2.3 Annual Meetings. The initial annual meeting of the Members of the Association ("Initial Meeting") shall be held within thirty (30) days after the end of the Declarant Control Period. After the Initial Meeting, regular annual meetings shall be set by the Board so as to occur at least thirty (30) days but not more than one hundred twenty (120) days before the close of the Association's fiscal year on a date and at a time set by the Board. During the Declarant Control Period informational meetings of the Members shall be held as provided in Section 3.4 of the Declaration.

2.4 Special Meetings. The President may call a special meeting of the Members. In addition, it shall be the duty of the President to call a special meeting if so directed by resolution of the Board or upon a petition signed by Voting Members representing at least twenty-five percent (25%) of the Dwelling Units.

2.5 Notice of Meetings. The Association's Secretary shall cause written notice stating the place, day, and hour of any Association meeting to be delivered by hand delivery or United State mail, postage prepaid, to each Member, or, if permitted by Tennessee law, by facsimile, computer, fiber optics, cable, or other similar communication devices, or such other manner which is reasonably calculated, as determined un the discretion of the Board, to provide personal notice to the Members entitled to notice. Such notice shall be delivered not less than ten (10) nor more than sixty (60) days before the date of such meeting, by or at the direction of the President or the Secretary of the officers or persons calling the meeting.

In the case of a special meeting or when otherwise required by statute or these By-Laws, the purpose or purposes for which the meeting is called shall be state in the notice. No other business shall be transacted at a special meeting except as stated in the notice.

If mailed, the notice of a meeting shall be deemed to be delivered when deposited in the United State mail addressed to the Member at his or her address as it appears on the Association's records, with postage prepaid. If sent by facsimile, computer, fiber optics, cable, email or such other similar communications device, notice shall be deemed to be delivered when transmitted to the Member at his or her address or number as it appears on the Association's records. The failure of any Member to receive actual notice of a meeting of the Members shall not affect the validity of any action taken at such meeting.

2.6 Waiver of Notice. Waiver of notice of a meeting of the Members shall be deemed the equivalent of proper notice. Any Voting Member may, in writing, waive notice of any meeting of the Voting Members, either before or after such meeting. Attendance at a meeting by a voting Member shall be deemed waiver buy such Voting Member of a notice of the time, date and place thereof, unless such Voting Member specifically objects to lack of proper notice at the time the meeting is called to order. Attendance at a special meeting also shall be deemed waiver of notice of all business transacted unless an objection on the basis of lack of proper notice is raised before the business is put to a vote.

2.7 Adjournment of Meetings. At any meeting of the Association, the Voting Members who represent a majority of the votes present at the meeting may adjourn the meeting to a different date, time, or place, and notice need not be given of the new date, time, or place, if the new date, time, or place is announced at the meeting before adjournment. At the reconvened meeting, if a quorum is present, any business may be transacted which might have been transacted at the meeting originally called. If a new date, time, and place for reconvening the meeting is not fixed by those in attendance at the original meeting or if for any reason a new date, time, or place is fixed for reconvening the meeting after adjournment, notice of the time and place for reconvening the meeting shall be given to Voting Members in the manner prescribed for regular meetings.

2.8 Attendance at Meetings/Voting. Any Member may be present at any meeting of the Members, but the voting rights shall be vested exclusively in the Voting Members; provided that during the Declarant Control Period, unless expressly provided in the Declaration or these By-Laws, all voting rights shall be bested exclusively in the Declarant and the Voting Members shall have no voting rights. From and after the end of the Declarant Control Period, each Voting Member shall be entitled to one (1) vote for each Dwelling Unit which the Voting Member represents. Any action which may be taken at any meeting of the Members may be taken without a meeting by written ballot as provided in Tenn. Code Ann. § 48-57-108.

2.9 Proxies. Voting Members may vote in person or by proxy. Each proxy shall be in writing, dated, signed and filed with the Secretary prior to the meeting for which it is to be effective. Proxies may be delivered to the Secretary by personal delivery, U.S. mail or telecopy to any Board member or the professional management agent, if any. Unless otherwise provided in the proxy, a proxy shall cover all votes which the Voting Member giving such proxy is entitled to cast, and in the event of any conflict between two (2) or more proxies purporting to cover the same voting rights, the later dated proxy shall prevail, or if dated as of the same date, both shall be deemed invalid. No proxy shall be valid more than eleven (11) months after its execution. Every proxy shall be revocable and shall automatically cease upon conveyance of the Dwelling Unit which the Voting Member represents.

2.10 Majority. As used in these By-Laws, the term "Majority" shall mean those votes, Owners, Voting Members, or other group, as the context may indicate, totaling more than fifty percent (50%) of the total eligible number.

2.11 Quorum. Except as otherwise provided in these By-Laws or in the Declaration, the presence of the Voting Members (in person or by proxy) representing at least ten percent (10%) of the total votes in the Association shall constitute a quorum at all meetings of the Association.

2.12 Conduct of Meetings. The President shall preside over all meeting of the Association, and the Secretary shall keep the minutes of meetings and all resolutions adopted at meetings.

## ARTICLE III
## Board of Directors: Number, Powers, Meetings

A. Composition and Selection.

3.1 Governing Body; Composition. The affairs of the Association shall be governed by a board of Directors (the "Board"), each member of which (a "Director") shall have one (1) equal vote. Except with respect to Directors appointed by the Declarant, each Director shall be an Owner, a Voting Member or a Resident of a Dwelling Unit who has completed, prior to being elected to the Board, such training and committee or other service requirements as established by the Board; provided, however, no more than one (1) representative from a Dwelling Unit may serve on the Board at the same time.

3.2 Directors During Declarant Control Period. During the Declarant Control Period, the Board shall consist of five (5) Directors unless and until it is enlarged to seven (7) Directors as

provided herein. All of the Directors shall be appointed by the Declarant acting in its sole discretion and shall serve at the pleasure of the Declarant. The Declarant may from time to time appoint one (1) or two (2) Owners to act as non-voting counselors to the Board or as voting members of the Board. In the event the Declarant appoints any Owners to serve on the Board, whether as non-voting or voting members, the number of Directors shall be increased from five (5) members to seven (7) members. The Declarant may remove any Owner appointed to serve on the Board in any capacity at any time, with or without cause.

3.3 Directors After Declarant Control Period. At the first annual meeting of the Association following the end of the Declarant Control Period, the Members shall elect seven (7) Board members, each to serve the term for which he or she is elected (or until a successor is elected and qualified) and each of whom must be a Member. Thereafter, the Board shall consist of not less than three (3) members nor more than seven (7) members as may be fixed or changed from time to time and within the minimum and maximum provided by a resolution of the Board. Elections of the Board shall be conducted so as to create staggered terms with two (2) classes of approximate equal size. Except as required to provide or maintain staggered terms as provided herein, each member of the Board shall serve a two (2) year term or until a successor is elected and qualified. Board members may succeed themselves in office.

3.4 Nomination of Directors. Except with respect to Directors appointed by the Declarant, nominations for election to the Board shall be made in accordance with the policies and procedures established, from time to time, by the Board. Such policies and procedures may include, but are not limited to, requiring a specified number of signatures as a precondition to appearing on the ballot or permitting nominations through a Nominating Committee.

For any election, the Board may, but shall not be obligated to, appoint a Nominating Committee. If appointed, the Nominating Committee shall consist of three (3) or more persons and a Chairperson, who shall be a member of the Board. The remaining members of the Nominating Committee shall be Members, Residents, or Voting Members.

3.5 Election and Term of Office. At the Initial Meeting of the Members, the Voting Members shall elect a full Board of seven (7) Directors. The four (4) candidates receiving the greatest number of votes shall each serve a two (2) years term and three (3) candidates receiving the next great number of votes shall each serve a one (1) year term. Thereafter, each Director shall serve a two (2) year term. Each Director shall hold office until his term expires or until his successor shall have been elected and qualified. Directors may succeed themselves in office, but no Director shall serve more than three (3) terms in succession. IN all elections for member of the Board, the Voting Member for each Dwelling Init shall be entitled to the number of votes equal to the number of Directors to be elected (cumulative voting shall not be permitted).

3.6 Removal of Directors/Vacancies.

(a) Any Director, other than a Director appointed by the Declarant, may be removed, with or without cause, by action of the Voting Members. Any Director whose removal is sought shall be given notice prior to any meeting called and noticed for that purpose. Upon removal of a Director,

a successor shall be elected by the Voting Members to fill the vacancy for the remainder of the term of such Director.

(b) Any Director who has three (3) consecutive unexcused absences from Board meeting, or who is more than thirty (30) days delinquent in the payment of any assessment or other charge due the Association, may be removed by a majority of the Directors present at a regular or special meeting of the Board at which a quorum is present, and a successor may be appointed by the Board to fill the vacancy for the remainder of the term.

(c) In the event of death, disability, or resignation of a Director, the Board may declare a vacancy and appoint a successor to fill the vacancy until the next annual meeting, at which time the Voting Members may elect a successor for the remainder of the term.

B. Meetings.

3.7 Place of Meetings. During the Declarant Control Period, meetings of the Board may be held inside or outside the state of Tennessee as determined by the Board. After the Declarant Control Period, all Board meetings will be held inside the State of Tennessee at locations determined by the Board.

3.8 Regular and Special Meetings. Regular meetings of the Board may be held at such time and place as the Board shall determine, but at least one (1) such meeting shall be held each quarter. Special meetings of the Board shall be held when requested by the President or a majority of the Directors.

3.9 Notice of Meetings. Notice of the time and place of a regular or special meeting shall be communicated to Directors as provided in this Section. The notice shall specify the time and place of the meeting, in the case of a special meeting, the nature of any special business to be considered. The notice shall be given to each Director by one (1) of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) telephone communication, either directly to a Director or to a person at the Director's office or home who would reasonably be expected to communicate such notice promptly to the Director; or (d) by facsimile, computer, fiber optics, or any such other communication device. All such notices shall be given at the Director's telephone or facsimile, or email number or sent to the Director's address as shown on the Association's records. Notice sent by first class mail shall be deposited into a United States mailbox not less than four (4) days before the time set for the meeting. Notices given by personal delivery, telephone, facsimile, or other device shall be delivered, telephoned, or transmitted at least seventy-two (72) hours before the time set for the meeting.

3.10 Waiver of Notice. The transactions of any meeting of the Board, however called and noticed or wherever held, shall be as valid as though taken at a meeting duly held after regular call and notice if (a) a quorum is present, and (b) either before or after the meeting each of the Directors not present signs a written waiver of notice, a consent to holding the meetings, or an approval of the minutes. The waiver of notice or consent need not specify the purpose of the meeting. Notice of a



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 107 of 126 PageID #: 112

meeting also shall be deemed given to any Director who attends the meeting without protesting before or at its commencement about the lack of adequate notice.

3.11 Quorum of Board of Directors. At all meeting of the Board, a majority of the Directors shall constitute a quorum for the transaction of business, and the votes of a majority of the Directors present at a meeting at which a quorum is present shall constitute the decision of the Board, unless otherwise specifically provided in these By-Laws or the Declaration. A meeting at which a quorum, is initially present may continue to transact business, notwithstanding the withdrawal of Directors, if any action taken is approved by at least a majority of the required quorum for that meeting. At any meeting of the Board, a majority of the Directors present at such meeting may adjourn the meeting to different date, time, or place, and notice need not be given of the new date, time, or place, if the new date, time, or place is announced at the meeting before adjournment. At the reconvened meeting, of a quorum is present, any business which might have been transacted at the meeting originally called may be transacted without further notice.

3.12 Compensation. No Director shall receive any compensation from the Association for acting as such; provided however, any Director may be reimbursed for expenses incurred on behalf of the Association upon approval of a majority of the other Directors. Nothing herein shall prohibit the Association from compensating a Director, or any entity with which a Director is affiliated, for services or supplies furnished to the Association in a capacity other than as a Director pursuant to a contract or agreement with the Association, provided that such Director's interest was made known to the Board prior to entering into such contract and such contract was approved by a majority of the Board, excluding the interested Director.

3.13 Conduct of Meetings. The President shall preside over all meetings of the Board, and the Secretary shall keep the minutes of meetings and all resolutions adopted at meetings.

3.14 Attendance at Meetings by Members: Members may attend meetings of the Board only if, and to the extent, permitted by the Board in its discretion. The Board shall hold informational meetings from time to time, but not less frequently than once each year, to which all Members shall be invited and at which the Board shall report to the Members on what the Board has worked on and accomplished since the preceding meeting and shall open the meeting for questions and comments from Members.

3.15 Action Without a Formal Meeting. Any action to be taken at a meeting of the Directors or any action that may be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Directors, and such consent shall have the same force and effect as a unanimous vote. Written consent or consents shall be filed with the minutes of the proceedings of the Board.

3.16 Telephonic Participation. One (1) or more Directors may participate in and vote during any regular or special meeting of the Board by telephone conference call or similar communication equipment by means of which all Persons participating in the meeting can hear each other at the same time, and those Directors so participating shall be present at such meeting. Any such meeting at which a quorum participates shall constitute a meeting of the Board.

C. Powers and Duties.

3.17 Powers. The Board shall have all of the powers and duties necessary and appropriate for the administration of the Association's affairs and or performing all responsibilities and exercising all rights of the Association as set forth in the Declaration, these responsibilities and exercising all rights of the Association as set forth in the Declaration, these By-Laws, the Articles, and as provided by law. The Board may do or cause to be done all acts and things as are not buy the Declaration, Articles, these By-Laws, or Tennessee law directed to be done and exercised exclusively by the Voting Members or the membership generally.

3.18 Duties. The duties of the Board shall include, without limitation:

(a) Preparation and adoption of budgets and assessments as provided in the Declaration;

(b) levying and collecting assessments from the Owners to fund the Common Expenses; and Limited Common Area Expenses;

(c) providing for the operation, care, upkeep, and maintenance of the recreational and other areas of common responsibility;

(d) providing for the recreation and social activities for the Members of the Association;

(e) designating, hiring, and dismissing the personnel (including, without limitation, an independent professional management company as provided in Section 3.20) necessary to carry out the rights and responsibilities of the Association and, where appropriate, providing for the compensation of such personnel and for the purchase of equipment, supplies, and materials to be used by such personnel in the performance of their duties;

(f) depositing all funds received on behalf of the Association in a bank depository which the Board shall approve and using such funds to operate the Association; provided, any reserve fund may be deposited, in the Director's best business judgment, in depositories other than banks;

(g) making and amending resolutions, rules and regulations and establishing penalties for infractions thereof;

(h) opening of bank accounts on behalf of the Association and designating the signatories required;

(i) making or contracting for the making of repairs, additions, and improvements to or alterations of the Common Area in accordance with the Declaration and these By-Laws;

(j) subject to limitations provided for in the Declaration, enforcing by legal means the provisions of the Declaration, these By-Laws, and the rules adopted by the Board and ringing any proceedings which may be instituted on behalf of or against the Owners concerning the Association;

(k) obtaining and carrying property, liability and commercial crime insurance, as provided in the Declaration, paying the cost thereof, and filing and adjusting claims, as appropriate;

(l) paying all taxes and/or assessments which are or could become a lien on the Common Area or a portion thereof;

(m) paying the cost of all services rendered to the Association or its Members and not chargeable directly to specific Owners;

(n) keeping books with detailed accounts of the receipts and expenditures of the Association;

(o) making available (at a reasonable cost) to any prospective purchaser of a Dwelling Unit, any Owner, and the holders, insurers, and guarantors of any Mortgage on any Dwelling Unit, current copies of the Declaration, the Articles, the By-Laws, rules and annual financial statements of the Association;

(p) permitting utility suppliers to use portions of the Common Area reasonably necessary to the ongoing development or operation of the Properties;

(q) indemnifying a Director, officer or committee member, or former Director, officer or committee member of the Association to the greatest extent such indemnity is permitted by Tennessee law, the Articles, or these By-Laws; and

(r) without a vote or approval of the Owners, conveying title to portions of the Common Area, or granting easements over, through or under the Common Area for purposes and on such terms as the Board reasonably believes to be in the best interests of the Association.

3.19 Right of the Declarant to Disapprove Actions. During the Development Period, the Declarant shall have a right to disapprove any action, policy or program of the Association, the Board and any committee which, in the judgment of the Declarant, would tend to impair rights of the Declarant or its designees under the Declaration or these By-Laws, or interfere with development, construction or marketing of any portion of the Properties, or diminish the level of services being provided by the Association. This right to disapprove is in addition to, and not in lieu of, any right to approve or disapprove specific actions of the Association, the Board or any committee as may be granted to the Declarant in the Declaration or these By-Laws. During the Development Period, the following shall apply:

(a) The Declarant shall be given written notice of all meetings of the Association, the Board or any committee thereof to be approved at such meetings or by written consent in lieu of a meeting. Such notice shall be given by certified mail, return receipt requested, by personal delivery at the address the Declarant has registered with the Secretary of the Association, as it may change from time to time, or by confirmed facsimile transmission at the facsimile number the Declarant has registered with the Secretary of the Association, as it may change from time to time, which notice complies with the requirements for Board meeting set forth I these By-Laws and which notice shall, except in the case of the regular meetings held pursuant to the By-Laws, set forth in reasonable particularity the agenda to be following at said meeting.

(b) The Declarant shall be given the opportunity at each such meeting to join in or to have its representatives or agents join in discussion from the floor of any prospective action, policy, or program which would be subject to the right of disapproval set forth herein. The Declarant, its representatives or agents may make its concerns, thoughts, and suggestions known to the Board and/or the members of the subject committee.

(c) No action, policy or program subject to the right of disapproval set forth herein shall become effective or be implemented until and unless the requirements of subsections (a) and (b) above have been met and the time period set forth in subsection (d) below has expired.

(d) The Declarant, acting through any officer or Director, agent or authorized representative, may exercise its right to disapprove at any time within ten (10) days following the meeting at which such action was proposed or, in the case of any action taken by written consent in lieu of a meeting, at any time within ten (10) days following receipt of written notice of the proposed action. This right to disapprove may be used to block proposed actions, buy shall not extend to the requiring of any action or counteraction on behalf of any committee, the Board, or the Association unless such action or counteraction countermands an action, policy or program that was not property noticed and implemented in accordance with these By-Laws. The Declarant shall not use its right to disapprove to reduce the level of services which the Association is obligated to provide or to prevent capital repairs or any expenditure required to comply with applicable laws and regulations.

3.20 Management. The Association does not have any compensated employees. The Board may, but shall not be required to, contract with a professional management company at an amount established by the Board to perform such duties and services as the Board shall authorize for the Association; provided, however, that during the Development Period the management company may not be terminated by the Board without the prior written consent of the Declarant. The Declarant, or an affiliate of the Declarant, may be employed as the management company. The Board may delegate to such management company such powers as are necessary to perform its assigned duties, but shall not delegate policy making authority. The Board may delegate to one (1) of its members the authority to act on behalf of the Board.

3.21 Accounts, Reports and Records. The Association shall maintain accounts, reports and records which are reasonable and appropriate for the Association in light of its fiscal operations and responsibilities and as may be required by the State of Tennessee Nonprofit Corporation Act and shall make those accounts, reports and records available to the Members as and to the extent provided under the Tennessee Nonprofit Corporation Act.

3.22 Borrowing. During the Declarant Control Period, the Declarant may borrow money for any legal purpose without a vote of or approval from the membership. After the Declaration Control Period,, the Association, acting through its Board, shall have the power to borrow money for any legal purpose; provided, the Board shall obtain the approval by vote or written consent of Voting Members representing at least a majority of the total votes if the proposed borrowing is for the purpose of making discretionary capital improvements or purchasing additional capital assets and the total amount of such borrowing, together with all other debt incurred within the previous twelve (12) month period, exceeds or would exceed ten (10%) of the budgeted gross Common Expenses of the Association for that fiscal year. No mortgage lien shall be placed on any portion of the Common

Area without the affirmative vote or written consent of Voting Members representing at least a majority of the total votes of Dwelling Units entitled to use such portion.

3.23 Rights of the Association. The Association shall have the right to contract with any Person for the performance of various duties and functions.

3.24 Enforcement.

(a) Notice. Except as otherwise provided in the Declaration, prior to imposition of any sanction as provided in the Declaration, the Board or, if so directed by the Board, the Covenants Committee, if any, is established by the Board pursuant to Article V, or the management agent shall serve the alleged violator with written notice including (i) the nature of the alleged violation, (ii) the proposed sanction to be imposed, (iii) a statement that the alleged violator may present a written request for a hearing to the Board or the Covenants Committee, if any, within fifteen (15) days of the notice; and a statement that the propertied sanction shall be imposed as contained in the notice unless a request for a hearing is received by the Board or the Covenants Committee, if any , within such time period. If a timely request for a hearing is not received by the Board or the Covenants Committee, if any, the sanction stated in the notice shall be imposed. Such suspension shall not constitute a waiver of the right to sanction future violations of the same or other provisions and rules by any Person.

(b) Hearing. If a hearing is requested within the allotted fifteen (15) day period, the hearing shall be held before the Covenants Committee, if any, or if none, before the Board in executive session. The alleged violator shall be afforded a reasonable opportunity to be heard.

(c) Appeal. If a hearing is held before a Covenants Committee, the violator shall have the right to appeal the decision to the Board. To perfect this right, a written notice of appeal must be received by the management agent, President, or Secretary of the Association within fifteen (15) days after the hearing date.

3.25 Board Standards. In the performance of their duties, Directors are subject to immunity from suit and insulation from liability provided for Directors of nonprofit corporation by Tennessee Law and as otherwise provided in the Governing Documents.

## ARTICLE IV
## Officers

4.1 Officers. The officers of the Association shall be a President, Vice President, Secretary, and Treasurer. The President, Vice President, Secretary, and Treasurer shall be elected from among the members of the Board; other officers may, but need not, be members of the Board. The Board may appoint such other officers, including one (1) or more Assistant Secretaries and one (1) or more Assistant Treasurers, as it shall deem desirable, such officers to have the authority and perform the duties prescribed by the Board. Any two (2) or more offices may be held by the same person, except the offices of President, Secretary and Treasurer.

4.2 Election and Term of Office. The officers of the Association shall be elected annually by the Board at the first meeting of the Board following the election of Board members.

4.3 Removal and Vacancies. Any officer may be removed by the Board at any time with or without cause. A vacancy in any office arising because of death, resignation, removal, or otherwise may be filled by the Board for the unexpired portion of the term.

4.4 Powers and Duties. The officers of the Association shall each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as may specifically be conferred or imposed by the Board. The President shall be the chief executive officer of the Association. The Vice President shall act in the President's absence and shall have all powers, duties and responsibilities provided for the President when so acting. The Secretary (or the managing agent) shall keep the minutes of all meetings of the Association and the Board and shall have charge of such books and papers as the Board may direct. In the Secretary's absence, any officer directed by the Board shall perform all duties incident to the office of secretary. The Treasurer shall have primary responsibility for the preparation of the budget as provided for in the Declaration and may delegate all or part of the preparation and notification duties to a finance committee, management agent, or both.

4.5 Resignation. Any officer may resign at any time by giving written notice to the Board, the President, or the Secretary. Such resignation shall take effect on the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

4.6 Agreements, Contracts, Deeds, leases, Checks, Etc. All agreements, contracts, deeds, leases, checks, and other instruments of the Association shall be executed by an officer or authorized agent of the Association, except that checks in the amount of $5,000.00 or more shall be signed by two (2) officers and/or authorized agents of the Association.

4.7 Compensation. Compensation of officers shall be subject to the same limitations as compensation of Directors under Section 3.12 hereof.

4.8 Officer Standards. In discharging his or her duties as an officer, the general standards of Tennessee law with respect to corporate officers shall apply.

## ARTICLE V
## Committees Designated by the Board

5.1 General. The Board may establish such committees and as it deems appropriate to perform such tasks and functions as the Board may designate by resolution. Committee members serve at the Board's discretion for such periods as the Board may designate by resolution; provided, however, any committee member, including the committee chair, may be removed by the vote of a majority of the Directors. Each committee shall operate in accordance with the terms of the resolution establishing such committee. During the Declarant Control Period, the Declarant shall have the right to dissolve any committee or to remove any member from any committee with or without cause and at its sole discretion.

5.2 Covenants Committee. In addition to any other committees which the Board may establish pursuant to Section 5.1, the Board may appoint a Covenants Committee consisting of at least three (3) and no more than seven (7) members. Acting in accordance with the provisions of the Declaration, these By-Laws, and resolutions the Board may adopt, the Covenants Committee, which, if established, shall be the hearing tribunal of the Association and shall conduct all hearings held pursuant to Section 3.24 of these By-Laws. The Board may also appoint a subcommittee consisting of at least three (3) and no more than seven (7) members to function as the jury or trier of facts for all hearing held pursuant to Section 3.24.

5.3 Modifications Committee. During the Declarant Control Period, the Board may but shall not be required to appoint a Modifications Committee, and the Declarant or the Board appointed by the Declarant pursuant to the provisions of Section 3.2 may serve as the Modifications Committee. After the Declarant Control Period, the Board shall appoint a Modifications Committee as provided in Section 9.2 of the Declaration.

## ARTICLE VI

## RESERVED

## ARTICLE VII
## Miscellaneous

7.1 Fiscal Year. The fiscal year of the Association shall be January 1 through December 31 unless otherwise established by Board Resolution.

7.2 Parliamentary Rules. Except as may be modified by Board resolution, Robert's Rules of Order Newly Revised, as published from time to time, shall govern the conduct of Association proceedings when not in conflict with Tennessee law, the Articles, the Declaration, or these By-Laws.

7.3 Conflicts. If there are conflicts between the provisions of Tennessee law, the Articles, the Declaration, and these By-Laws, the provisions of Tennessee law, the Declaration, the Articles, and the By-Laws (in that order) shall prevail.

7.4 Books and Records.

(a) Inspection by Members and Mortgagees. The Board shall make available for inspection and copying by any holder, insurer or guarantor of a first Mortgage on a Dwelling Unit, any Member, or the duly appointed representative of any of the foregoing at any reasonable time and for a purpose reasonably related to his or her interest in a Dwelling Unit: the Declaration, By-Laws, and Articles, any amendments to the foregoing, the rules of the Association, the membership register, the most recent Financial Statement, the current Budget, books of account, and the minutes of meetings of the Members, the Board, and committees and any other records or information which may be required to be made available under Tennessee law. The Board shall provide for such inspection to take place at the office of the Association or at such other place within the Properties as the Board shall designate.

(b) Rules for Inspection. The Board shall establish reasonable rules with respect to:

(i) Notice to be given to the custodian of the records;

(ii) Hours and days of the week when such an inspection may be made; and

(iii) Payment of the cost of reproducing copies of documents requested.

(c) Inspection by Directors. Every Director shall have the absolute right at any reasonable time to inspect all books, records, and documents of the Association and the physical properties owned or controlled by the Association. The right of inspection by a Director includes the right to make a copy of relevant documents at the expense of the Association in furtherance of such Director's duties as a Director.

7.5 Notices. Unless otherwise provided in these By-Laws, all notices, demands, bills, statements, or other communications under these By-Laws shall be in writing and shall be deemed to have been duly given if delivered personally or if sent by (1) email to an email address provided by the recipient or (2) United States mail, first class postage prepaid:

(a) If to a Member of Voting Member, at the address which the Member or Voting Member has designated in writing and filed with the Secretary or, if no such address has been designated, at the address of the Dwelling Unit of such Member or Voting Member; or

(b) if to the Association, the Board, or the managing agent, at the principal office of the Association or the managing agent, if any, or at such other address as shall be designated by notice in writing to the Members pursuant to this Section.

7.6 Indemnification. To the maximum extent permitted by Tennessee law, the Association shall indemnify any and all persons who may serve or who have served at any time as directors, officers or committee members of the Association against any and all liabilities claims, obligations,

costs and expenses (including without limitation amount paid upon judgments, counsel fees and amounts paid in settlement, whether before or after suit is commenced), actually and necessarily incurred by such persons in connection with the defense or settlement of any claim, action, suit or proceedings in which they, or any of them, are made parties, or a party, which may be asserted against them or any of them, by reason of being or having been directors, officers or committee members or a director, an officer or a committee member of the Association. Provided, however, that in the event of a settlement, the indemnification herein shall apply only when the Board approves such settlement as being in the best interest of the Association.

The provisions hereof shall be in addition to and not exclusive of any and all other rights to which any director, officer or committee member may otherwise be entitled under any law, the Governing Documents, vote of Members of the Association, or otherwise. In the event of the death of an officer, director or committee member, the provisions hereof shall extend to his or her legal heirs, representatives, successors and assigns. The foregoing rights shall be available whether or not such person or persons were in fact directors, officers or committee members at the time of incurring or becoming subject to such expenses, and whether or not the proceedings, claim, suit or action is based on matters which occur prior to the adoption of this bylaw. The invalidity or unenforceability of any provision of this bylaw shall not affect the validity or enforceability of any other provision hereof. The Association shall, as a Common Expenses, maintain adequate general liability insurance and Directors and Officer (D&O) insurance to fund this indemnity obligation, if such insurance is reasonably available; provided however, during the Declarant Control Period, the Association shall not be required to obtain or maintain Directors and Officers insurance coverage.

7.7 Amendment.

(a) By Declarant. Until termination of the Development Period, the Declarant may unilaterally amend these By-Laws for any purpose.

(b) By the Board. The Board shall be authorized to amend these By-Laws without the consent of the Members to correct scriveners' errors and other mistakes of fact, provided that any amendments under this provision have no material adverse effect on the rights of the Members. During the Development Period, any such amendments shall require the consent of the Declarant.

(c) By Members. Except as provided above, these By-Laws may be amended only by the affirmative vote or written consent, or any combination thereof, of Members holding at least a Majority of the total votes in the Association, and, during the Development Period, the written consent of the Declarant. Notwithstanding the above, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause.

(d) Validity and Effective Date. Any amendment to these By-Laws shall become effective upon recordation in the public records, unless a later effective date is specified in the amendment. Any procedural challenge to an amendment must be made within six (6) months of its recordation or such amendment shall be presumed to have been validly adopted. In no event shall a change of conditions or circumstances operate to amend any provisions of these By-Laws.

(e) Declarant Rights. No amendment may remove, revoke, or modify any right or privilege of the Declarant without the written consent of the Declarant, or the assignee of such right or privilege.

(f) Member Consent to Amendment. If a Member consents to any amendment to the Declaration or these By-Laws, it will be conclusively presumed that such Member has the authority to consent and no contrary provision in any Mortgage or contract between the Member and a third party will affect the validity of such amendment.

## CERTIFICATION

I hereby certify that the foregoing By-Laws were adopted by Southern Springs Homeowners Association, Inc. on the 17th day of October, 2016.

Officer Vice President
Officer Title

BK/PG: R2900/1274-1276
23001584
3 PGS:AL-RESTRICTIONS
NANCY BATCH: 297592 02/08/2023 - 09:40 AM

| | |
|---|---|
| VALUE | 0.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 15.00 |
| ARCHIVE FEE | 0.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| TOTAL AMOUNT | 17.00 |

STATE OF TENNESSEE, MAURY COUNTY
JOHN FLEMING
REGISTER OF DEEDS

This document prepared by:
Pulte Homes Tennessee Limited Partnership
100 Westwood Place, Suite 100
Brentwood, TN 37027

# SUPPLEMENTAL DECLARATION TO DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR SOUTHERN SPRINGS (ANNEXING PHASE 8)

This Supplemental Declaration to Declaration of Covenants, Conditions and Restrictions for Southern Springs ("Supplemental Declaration") is made and entered into as October 5, 2022 by Pulte Homes Tennessee Limited Partnership ("Declarant").

WITNESSETH:

WHEREAS, Declarant submitted certain property to the Declaration of Covenants, Conditions and Restrictions for Southern Springs of record in Book R2398, Page 55, Register's Office for Maury County, Tennessee (as subsequently amended and restated in Book R2409, Page 686, Register's Office for Maury County, Tennessee) (the "Declaration");

WHEREAS, pursuant to Article XII, Section 7.1 of the Declaration, Declarant has the right to subject to the provisions of the Declaration all or any portion of the Properties (as that term is defined in the Declaration); and

WHEREAS, Declarant desires to subject to the provisions of the Declaration the Property known as Southern Springs Phase 8 as more particularly described on Exhibit A, attached hereto and incorporated herein by this reference, and which is depicted on the Plat recorded in Book P23, Page 31, Register's Office for Maury County, Tennessee;

NOW, THEREFORE, for and in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Declarant, being empowered so to do hereby amends the Declaration as follows:

1. Amendment. The Declaration is amended to subject to the provisions of the Declaration the Property known as Southern Springs Phase 8 is more particularly described in Exhibit A and depicted on the Plat recorded in Plat Book P23, Page 31 in the Register's Office for Maury County, Tennessee.

Said property, being a portion of the same property conveyed to Declarant by deed recorded in Book R2582, Page 181, Register's Office for Maury County, Tennessee, is deemed submitted to



EXHIBIT
E

the provisions of the Declaration, effective upon the date of recordation of this instrument with the Register's Office of Maury County, Tennessee.

2. Ratification. In all other respects, the Declaration is ratified and confirmed.

IN WITNESS WHEREOF, Pulte Homes Tennessee Limited Partnership has caused this Supplemental Declaration to be executed as of the day and date first above written.

**DECLARANT**

PULTE HOMES TENNESSEE LIMITED PARTNERSHIP
A Nevada Limited Partnership

By: Pulte Homes Tennessee, Inc. (fka Radnor Homes, Inc.) a Michigan Corporation, General Partner of Pulte Homes Tennessee Limited Partnership

By: [signature]
Name: Kyle Carson
Title: Director of Finance (Nashville Division)

STATE OF TENNESSEE )
COUNTY OF WILLIAMSON )

Before me, the undersigned Notary Public in and for the County and State aforesaid, personally appeared Kyle Carson, with whom I am personally acquainted (or upon proof to me of satisfactory evidence), and acknowledged himself to be Director of Finance of the Nashville Division of Pulte Homes Tennessee, Inc. (fka Radnor Homes, Inc.), a Michigan corporation, that is the General Partner of Pulte Homes Tennessee Limited Partnership, a Nevada limited partnership which is the within named bargainor, and that he as such Director of Finance of the Nashville Division of the General Partner, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing his name as Director of Finance of the Nashville Division of the General Partner.

Witness my hand and seal, this 5th day of October, 2022.

Kimberly Maynard
Notary Public
My commission expires: 9-8-2025

KIMBERLY MAYNORD
STATE OF TENNESSEE NOTARY PUBLIC
DAVIDSON COUNTY
MY COMMISSION EXPIRES 9-8-2025

**EXHIBIT A**

Being all of the approximately 30.72 acres of property described and depicted as Southern Springs Phase 8 by Del Webb on the Plat recorded in Book P23, Page 31 with the Register's Office for Maury County, Tennessee, and being a portion of the same property conveyed to Declarant by deed recorded in Book R2582, Page 181 in the Register's Office for Maury County, Tennessee.

BK/PG: R3037/1332-1334
24017085
3 PGS:AL-RESTRICTIONS
JANE BATCH: 341988 12/20/2024 - 10:10 AM

| | |
|---|---|
| VALUE | 0.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 15.00 |
| ARCHIVE FEE | 0.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| TOTAL AMOUNT | 17.00 |

STATE OF TENNESSEE, MAURY COUNTY
JOHN FLEMING
REGISTER OF DEEDS

This document prepared by:
Pulte Homes Tennessee Limited Partnership
100 Westwood Place, Suite 100
Brentwood, TN 37027

# SUPPLEMENTAL DECLARATION TO DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR SOUTHERN SPRINGS (ANNEXING REVISION OF PHASE 1)

This Supplemental Declaration to Declaration of Covenants, Conditions and Restrictions for Southern Springs ("Supplemental Declaration") is made and entered into as of December 16, 2024 by Pulte Homes Tennessee Limited Partnership ("Declarant").

W I T N E S S E T H:

WHEREAS, Declarant submitted certain property to the Declaration of Covenants, Conditions and Restrictions for Southern Springs of record in Book R2398, Page 55, Register's Office for Maury County, Tennessee (as subsequently amended and restated in Book R2409, Page 686, Register's Office for Maury County, Tennessee) (the "Declaration");

WHEREAS, pursuant to Article XII, Section 7.1 of the Declaration, Declarant has the right to subject to the provisions of the Declaration all or any portion of the Properties (as that term is defined in the Declaration); and

WHEREAS, Declarant desires to subject to the provisions of the Declaration the Property known as Southern Springs Revision of Phase 1 as more particularly described on Exhibit A, attached hereto and incorporated herein by this reference, and which is depicted on the Plat recorded in Plat Book P23, Page 532, Register's Office for Maury County, Tennessee;

NOW, THEREFORE, for and in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Declarant, being empowered so to do hereby amends the Declaration as follows:

1. <u>Amendment</u>. The Declaration is amended to subject to the provisions of the Declaration the Property known as Southern Springs Revision of Phase 1 is more particularly described in Exhibit A and depicted on the Plat recorded in Plat Book P23, Page 532 in the Register's Office for Maury County, Tennessee.

Said property, being a portion of the same property conveyed to Declarant by deed recorded in Book R2346, Page 632, Register's Office for Maury County, Tennessee, is deemed submitted to

the provisions of the Declaration, effective upon the date of recordation of this instrument with the Register's Office of Maury County, Tennessee.

2. Ratification. In all other respects, the Declaration is ratified and confirmed.

IN WITNESS WHEREOF, Pulte Homes Tennessee Limited Partnership has caused this Supplemental Declaration to be executed as of the day and date first above written.

**DECLARANT**

PULTE HOMES TENNESSEE LIMITED PARTNERSHIP
A Nevada Limited Partnership

By: [signature]
Name: Kyle Carson
Title: VP Finance (Nashville Division)
Pulte Homes Tennessee, Inc. (fka Radnor Homes, Inc.) a Michigan Corporation, General Partner of Pulte Homes Tennessee Limited Partnership

STATE OF TENNESSEE )
COUNTY OF WILLIAMSON )

Before me, the undersigned Notary Public in and for the County and State aforesaid, personally appeared Kyle Carson, with whom I am personally acquainted (or upon proof to me of satisfactory evidence), and acknowledged himself to be VP Finance of the Nashville Division of Pulte Homes Tennessee, Inc. (fka Radnor Homes, Inc.), a Michigan corporation, that is the General Partner of Pulte Homes Tennessee Limited Partnership, a Nevada limited partnership which is the within named bargainor, and that he as such VP Finance of the Nashville Division of the General Partner, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing his name as VP Finance of the Nashville Division of the General Partner.

Witness my hand and seal, this 17 day of December, 2024.

[signature]
Notary Public
My commission expires: 4/10/2027

FARRAH BURGETT
STATE OF TENNESSEE NOTARY PUBLIC
COUNTY OF WILLIAMSON



Case 1:25-cv-00037 Document 1-1 Filed 05/30/25 Page 122 of 126 PageID #: 127
Book R3067 Page 1333

## EXHIBIT A

Being all of the approximately 1.043 acres of property described and depicted as Southern Springs Revision of Phase 1 on the Plat recorded in Plat Book P23, Page 532 with the Register's Office for Maury County, Tennessee, and being a portion of the same property conveyed to Declarant by deed recorded in Book R2346, Page 632 in the Register's Office for Maury County, Tennessee.

**Katie McCain**

[redacted]

---------- Forwarded message ---------
From: **Del Webb Southern Springs** <[redacted]>
Date: Fri, Aug 4, 2023 at 11:48 AM
Subject: Southern Springs HOA Transition Update
To: <[redacted]>

Del Webb Southern Springs

# Association News

*Posted by Board President (Kim Maynord) on Aug 04, 2023 11:47 am*

## Southern Springs HOA Transition Update

Dear Southern Springs Homeowners and Residents:

I hope that you have enjoyed your summer thus far and are looking forward to the months ahead that will hopefully bring some cooler temperatures our way. I wanted to take this time to reach out to you and give you an update on the current status of the Association.

The Southern Springs Community has officially started its journey toward the final stages of completion. As we draw closer to this



EXHIBIT
9

final stage in which all homes are closed and all property is officially transferred into the name of the HOA, the Board has begun discussions regarding the transition plan for the community. The transition plan will create the pathway in which the control and responsibilities of the governance of the Southern Springs Homeowners Association is transferred from the Developer's control to a homeowner-elected Board of Directors.

The timing of this official transition is unknown at this time due to the timing of the transfer of all common property and the closing of all the remaining planned lots for the community. These lots will also include those planned for the area underneath the sales center within the community. While we do not have the exact timing for the final transition at this time, I did want to communicate that we expect it to occur prior to year-end of 2024.

The Board will be working diligently on the plan through the end of 2023; and then will work in conjunction with both current and newly-created committees to carry out this plan once it is finalized.

I look forward to sharing more updates as the plan continues to progress and is finalized.

Your Southern Springs HOA Board President,

Kim Maynord

ACCESS THE NETWORK

Sincerely,
Southern Springs HOA

If you do not wish to receive these notifications, please update your notification preferences.

CERTIFIED MAIL

stamps.com

★ 1-UP Laser Form★
★USA CMF - 134 01/22★

$16.07[0]
US POSTAGE IMI
PRIORITY MAIL
COMMERCIAL
FROM 37027
05/01/2025
Stamps.com

063S0014950543

9402 7112 0620 8871 8636 78

CORPORATION SERVICE COMPANY
2908 POSTON AVE
NASHVILLE TN 37203-1312